COPY

1

1    IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF KANSAS

FILED

2                                      2003 FEB 28  P 12: 59

3

4    UNITED STATES OF AMERICA,      RALPH L. DELOACH
     ------------------ Plaintiff                  CLERK
                                    BY_____,DEPUTY
5         vs.                       AT TOPEKA.KS.
                                    )     Case No.
                                    )     00-40104-01/02
6    WILLIAM L. PICKARD and         )
     CLYDE APPERSON,                )
7    ------------------ Defendants.)

8

9                    TRANSCRIPT OF THE
     TESTIMONY OF MICHAEL BRIAN HOBBS HAD DURING THE
                       JURY TRIAL
10                       BEFORE
          HONORABLE RICHARD D. ROGERS
11             and a jury of 12
                        On
12             February 19, 2003

13   APPEARANCES:

14   For the Government:    Mr. Gregory G. Hough
                            Asst U.S. Attorney
15                          290 Federal Building
                            444 Quincy Street
16                          Topeka, Kansas   66683

17   For the Defendant:     Mr. William Rork
     (Pickard)              Rork Law Office
18                          1321 SW Topeka Blvd.
                            Topeka, Kansas   66603
19
     For the Defendant:     Mr. Mark Bennett
20   (Apperson)             Bennett, Hendrix & Moylan
                            5605 SW Barrington Ct. S.
21                          Topeka, Kansas   66614

22   Court Reporter:        Roxana S. Montgomery, CSR
                            Nora Lyon & Associates
23                          1515 South Topeka Avenue
                            Topeka, Kansas   66612

24

25

2886

COPY

2

1                           I   N   D   E   X

2      Certificate ------------------------------ 134

3

4                           W I T N E S S

5      ON BEHALF OF GOVERNMENT:                    PAGE

6      MICHAEL BRIAN HOBBS

7      Direct Examination by Mr. Hough              3
       Cross-Examination by Mr. Rork              88
8      Cross-Examination by Mr. Bennett          105
       Redirect Examination by Mr. Hough         123

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    MICHAEL BRIAN HOBBS,
 2          called as a witness on behalf of the Plaintiff,
 3          was sworn, and testified as follows:
 4                    DIRECT-EXAMINATION
 5          BY MR. HOUGH:
 6      Q.  Good morning, sir.
 7      A.  Good morning.
 8      Q.  Would you please tell us your name and spell
 9          your last name for the record?
10      A.  Michael Brian Hobbs, that's H-O-B-B-S.
11      Q.  Sir, you're here today--
12                    MR. RORK:  Excuse me, Mr. Pickard and
13          I would ask that we could perhaps move the
14          screen so we can see the witness.
15                    THE COURT:  Yes.
16      Q.  (By Mr. Hough)  Sir, you are here today
17          pursuant to a court order, a subpoena.  Is that
18          right?
19      A.  That's correct.
20      Q.  Do you have any type of an agreement or
21          understanding with the prosecution in return
22          for your testimony?
23      A.  Yes.  As far as I know I have an immunity
24          agreement.
25      Q.  And would you describe your understanding of
```

```
 1        that?
 2   A.   Basically, anything I say here that may tend to
 3        incriminate me in this instance will not.
 4   Q.   Okay.  And is that in the form of an oral
 5        understanding, or is there some written
 6        document?
 7   A.   There's a written document.
 8   Q.   Okay, and--
 9   A.   I believe it's a proffer.
10   Q.   And?
11               (THEREUPON, there was a conversation
12        in low tones between Mr. Hough and Agents
13        Nichols and Hanzlik.)
14   Q.   Did you hire an attorney and get some type of a
15        written proffer agreement at some point in
16        time?
17   A.   No, I just seen my name in a document.
18   Q.   Okay.  Was it in the form of a police report,
19        or was it in the form of something else?
20   A.   It was a written document that Todd Skinner
21        had.
22   Q.   Okay.  Are you referring to the immunity
23        agreement that Mr. Skinner had?
24   A.   Yes.
25   Q.   You did not personally get anything in addition
```

```
 1              to that.  Correct?
 2      A.   That's correct.
 3      Q.   Okay.  Sir, in the last ten years, have you
 4           used any type of a controlled substance other
 5           than a prescription medicine?
 6      A.   Yes, I have.
 7      Q.   And would you describe that for us, please?
 8      A.   Do you want me to just go through the list?
 9      Q.   Please.
10      A.   Let's see.  There's marijuana, hashish, LSD,
11           MDA, MDMA, DMT, 5-MEO, cocaine, let's see,
12           morphine, coffee, let's see.  There are
13           probably more.  LSD.  That's the ones that come
14           to mind.
15      Q.   Okay.  And when was the last time that you used
16           some controlled substance other than by a
17           prescription, prior to testifying today?
18      A.   Let's see, I drank alcohol last night, smoked
19           marijuana as I was leaving my house.
20      Q.   How long ago was that?
21      A.   That was three days ago.
22      Q.   Okay, and that's the last use of a controlled
23           substance, then?
24      A.   Yes.
25                   MR. BENNETT:  Judge, could we
```

1     approach the bench, please?

2              THE COURT:  Yes, you may.

3              (THEREUPON, the following proceedings

4     were held at the bench and outside of the

5     hearing of the jury.)

6              MR. BENNETT:  Judge, as I understand

7     the witness, he has no immunity agreement.

8     That's what I think I heard him say.

9              MR. HOUGH:  That's correct.  He has

10    no immunity agreement.

11             MR. BENNETT:  I think for the record

12    that the Court ought to instruct the witness or

13    advise the witness of his potential exposure

14    before he goes ahead and testifies.  It's not

15    my job to protect him, but I was a little

16    startled when he said he's relying on some

17    agreement that was made with Skinner, as I

18    understand it.

19             MR. HOUGH:  Judge, we have told him

20    that he would not be prosecuted for the

21    information that he provided in court relative

22    to this conspiracy and that he's in no trouble

23    as a result of that, and he's certainly not at

24    any exposure for casual drug use that would

25    have occurred in the state of California,

1       consistent with his testimony, that occurred

2       three days ago.  And, frankly, our line of

3       inquiry regarding this matter is over.

4               MR. RORK:  Well, Judge, I would just

5       ask on behalf of Mr. Pickard that the

6       government make that clear, then, for the jury

7       or for him that he's not being prosecuted for

8       anything he's saying here today rather than

9       leave him hanging.

10              MR. HOUGH:  I can do that.

11              MR. BENNETT:  Judge, what I don't

12      want to do is end up being precluded from

13      exploring fully anything and everything illegal

14      or potentially illegal that he has been

15      involved in, whether it has to do with this

16      conspiracy or some other potential illegal

17      activity.  It's my position that I ought to be

18      able to fully examine him, and I don't want to

19      be put in a position of having to be foreclosed

20      by virtue of there being some contention by

21      either the government or the witness that he's

22      not-- he doesn't have any immunity for this

23      and, therefore, wants to exercise his 5th

24      Amendment.  I think it would be improper for me

25      to ask him questions that would result in that

1    type of response from him about a 5th Amendment

2    privilege.

3        MR. HOUGH:  Judge, I can make the

4    record more clear when we step back down that

5    he won't be prosecuted for his personal drug

6    usage and that he won't be prosecuted for the

7    information that he has provided relative to

8    this LSD lab, and that should cure Mr.

9    Bennett's concerns.

10        MR. BENNETT:  Well, it will cure them

11    if I'm-- if what that means is I'm not going to

12    be foreclosed from a full cross-examination of

13    him with regard to any involvement that he's

14    had in any drug activity, whether it's moving

15    labs, or moving precursor, or whatever it might

16    be.

17        MR. HOUGH:  Well, I think that within

18    the ten year-- I mean, within the realm of

19    relevance, my question to the witness was back

20    ten years.  I think that counsel is free to

21    explore that.

22        MR. RORK:  And, Judge, I would just

23    add that perhaps the government should just

24    indicate to him that there's an agreement that

25    references testimony in this case, that absent

1    a serious capital offense, there would be no
2    prosecution, and just make it that simple or
3    that widespread.
4              MR. HOUGH:  Well, it's not that
5    widespread.  It's limited to personal drug use
6    and the information that he's provided relative
7    to the LSD lab.
8              MR. BENNETT:  Well, see--
9              MR. RORK:  That's the problem.
10             MR. BENNETT:  -- that's limiting it
11   now, and if he has been involved in some other
12   LSD lab or some mescaline manufacturing or some
13   DMT manufacturing, MDMA, or whatever it might
14   be on this base or any other base or in
15   conjunction with Mr. Skinner or anybody else, I
16   think I ought to be able to ask those
17   questions.  Now, from what I hear--
18             THE COURT:  Well, doesn't look to me
19   like the government's going to foreclose you
20   from asking any questions.
21             MR. HOUGH:  No.
22             MR. BENNETT:  With that last comment,
23   I thought he was.
24             MR. HOUGH:  No.
25             MR. BENNETT:  He was saying, well,

1          personal drug use and anything in regards to

2          this situation, and so that's my concern.  I

3          mean, I'd like to hear the man's testimony, but

4          if I don't want to then be somehow cut off from

5          going into any other potential transgressions

6          he's been involved in with Mr. Skinner or

7          anybody else.

8                    MR. RORK:  And, Judge, so you can

9          know, there is some information relative to him

10         with Mr. Skinner in manufacturing MDA and those

11         5-MTs and other entheogens.

12                    MR. HOUGH:  We have no intention of

13         prosecuting him for that, and we will clarify

14         that when we go back.

15                    THE COURT:  All right.  Well, let's

16         go ahead.

17                    MR. BENNETT:  Okay.

18                    (THEREUPON, there was a conversation

19         in low tones between the Court and the

20         Bailiff.)

21                    THE COURT:  Are you satisfied with

22         going ahead?

23                    MR. HOUGH:  Yes, sir.

24                    THE COURT:  All right, you may

25         proceed.

```
1    Q.  (By Mr. Hough)  Mr. Hobbs, in spite of the fact
2        that you don't have your own separate written
3        agreement, you have been informed that you will
4        not be prosecuted for any personal drug use or
5        personal drug manufacture relative to your
6        testimony here today.  Correct?
7    A.  That's correct.
8    Q.  And we have also informed you that you will not
9        be prosecuted for any information that you have
10       provided and will provide in this trial
11       relative to this LSD lab.  Correct?
12   A.  That is correct.
13   Q.  Okay, thank you.  Now, you indicated your
14       personal drug use a moment ago.  Has any of
15       that personal drug use affected your ability to
16       understand the questions that I'm asking?
17   A.  No, sir.
18   Q.  Has any of it affected your ability to
19       communicate answers in return to questions or
20       informed thoughts?
21   A.  No.
22   Q.  Now, you understand my questions now?
23   A.  Yes, I do.
24   Q.  Can you tell us, sir, do you know a man named
25       Todd Skinner?
```

```
1     A.   Yes, I do.

2     Q.   Can you tell us how you met Mr. Skinner?

3     A.   We both grew up in the same home town, in

4          Tulsa, Oklahoma.  My ex-wife was a masseuse,

5          and he was one of her clients, and we all went

6          out to dinner, and eventually I started working

7          for Gardner Springs.

8     Q.   And what is Gardner Spring?

9     A.   Gardner Springs is owned by his mother,

10         Katherine Magrini, and they manufacture coiled

11         springs.

12    Q.   When did you meet Mr. Skinner, approximately?

13    A.   Approximately 1990.

14    Q.   And how soon thereafter did you start working

15         at Gardner Springs?

16    A.   Probably about a year after that.

17    Q.   And at some point in time, then, did you move

18         to Kansas to work at Gardner Springs?

19    A.   Yes, I did.

20    Q.   When was that?

21    A.   That was when we first took other the facility,

22         approximately '96, end of '96.

23    Q.   So was there actually a viable Gardner Springs

24         business going on at Wamego?

25    A.   Yes, there was.
```

```
1    Q.  During what period of time?
2    A.  It took a while to convert it to a usable
3        facility, so probably about '98 is when we were
4        fully operational.
5    Q.  And how long did it maintain operations?
6    A.  Approximately two years.
7    Q.  What was your job at Gardner Springs?
8    A.  I began there in the shipping and receiving
9        warehouse, moved on to a driver, and then,
10       after we took over the site in Wamego, I spent
11       a lot of time on the road just converting-- I'm
12       sorry-- just transporting materials back and
13       forth.
14   Q.  And what types of vehicles did you use for this
15       transportation?
16   A.  Ryder trucks mostly.
17   Q.  And was it unusual for there to be other Ryder
18       trucks other than the one that you would have
19       been driving, for instance, more than one Ryder
20       truck there at the Wamego site hauling stuff in
21       and out?
22   A.  Normally it was only one unless we had a lot
23       of-- we would bring the wire for the springs on
24       huge stacks, and if the weight got too much, we
25       would get a separate truck.
```

```
 1    Q.  And by the time that you moved to Wamego--
 2        strike that.  When did you actually move to
 3        Wamego with Gardner Springs?
 4    A.  You know, I was halfway in between Wamego and
 5        Tulsa most of the time, had a place to stay at
 6        both locations.
 7    Q.  When did you obtain a place to stay in Wamego?
 8    A.  Approximately July of '97.
 9    Q.  And where was that at?
10    A.  That was at the site in Wamego.
11    Q.  So you stayed at the missile base--
12    A.  Yes.
13    Q.  -- or converted missile base?
14    A.  (Witness nods head up and down.)
15    Q.  Did you also eventually get a residence, a
16        rental house in Wamego, or did you always stay
17        at the missile base?
18    A.  I had a residence in Manhattan.
19    Q.  And when did you get the place there in
20        Manhattan?
21    A.  Let's see.  It would have been around August,
22        September of '97.
23    Q.  After you met Mr. Skinner, did you meet a man
24        named William Pickard or Leonard Pickard?
25    A.  Yes, I did.
```

```
 1    Q.   Did you know him by the name William Pickard or
 2         Leonard Pickard, or what name did you know him
 3         by?
 4    A.   Leonard Pickard.
 5    Q.   And can you tell us when it was that you met
 6         Mr. Pickard and how?
 7    A.   I met him-- Mr. Skinner had a place in Stinson
 8         Beach, and he had a vehicle that he wanted me
 9         to bring to the Pan Pacific Hotel in San
10         Francisco, so I drove a vehicle to the Pan
11         Pacific, and that's where I met Mr. Pickard.
12    Q.   Do you recall about when that was?
13    A.   Sometime in '98.
14    Q.   When you arrived at the Pan Pacific Hotel in
15         '98, tell us what happened.
16    A.   I walked up to the door to deliver the keys,
17         and Mr. Skinner introduced me to Mr. Pickard.
18    Q.   Where in the Pan Pacific did this occur?
19    A.   In the penthouse, I believe it was out on the
20         balcony.
21    Q.   Describe the meeting and the introduction if
22         you would, please.
23    A.   Skinner just said that I should meet Pickard
24         and that I would probably be seeing him in the
25         future, just pretty brief introduction.
```

```
1    Q.   Did you stay there a while?
2    A.   No.
3    Q.   Was Mr. Pickard alone at the time?
4    A.   There was one other person in the room.   I
5         don't know if they were together or it was a
6         guest of Skinner's.
7    Q.   And would you describe this other person?
8    A.   To the best of my recollection, it was a
9         Caucasian female, blond hair, kind of a small
10        build.
11   Q.   Did you later learn who she was?
12   A.   No.
13   Q.   Okay.  So after meeting Mr. Pickard at the
14        Stinson Beach area in '98, after the meeting,
15        did you leave, did you stay?  What happened?
16   A.   I left.
17   Q.   When would have been the next time that you
18        recall meeting Mr. Pickard again?
19   A.   That would be at the Albuquerque airport.
20   Q.   And when was that?
21   A.   That must have been six or eight months later.
22   Q.   And what was the purpose for you being there at
23        the Albuquerque airport?
24   A.   I had flown in there from Tulsa to pick up a
25        rental car that had to be returned to Oklahoma
```

```
1              City.  It was my understanding that Pickard had
2              important meetings to go to, and that the
3              rental car was nearly overdue, and it needed to
4              be returned, and he couldn't do it, so Skinner
5              asked me--
6        Q.    Who told you that, Mr. Skinner?
7        A.    Yes.
8        Q.    Okay.  I'm sorry.  Go ahead.
9        A.    Skinner asked me if I would do it, and I told
10             him I would, so I was off.
11       Q.    So how did you get then from Tulsa to
12             Albuquerque?
13       A.    I flew.
14       Q.    And when you got to Albuquerque, what happened?
15             Describe the meeting.
16       A.    I had met Pickard in the airport.  He gave me
17             the keys, and--
18       Q.    Did he give you any instructions?
19       A.    He just said that it needed to be returned to
20             Oklahoma City.
21       Q.    Did he tell you where he was going or what he
22             was doing, and why he couldn't return it
23             himself?
24       A.    No.  I didn't ask, and he didn't say.
25       Q.    Did Mr. Pickard indicate how long the truck had
```

1        been leased and what the purpose was that it

2        needed to be returned?

3    A.  I think there's a 30 day limit--

4             MR. BENNETT:  Judge, just a minute.

5        I'm going to object.  I think we were talking

6        about a car, and then Mr. Hough switched it to

7        a truck, and--

8             THE WITNESS:  It was actually a

9        pickup truck.

10            THE COURT:  All right.  Thank you.

11            THE WITNESS:  A rental pickup truck.

12   Q.  (By Mr. Hough)  Thank you.  Continue, please.

13   A.  I'm sorry.  What was the next question?

14   Q.  So your understanding was it needed to be

15       returned to Oklahoma City.  Correct?

16   A.  That's correct.

17   Q.  Did you drive it, then, from Albuquerque to

18       Oklahoma City?

19   A.  Yes, I did.

20   Q.  And do you recall returning it, where you

21       returned it to?

22   A.  It was-- I can't remember exactly which rental.

23       I think it was Hertz rental near the airport in

24       Oklahoma City.

25   Q.  Do you recall what type of a truck it was?

```
 1    A.   It was a little, maybe a Nissan, just a small,
 2         small sized pickup truck.
 3    Q.   Did it have any cargo in it?
 4    A.   No.  It was completely empty.
 5    Q.   During the time at Stinson Beach, did you see
 6         Mr. Pickard at all again other than just the
 7         initial meeting?
 8    A.   At that point, no.  Later on.
 9    Q.   About how much later on?  Do you recall when?
10    A.   There was-- I think it was late in '99.  Mr.
11         Skinner had rented a residence there in Stinson
12         Beach, and he had his children out there, and
13         so I was out there helping him watch the kids,
14         and that's when Pickard came out to the house
15         and stayed.
16    Q.   How long was he there?
17    A.   Maybe five to seven days, approximately a week.
18    Q.   Did you interact much with him while he was
19         there?
20    A.   Very little.  I think I was off with the kids,
21         and--
22    Q.   Did Mr. Skinner, that you saw, interact much
23         with Mr. Pickard while he was there?
24    A.   Yeah, I believe so.
25    Q.   Do you recall seeing Mr. Pickard at all in
```

```
 1        Santa Fe, New Mexico, in '99?
 2   A.   Yes, I do.
 3   Q.   And can you describe any events in the spring
 4        of '99 that you recall?
 5   A.   We had gone to Santa Fe to go to an art show to
 6        pick up art.
 7   Q.   We being who?
 8   A.   Myself, Todd Skinner, Gunnar Guinan, and
 9        Guadalupe.
10   Q.   Okay.
11   A.   And we were there for the art show, and Pickard
12        came to the house one day.
13   Q.   Tell us what exactly you were looking for at
14        the art show, if anything.
15   A.   We were-- we bought Satillo tile, and basically
16        just looking for art pieces to go inside the
17        missile base.
18   Q.   How long did you stay in Santa Fe, do you
19        recall?
20   A.   I couple of weeks.  It was kind of a vacation
21        as well.
22   Q.   Tell us-- okay, and where did you and the other
23        three men stay?
24   A.   Let's see.  When we first got there, we stayed
25        with Mr. Skinner at his-- the residence he had
```

```
1          rented, and eventually we got our own place for
2          about a week.
3    Q.   Where was that in relationship to where Mr.
4          Skinner's place was?
5    A.   It was across town a ways, probably seven
6          miles.
7    Q.   Do you recall what region of Santa Fe this was
8          in?
9    A.   Let's see.  The place we had was near downtown,
10         and his place was a bit nicer.  It was up on a
11         hill.  I don't-- I'm not sure what the region
12         is called there.
13   Q.   And tell us what happened during this period of
14         time in '99 when you were in Santa Fe, other
15         than looking for the artwork and the tile, if
16         anything?
17   A.   Let's see.  I guess it was a vacation as well,
18         so-- in the daytimes, we'd go to the art shows
19         and try to find what we were looking for, and
20         in the evenings, just hang out around town,
21         have dinner, maybe go to a bar, have a drink.
22   Q.   Who was paying the bills there?  Was everyone
23         paying their own, or was someone picking up all
24         the bills, or do you recall?
25   A.   Skinner had footed a lot of the bills, but we
```

```
 1            also paid our own way in the evenings.
 2       Q.   Do you recall in June of '99 being at a house
 3            in the Las Campanas region of Santa Fe?
 4       A.   Yes, I do.
 5       Q.   And who was there with you, if you recall?
 6       A.   Skinner and Pickard.
 7       Q.   And what was the purpose for you being there?
 8       A.   There was a cargo trailer that was there that
 9            we were going to move to a different location.
10       Q.   Do you recall the color of the cargo trailer?
11       A.   Yes.  It was white, it was six by ten.
12       Q.   And do you recall why it needed to be moved?
13       A.   I wasn't sure.
14       Q.   Whose idea was it to go move it?
15       A.   Skinner had asked me to help him out.
16       Q.   And what did Lupe and Mr. Guinan do while you
17            and Mr. Pickard and Skinner were there?
18       A.   They were at the second residence we had
19            rented.  It was near downtown.
20       Q.   When you went to the residence, did you
21            actually see this trailer there?
22       A.   Yeah, it was parked right outside in the
23            driveway there.
24       Q.   And when you got there, what happened?
25       A.   Pulled the truck around, loaded the trailer up,
```

```
 1            and then that's pretty much it.  I followed Mr.
 2            Skinner to a separate location.
 3     Q.   What was Mr. Pickard doing?
 4     A.   He followed us as well.
 5     Q.   So there were three separate vehicles?
 6     A.   That's correct.
 7     Q.   Whose idea was it, if you know, to move the
 8            trailer?
 9     A.   Skinner is the one who asked me if I would do
10            it, so I'm assuming it was his.
11     Q.   And when you got there to hook the trailer up,
12            who was calling the shots, if anyone?
13     A.   I don't think anyone was.  I mean, I was
14            working for Skinner, so he was, you know, just
15            helping me hook the trailer up.
16     Q.   What was Mr. Pickard doing while you and Mr.
17            Skinner were hooking the trailer up?
18     A.   I don't really recall.  I think it was just
19            kind of so quickly that we pretty much just
20            pulled up there, hooked it up, and took off.
21     Q.   Once it was hooked up-- well, strike that.  Did
22            you ever go into the residence or see inside of
23            the residence there?
24     A.   No.
25     Q.   And was the trailer in front of, or behind, or
```

| | | |
|---|---|---|
| 1 | | to the side of the residence, if you recall? |
| 2 | A. | In the front. |
| 3 | Q. | And after it was hooked up, what did you do |
| 4 | | with it? |
| 5 | A. | We drove it to a house that was in Rancho de |
| 6 | | Canada in Santa Fe as well. |
| 7 | Q. | And then what happened? |
| 8 | A. | We pulled it down the hill and into the garage |
| 9 | | and left it there locked up. |
| 10 | Q. | Did anyone ever tell you what was in the |
| 11 | | trailer? |
| 12 | A. | No, they didn't. |
| 13 | Q. | Did you ever have any conversation with anyone |
| 14 | | about opening or unloading the trailer? |
| 15 | A. | Yeah.  Skinner told me once we pulled in there |
| 16 | | not to open it. |
| 17 | Q. | Did he tell you why? |
| 18 | A. | He just said there was dangerous things in |
| 19 | | there. |
| 20 | Q. | Did you go around or look into the trailer at |
| 21 | | all while you were there? |
| 22 | A. | I did not look in it.  I did go around it |
| 23 | | several times as we were pulling it into the |
| 24 | | garage.  It barely fit in there. |
| 25 | Q. | Did you notice anything unusual about it? |

```
 1      A.    There was definitely strange smells coming from
 2            it of a chemical nature, I guess.
 3      Q.    Okay.  How would you describe those?
 4      A.    Maybe-- I guess what it reminded me of was
 5            opening the cabinet under the kitchen sink
 6            where I store, you know, household cleaning
 7            products and that kind of thing.
 8      Q.    Okay.  And what happened to that trailer, if
 9            you know?
10      A.    Eventually, it was moved from that location to
11            a storage unit.
12      Q.    Do you recall when this was in relationship to
13            it being moved into this residence as you have
14            described in June of '99?
15      A.    It was shortly after that, maybe a month after
16            that.
17      Q.    So July, August '99?
18      A.    July, August.
19      Q.    And did you go to the residence where you had
20            parked this trailer to move it?
21      A.    Yes.
22      Q.    Did you go alone?
23      A.    Yes, I did.
24      Q.    And where did you come from to get there?
25      A.    I believe at that time I was in Kansas, Wamego.
```

```
 1            I flew out of Kansas City into Albuquerque and
 2       took a shuttle to there, where there was a
 3       truck that we had left behind, so I used the
 4       truck to pull the trailer.
 5    Q.  And where was the truck at?
 6    A.  At the house in Rancho de Canada, where the
 7       trailer was.
 8    Q.  Was anybody staying in or living in that house,
 9       to your knowledge?
10    A.  Yes.  Mr. Kendall, Graham Kendall had been
11       staying there.
12    Q.  For the whole month and a half?
13    A.  I'm pretty sure he was there most of the time,
14       yes.
15    Q.  Who paid for your airfare from Kansas out
16       there?
17    A.  That was Skinner.
18    Q.  And did he pay it in advance, or reimburse you,
19       or do you recall?
20    A.  He paid for it in advance.
21    Q.  And when you got to the residence, tell us what
22       happened.  This is July, August '99 when you
23       got back there the second time to move it?
24    A.  Right, yeah.  It was pretty cut and dried, just
25       pulled up there, attached the trailer to the
```

1          truck, pulled it over to the storage unit that

2          I had rented previously, and backed the trailer

3          in and left it.

4     Q.   Did anyone meet you at the residence?

5     A.   No.

6     Q.   Do you recall anyone giving you any directions

7          at that time?

8     A.   No.

9     Q.   Do you recall having any conversation with Mr.

10         Apperson when you went out there that second

11         time?

12    A.   Not at that time, no.

13    Q.   When, then, did you?

14    A.   There was a time about a month later where I

15         had gone back to the storage unit and pulled

16         the trailer back to the house where I was to

17         meet Apperson.

18    Q.   Okay, tell us about that, then.  After you had

19         moved this into the storage unit, did you just

20         leave it there?

21    A.   Yeah, it stayed there, and then it was moved

22         back, I believe, as a security measure, because

23         I think for some reason Skinner didn't want

24         Pickard to know that he had pulled this trailer

25         away from the house, that he supposed we had it

```
1          sitting in there for a while.  This was
2          supposed to be there the whole time.
3    Q.    The house Mr. Kendall was at?
4    A.    Right.  It was supposed to be there the whole
5          time but, apparently, Skinner felt it wasn't
6          very-- let's see -- I don't remember the word
7          that-- he wasn't very trustful of Pickard, so
8          he wanted to move it away to a separate
9          location that he didn't know about.
10   Q.    Okay.  So, then, how much later was it after
11         the trailer with the chemical odors was moved
12         into the storage facility that you moved it
13         back out to the house?
14   A.    That was about two weeks.  Wasn't very long.
15   Q.    And what were you doing during that two weeks?
16   A.    I was in Santa Fe, living there.
17   Q.    And where were you living in relationship to
18         where that storage facility was?
19   A.    Pretty close.  I was staying with a friend of
20         mine that I had met there and--
21   Q.    When you say pretty close, how close?
22   A.    I'd say six blocks.
23   Q.    Was it within eyesight from this place?
24   A.    Yes.
25   Q.    And the place where you were staying with a
```

| | | |
|---|---|---|
| 1 | | friend was an apartment? |
| 2 | A. | Yes. |
| 3 | Q. | And was it on some floor other than the ground |
| 4 | | floor? |
| 5 | A. | Yeah, it was on the second story. |
| 6 | Q. | And from the balcony on the second story, could |
| 7 | | you see the storage unit? |
| 8 | A. | I could see the facility, not the unit itself. |
| 9 | Q. | Okay, and then a couple weeks later when you |
| 10 | | moved it out of the storage facility, did |
| 11 | | someone tell you to do that? |
| 12 | A. | Yes, that was Skinner. |
| 13 | Q. | And what did he tell you about moving it out of |
| 14 | | there?  What were your instructions or |
| 15 | | directions from him? |
| 16 | A. | I was to get the trailer and pull it back to |
| 17 | | the house at Rancho de Canada, where I would |
| 18 | | meet Apperson, who would have a truck, and he |
| 19 | | was going to transfer the contents from the |
| 20 | | trailer into the truck that he had rented, |
| 21 | | which we did. |
| 22 | Q. | That actually occurred? |
| 23 | A. | That did occur. |
| 24 | Q. | When you moved the trailer out of the storage |
| 25 | | shed, did you still notice that chemical odor? |

```
 1    A.  Yeah.  It had kind of maybe built up in there a

 2        bit, so when I first popped it open--

 3    Q.  Pretty strong?

 4    A.  Yeah.

 5    Q.  And then were you alone when you hooked up to

 6        the truck and moved it to the house?

 7    A.  Yes, I was.

 8    Q.  Was Mr. Kendall still staying in that house?

 9    A.  Yes, he was.

10    Q.  And when you arrived at the house, did Mr.

11        Apperson meet you there?

12    A.  Yes.

13    Q.  And what happened then?

14    A.  We opened the door to his truck.

15    Q.  What kind of truck did Mr. Apperson have?

16    A.  It was a Ryder truck.

17    Q.  How-- a big box truck, or what?

18    A.  Maybe 15 foot, 15 to 18 foot.

19    Q.  Okay.

20    A.  So--

21    Q.  And after you opened the back-- did you help

22        him, or did he open the back of it himself?

23    A.  He opened the back, and I handed him the keys

24        to the trailer--

25    Q.  Uh-huh.
```

1   A.  -- which had swinging doors, and he opened
2       that, backed his truck right up to the trailer
3       and just started putting things into the truck.
4   Q.  Did you help him do that?
5   A.  No.
6   Q.  Why not?
7   A.  We had walkie-talkies.  We were in
8       communication on the radio, and I was standing
9       down the road so I could inform him if there
10      was any cars, any traffic coming up the road.
11  Q.  Who provided the walkie-talkies?
12  A.  That would be Skinner, I guess.
13  Q.  You say you guess.  Why do you guess?
14  A.  I mean, they were at the house.  That's where I
15      got them from.
16  Q.  Whose idea was it?
17  A.  As far as I know, they belonged to him.
18  Q.  Whose idea was it to use the walkie-talkies?
19  A.  That was Skinner.
20  Q.  Was Mr. Skinner there when Mr. Apperson was
21      unloading out of the trailer into the Ryder
22      truck?
23  A.  No.  As far as I can remember, I think he was
24      in Kansas at the time, Wamego.
25  Q.  And if the walkie-talkies were in the house and

```
 1            Mr. Skinner was in Kansas, whose idea was it
 2            when you and Mr. Apperson were there together
 3            to go in and get the walkie-talkies and for you
 4            to go up the road and be the lookout man?
 5       A.   Skinner is the one who told me where they were
 6            and that we should do it that way.
 7       Q.   When did he tell you that if he wasn't there?
 8       A.   That was before I had left.
 9       Q.   Did you have any discussion with Mr. Apperson
10            about that?
11       A.   Yeah, as I handed him the walkie-talkie, I
12            informed him of what I was going to do.
13       Q.   And what did he say?
14       A.   He said it sounded like a great plan.
15       Q.   How long did it take Mr. Apperson to get these
16            items unloaded, and what were you doing while
17            he was doing that?
18       A.   For about maybe 25 minutes, 25 to 30 minutes, I
19            was just walking down the road.  It was a
20            gravel road.  I was just kind of standing at
21            the point where I could see where both roads
22            come up.
23       Q.   Did you see any traffic?
24       A.   No.
25       Q.   Did you have any communication with Mr.
```

```
 1           Apperson on the walkie-talkies while that was
 2           occurring?
 3      A.   No, I didn't.
 4      Q.   How did you know when to come back to the
 5           house?
 6      A.   He started the truck up and turned on the
 7           lights.
 8      Q.   And when he did that, what happened?
 9      A.   He proceeded to turn around and come down the
10           road, and he said he was going off.
11      Q.   Did he tell you where he was going, what he was
12           going to do?
13      A.   He was going to meet Pickard at the Holiday
14           Inn, I believe, in Santa Fe.
15      Q.   Did he tell you why?
16      A.   No.
17      Q.   Did you have an understanding of why he was
18           meeting Mr. Pickard after unloading these
19           items?
20      A.   No, I didn't.
21      Q.   Did you have an understanding of what it was
22           that Mr. Apperson had moved out of the trailer
23           into the rental truck?
24      A.   I had no idea.
25      Q.   After he had left, what did you do?
```

```
 1    A.   I stayed the night at the house there, and the
 2         next day I'd met Pickard at the hotel, at the
 3         Holiday Inn.
 4    Q.   Prior to that and after Mr. Apperson had left
 5         in the rental truck, did you look in or look at
 6         this trailer that Mr. Apperson had unloaded?
 7    A.   Yes, I did.  I had to shut the doors.  They
 8         were still open.
 9    Q.   Was it empty, or were there things in it?
10    A.   It was completely empty.
11    Q.   And the odor that you have described, was it
12         still in there?
13    A.   Yes, it was still apparent.
14    Q.   While Mr. Apperson was doing the unloading, did
15         you hear any sounds at all, I mean, could you
16         hear him loading and unloading items?
17    A.   The only thing I remember hearing was kind of a
18         metal on metal sound, like some kind of a tank.
19    Q.   Okay.
20    A.   Helium tank or something.
21    Q.   Is the man that you are testifying about, Clyde
22         Apperson, is he in the courtroom today?
23    A.   I actually don't see him.
24    Q.   Can you describe for us the man you know as
25         Clyde Apperson?
```

```
1    A.   I've only seen him a few times.
2              (THEREUPON, there was a conversation
3         in low tones between Mr. Hough and the Clerk.)
4    A.   He's probably around 45, dark hair--
5    Q.   When you--
6    A.   -- large build.
7    Q.   Did he have any facial hair or glasses during
8         this period of time?
9    A.   He had a mustache.  I don't recall if he had
10        glasses or not.
11   Q.   Did you know him by the name Clyde Apperson or
12        by some other name?
13   A.   He was always referred to as Mr. C.
14   Q.   Let me show you what's been caused to be
15        admitted in this case as Government's Exhibit
16        313A and identified as a photograph of Clyde
17        Apperson, also known as C.  Do you recognize
18        that?
19   A.   Yeah.
20   Q.   Is that the man that you know?
21   A.   It is.
22   Q.   And you do not see this man in the courtroom
23        today or anyone that appears to be like him?
24   A.   I don't.
25   Q.   If you were to imagine him with glasses and
```

```
 1           without the mustache and beard, would that be
 2           of assistance?
 3    A.     I'm sure it would change his appearance.
 4    Q.     Okay.  Did you ever see Mr. Apperson clean
 5           shaven, with shorter hair, for instance, and
 6           with glasses?
 7    A.     No.
 8    Q.     This gentleman seated here, does he look
 9           familiar to you at all, the man looking down
10           writing here?
11    A.     I guess, actually, if you cut his beard and put
12           glasses on him, that could be Apperson.
13                   MR. HOUGH:  Your Honor, for the
14           record, we would ask that Mr. Apperson look up
15           so that the witness could see him, please.
16                   THE COURT:  Would you look up,
17           please.
18                   DEFENDANT APPERSON:  (Complies.)
19                   THE COURT:  Thank you.
20                   THE WITNESS:  Yeah, I believe that
21           could be him.
22    Q.     (By Mr. Hough)  Does he look substantially
23           different than when you saw him during this
24           period of time in 1999 in Santa Fe?
25    A.     He looks different, yes.
```

```
 1    Q.  Now, you indicated that the next day after Mr.
 2        Apperson had unloaded these items out of the
 3        trailer into the rental truck and drove off,
 4        that the next day you met with Mr. Pickard at
 5        the Holiday Inn.  Do you recall saying that?
 6    A.  Yes, I do.
 7    Q.  And would you describe for us, please, what
 8        happened there at the Holiday Inn?
 9    A.  Pickard and I left and went to a storage unit
10        that I had rented that he had some personal
11        items in.
12    Q.  Did you have any conversation with Mr. Pickard
13        about Mr. Apperson, where he was going, what he
14        was doing?
15    A.  Yes.  He mentioned that they were headed to New
16        York, headed to the East Coast.
17    Q.  And when you went, then, to the storage unit,
18        did you go with Mr. Pickard?
19    A.  Yes, I did.
20    Q.  And what happened there?
21    A.  We opened the unit, and he grabbed a few of his
22        things out of there, and I had pulled the
23        trailer along with me, and he had asked me if I
24        would load all of his things into this trailer
25        and that I was going to bring them to the
```

```
 1            facility in Wamego.
 2       Q.   How big was this rental unit that had Mr.
 3            Pickard's things in it?
 4       A.   I believe it was six by ten, the same size as
 5            the trailer.
 6       Q.   And where was it in relationship to the storage
 7            unit that you had had this white trailer parked
 8            at?
 9       A.   Maybe four miles apart, and--
10       Q.   When was it that Mr. Pickard had had you rent
11            this storage unit for him?
12       A.   That was probably two months prior when we were
13            there for the art show.
14       Q.   Okay.  Did you later go back to the storage
15            unit and get those items like he had told you?
16       A.   Yeah.  The next day I went and loaded
17            everything up.
18       Q.   What types of items do you recall seeing?
19       A.   Pretty much his personal items, computer stuff,
20            just like files, paperwork, clothing,
21            suitcases, just seemed like all personal items.
22       Q.   Do you recall seeing any non personal items,
23            like a gas cylinder?
24       A.   There was a gas cylinder, yeah, like the helium
25            tank, like the one I heard in the trailer.
```

```
1    Q.  And where was Mr. Pickard when you were loading
2        these items up?
3    A.  He had already left.
4    Q.  Did he leave with Mr. Apperson?
5    A.  I didn't see him leave with Apperson.  I had
6        just assumed that they were travelling
7        together.
8    Q.  And what happened then after you had loaded
9        these items into the trailer?
10   A.  I left driving a truck that was pulling the
11       trailer and drove to Wamego, Kansas.
12   Q.  When you got to Wamego, Kansas, what did you
13       do?
14   A.  Pulled the trailer around inside the gated
15       area, locked it up, and handed the key to Mr.
16       Skinner, who was there at the time.
17   Q.  Did you drive from Santa Fe to Wamego alone?
18   A.  Yes.
19   Q.  Do you recall being in Santa Fe and, during
20       this period of time that you're talking about,
21       being asked to purchase items like latex gloves
22       and the like?
23   A.  Yes.  At one point, that was part of my job, I
24       guess, there for Mr. Skinner was buying
25       groceries, doing shopping runs, and as I was
```

1          going out one day, Pickard was there, Pickard

2          and Apperson, and he had asked me to pick some

3          things up, and that was some plastic storage

4          tubs and boxes and latex gloves, and there were

5          a few other things, too.

6     Q.   Do you recall when that was in relationship to

7          you picking up that trailer?

8     A.   It was previous to that.

9     Q.   So it was before the trailer?

10    A.   That's right.

11    Q.   And how much before you going with Mr. Skinner

12         and Mr. Pickard to get this trailer that

13         smelled of the chemicals, a day, a week?

14    A.   A week.

15    Q.   Were you ever told why Mr. Pickard wanted those

16         items?

17    A.   No.

18    Q.   And when you returned with those items, was Mr.

19         Pickard pleased, or were you asked to do

20         something else?

21    A.   Yeah.  There was-- I brought back some

22         cardboard boxes and, apparently, they weren't

23         the right size.  I had to go back and get

24         larger size boxes.

25    Q.   Now, after you dropped this off with Mr.

```
 1          Skinner, did you stay at Wamego?

 2    A.   Yes, I did.

 3    Q.   How long did you stay in Wamego then?

 4    A.   I think I was back and forth to Tulsa quite a

 5         few times briefly after I showed up there.

 6    Q.   Again, hauling the wire that you have described

 7         previously?

 8    A.   Right.  I would bring the wire to Wamego and

 9         then we had the machinery there to bend it into

10         springs, and we would bring them back down to

11         the warehouse in Oklahoma, the shipping and

12         receiving side.

13    Q.   Who was in charge at the Wamego place?

14    A.   That would be Mr. Skinner.

15    Q.   Did he have all the keys and make all the

16         decisions there during that period of time?

17    A.   Yes, he did.

18    Q.   Back in June of '99 when you met with Mr.

19         Skinner and Mr. Pickard at the house in Santa

20         Fe, do you recall Lupe being there?

21    A.   Yeah, he was there.

22    Q.   And do you recall what, if anything, Lupe was

23         asked to do?

24    A.   Now, he didn't go at the time we went to pick

25         up the trailer.  It was previous to that, and--
```

42

```
1    Q.   So this was sometime prior to meeting Mr.

2         Pickard and Mr. Skinner in front of this house

3         and hooking up the trailer and driving off?

4    A.   Correct.

5    Q.   Okay.  And what do you recall about that?

6    A.   I brought Lupe to a cafe in Santa Fe where I

7         met Skinner and Pickard, and they had some work

8         for him at the house.  I guess they had made

9         some kind of messes, and they were trying to

10        get him to clean up, clean things up.

11   Q.   Did you have any understanding or did you

12        overhear them telling him what it was that they

13        were expecting him to do?

14   A.   Something about some tile work that they wanted

15        him to chip out and replace.

16   Q.   And do you recall him being paid or any

17        negotiation about payment about that?

18   A.   No.  If he was paid, I never knew about it.

19   Q.   Were you there the whole time that the

20        conversation occurred with Lupe?

21   A.   At least for half of it.

22   Q.   Okay.  And so to your knowledge, did Lupe go to

23        the house and do this tile work?

24   A.   As far as I know, yes, he did.

25   Q.   And did you see or hear anyone give him
```

```
 1            directions, specifically, about that?
 2       A.   The only thing I saw that was a little bit out
 3            of the ordinary was Skinner handing him a
 4            Valium.  He said he should take it.
 5       Q.   Any idea why?
 6       A.   I mean, now I can formulate an opinion.  I
 7            would say there may have been a lab there.
 8       Q.   Upon what would you base that opinion?
 9       A.   Just because he was handing him Valium, which
10            would counteract the effect if he was to get
11            dosed.
12       Q.   With what?
13       A.   With LSD.
14       Q.   And when was it in relationship-- how much
15            before you going there to get this trailer with
16            Mr. Skinner and Mr. Pickard was it that Lupe
17            was given the Valium and sent into the place, a
18            day, a couple of days?
19       A.   It was probably a week and a half.
20       Q.   So then chronologically, then, Lupe going in
21            and getting Valium, you being asked by Mr.
22            Pickard to get these latex gloves and boxes and
23            things, and you getting there and meeting Mr.
24            Apperson, hooking up-- or excuse me.  Strike
25            that-- you meeting Mr. Skinner and Mr. Pickard
```

```
 1        hooking up the trailer, what was the chronology
 2        there, if you could walk us through that,
 3        please?
 4   A.   Let's see.  I guess the first thing would be
 5        Lupe being dropped off at the cafe and asked to
 6        clean up a mess they made, and then I went and
 7        got the boxes and the storage tubs and the
 8        gloves.
 9   Q.   About how long after that did you do that?
10   A.   Maybe four or five days.
11   Q.   Okay.  And then--
12   A.   And then another week later, that's when we
13        went to go pick up the trailer.
14   Q.   Okay.  Now, the trailer that you then delivered
15        to Mr. Skinner at the Wamego site and turned
16        the keys over to him, did you ever see or know
17        what became of the trailer?
18   A.   No, I didn't.
19   Q.   How soon after that, then, did you return to
20        Tulsa, if you recall?
21   A.   Pretty soon after that.  There had been quite a
22        bit of production at the Wamego site, and they
23        were needing some of the parts in the shipping
24        department for Gardner Spring, so I took off
25        for Tulsa probably-- I think it was probably
```

```
 1              the next day after I got a good night's sleep.

 2              I just hoofed it down to Tulsa.

 3         Q.   A lot of driving.

 4         A.   (Witness nods head up and down.)

 5         Q.   Did you ultimately then move to Santa Fe?

 6         A.   Yes, I did.

 7         Q.   About when did that occur?

 8         A.   Let's see.  That would have been in 2000,

 9              approximately February of 2000.

10         Q.   After you had been there a while, in about July

11              or August of 2000, do you recall getting a call

12              from Mr. Skinner?

13         A.   Yes, I do.

14         Q.   When you were in Santa Fe, were you working for

15              Gardner Springs still, or had you quit?

16         A.   No.  I had quit.  I was painting for a living

17              there.

18         Q.   Okay.  And when you got the call from Mr.

19              Skinner in July, August 2000, what happened?

20         A.   He seemed kind of panicked, and he said that he

21              was in a tight spot and that he really needed

22              my help.

23         Q.   Did he describe what the tight spot was?

24         A.   Yeah.  Eventually, he flew me there, and we met

25              and talked in person, and so--
```

```
 1    Q.   What kinds of things did he tell you about the
 2         tight spot that caused you to agree to come
 3         help him out?
 4    A.   He had informed me that Tim Schwartz had passed
 5         away.
 6    Q.   Who's Tim Schwartz?
 7    A.   Tim Schwartz was a guy that owned another
 8         missile silo in Ellsworth County in Kansas.
 9    Q.   Had you ever met Tim Schwartz?
10    A.   Yes, I had, a few times.
11    Q.   And had he been to Mr. Skinner's place, the
12         Atlas E in Wamego from time to time?
13    A.   Yeah, that's where we had met.
14    Q.   How many times did you see him there?
15    A.   I saw him there twice.
16    Q.   Did you ever know Tim Schwartz to be involved
17         in any type of criminal activity at all?
18    A.   Outside of maybe controlled substance use.
19    Q.   Did you ever know him to be involved in
20         distribution or manufacture of LSD at all?
21    A.   No.
22              MR. RORK:  Judge, I object to the
23         foundation.  He doesn't indicate that he's ever
24         known where Mr. Schwartz lives and what he does
25         in his spare time and how much time he does it
```

1    and all those requirements.

2              THE COURT:  See if you can develop it

3         more.

4    Q.  (By Mr. Hough)  How often did you see Mr.

5         Schwartz?

6    A.  Twice.

7    Q.  Did you ever have conversations with Mr.

8         Skinner about Mr. Schwartz?

9    A.  No.

10   Q.  And did Mr. Schwartz, other than-- strike that.

11       Did you ever see Mr. Schwartz use some

12       controlled substance as you saw?

13   A.  Yes, I did.

14   Q.  And like what?

15   A.  Marijuana.

16   Q.  Where was that at?

17   A.  That was in Wamego.

18   Q.  At the Atlas E base?

19   A.  At the Atlas E.

20   Q.  Did you ever know him to be involved with

21       anything other than marijuana?

22   A.  Not that was controlled, no.

23   Q.  Okay, and would you have any reason to believe

24       that he would have any involvement in LSD?

25              MR. RORK:  Judge, again, I would just

```
 1              object--
 2    A.   No, I don't.
 3                   MR. RORK:  -- based on the form and
 4         lack of foundation and sufficient knowledge,
 5         two times.
 6                   THE COURT:  Overruled.
 7    Q.   (By Mr. Hough)  Now, Mr. Skinner, you
 8         indicated, told you that Tim Schwartz had died?
 9    A.   Yes.
10    Q.   And what else did he tell you about this death
11         that caused you to come to Kansas?
12    A.   He said that he had some things that were there
13         that he needed to extract.
14    Q.   There being where?
15    A.   In Ellsworth at Tim Schwartz's place.
16    Q.   Okay.
17    A.   And he mentioned that Tim's father was trying
18         to get in there just to see what was going on
19         there, and that he wanted to retrieve some
20         things before that happened.
21    Q.   Did he give you any indication of what it was
22         that he needed to retrieve or why it was that
23         he needed to get in there before Tim's father
24         got in there?
25    A.   He never flat out said that there was a lab
```

1       there, and I agreed to it just because it

2       seemed like he was in a panic situation and

3       needed help.

4    Q. Did you consider yourself good friends with Mr.

5       Skinner at the time?

6    A. Yes, I did.

7    Q. So then did you come from Santa Fe to Wamego

8       and meet with Mr. Skinner about that?

9    A. I flew from Santa Fe-- actually, Albuquerque to

10      Tulsa, where I met with Skinner, and the two of

11      us drove to Wamego from there.

12   Q. And did you have a discussion along the way as

13      to the urgency?

14   A. Yeah, we talked a little bit about it.

15   Q. What do you recall being discussed?

16   A. The one thing that just made me assume that it

17      may have been something to do with a lab was he

18      kept saying the word nano-technology.

19   Q. In what context?

20   A. Let's see.  Gosh, I can't remember the exact

21      wording he used, but basically he wanted us to

22      go there and to extract-- I can't remember

23      exactly how he put it.  I just-- for some

24      reason, that word sticks out in my memory.

25   Q. At that time, July, August of 2000, prior to

```
 1          going to the Atlas F, did you have any idea
 2          that there was an LSD lab?
 3    A.    I just had suspicions, but nothing to prove it.
 4    Q.    And your suspicions were based on what?
 5    A.    Just the secrecy surrounding the white trailer,
 6          the smell that was emanating from it.
 7    Q.    Whose secrecy was it that--
 8    A.    Just the way we had moved the trailer, Skinner
 9          was in front of me, Pickard was behind me.  To
10          my knowledge, that was in case-- that was so a
11          police officer couldn't get in between there to
12          pull me over.
13    Q.    So it was three vehicles in tandem going from
14          the residence after you had hooked up, over to
15          the other place?
16    A.    That's correct.
17    Q.    Okay.  Well, once you got, then, to Kansas did
18          you agree to assist Skinner to fix this
19          problem?
20    A.    Yes, I did.
21    Q.    And what happened?
22    A.    We had a truck that belonged to Gardner
23          Springs.  It's a moving truck.
24    Q.    Well, let's back up.  When you arrived in
25          Kansas, did you all go straight to the place in
```

```
1          Wamego where Mr. Skinner--
2     A.   Yes, we did.
3     Q.   And did you meet anyone else there?
4     A.   Yes.  Gunnar Guinan was there, and Lupe was
5          there as well.
6     Q.   And did you-- how soon after you arrived was it
7          that you went over to the Atlas F?
8     A.   That wasn't until the next day.
9     Q.   Did the four of you have any discussions about
10         what you were going to do the next day?
11    A.   I think Todd was on the phone most of that
12         morning, and then the first thing he said is,
13         "We're just going to go there for an inspection
14         to check the place out."
15    Q.   Do you recall, if you know, who he was on the
16         phone with?
17    A.   No, I don't know.
18    Q.   Didn't tell you?
19    A.   No.
20    Q.   So did you go over there then for the
21         inspection?
22    A.   Yes, we did.  We left that afternoon.
23    Q.   Did the four of you go together?
24    A.   Yes-- or not in the same vehicle.
25    Q.   So you took more than one vehicle?
```

```
 1    A.   Yeah.  We had the truck, the Gardner Springs
 2         truck, and then Skinner had his own vehicle
 3         that we had drove from Tulsa to Wamego.
 4    Q.   Prior to going, did you get any supplies?
 5    A.   Not that trip.
 6    Q.   Then all four of you went together for this
 7         inspection?
 8    A.   Yes.
 9    Q.   And tell us what happened.
10    A.   We got there.  The whole place was gated off
11         and locked, and so Skinner had some of the
12         keys, so he started going through some of the
13         locks.  Some of the locks we didn't have keys
14         to, and so Skinner had bolt cutters that we
15         used to cut through the locks to gain entry.
16    Q.   Was this a vertical or a horizontal, like the
17         Wamego silo?
18    A.   No, it's vertical.
19    Q.   And did you access down into the vertical
20         thing?
21    A.   Yes, we did, not-- yeah, we went down, down
22         below.
23    Q.   Was it the area inside that?
24    A.   Where the missile was?
25    Q.   Yeah.
```

```
1    A.   No, it wasn't the actual silo we went into.  It
2         had water in the bottom.  It's a pretty long
3         drop.  There's not any stairs that go down
4         there even.
5    Q.   And did Mr. Skinner have the keys to the inside
6         area of it, or did you have to cut those locks?
7    A.   We cut a lot of locks there that were inside.
8                   THE COURT:  Mr. Hough.
9                   MR. HOUGH:  Sir.
10                  THE COURT:  Let's take a break at
11        this time.  Ladies and gentlemen, let's take
12        about a 15-minute break, then we'll come back.
13        Mr. Bailiff.
14                  THE BAILIFF:  All rise.  Stand in
15        recess for 15 minutes.
16                  (THEREUPON, a recess was had.)
17                  THE COURT:  Mr. Hough, you may
18        continue.
19                  MR. HOUGH:  Thank you, Your Honor.
20   Q.   (By Mr. Hough)  Sir, let me show you what has
21        been caused to be marked and admitted in this
22        case as Government's Exhibit 672.  It's been
23        identified as a rental agreement with Storage
24        USA in New Mexico, in Santa Fe, 875 West San
25        Mateo Road.  It is dated September the 13th of
```

```
 1          1999 at 4:37 p.m.  Take a moment and look at
 2          that document and, if you would, please,
 3          familiarize yourself with it.
 4     A.   Yeah, it looks familiar.
 5     Q.   And describe for the jury, if you would,
 6          please, what that document represents.
 7     A.   This is the rental agreement for the storage
 8          unit where I had taken the trailer from the
 9          house on Rancho de Canada, and this is where I
10          stored the trailer for that short time.
11     Q.   So for purposes of putting your testimony in
12          context, that would have occurred, then,
13          sometime in September of '99?
14     A.   Yeah, I guess my time line is a little off.  It
15          says September 13th.
16     Q.   Okay.  So the events that you testified about
17          relative to the trailer, its movement, the
18          loading and the unloading, that would have
19          occurred sometime after that date.  Is that
20          fair?
21     A.   No, actually, it was a little bit before,
22          because we got-- we did all that, we got the
23          trailer to Rancho de Canada, and then after
24          that is when I rented the unit there.
25     Q.   Within a week?
```

```
 1    A.   Yes, to the best of my memory.
 2    Q.   Okay.  Now, before the break you were talking
 3         about Mr. Schwartz's Atlas F silo.  Okay?  Let
 4         me show you on the screen there a series of
 5         photographs that have been admitted into
 6         evidence in this case and identified as
 7         photographs of the Atlas F.  Take a moment and
 8         look at these if you would, please.  These are
 9         photographs taken by Lupe of the area beginning
10         with Exhibit 313 B.  Let's see if we can get
11         the lighting correct, that mood lighting fixed.
12         Do you recognize that, sir?
13    A.   Yes.  That looks like the site in Ellsworth.
14         Looks like the front entrance to the site in
15         Ellsworth.
16    Q.   Okay, and Exhibit 313 C, do you recognize that
17         doorway?
18    A.   Yes, I do.  That's at the same site in
19         Ellsworth.
20    Q.   And where is it in relationship to the front
21         door there, 313 B that I just showed you?
22    A.   That would be inside, down the stairs, yeah,
23         just down the stairs.  There was a-- I wouldn't
24         call it a spiral staircase, but it did circle
25         around as the stairs kept going down.  That
```

```
 1              door was near the bottom of the stairs.

 2      Q.   I'll show you 313 D.  Do you recognize--

 3      A.   That's the spiral looking staircase I was

 4              talking about.

 5      Q.   Okay, and 313 E?

 6      A.   Yeah, that looks familiar.  That's the door at

 7              the bottom of the stairs.

 8      Q.   The times that you were there-- strike that.

 9              The time that you were there with Mr. Skinner

10              that you started talking about when you went

11              with Mr. Guinan and Mr. Hobbs (sic) in July,

12              August of 2000, was that chain there as it is

13              depicted in the photograph?

14      A.   It was there until we cut it off.

15      Q.   And how did you cut that off?

16      A.   With an electric grinder.

17      Q.   And who did that?

18      A.   That was Skinner.

19      Q.   Okay.  What were you doing while he was doing

20              that?

21      A.   We were gathering up some items that were up a

22              few floors up, that were just more like

23              personal items.

24      Q.   Okay.  In the Atlas F, do you recall a room

25              with a treadmill?
```

| | | |
|---|---|---|
| 1 | A. | Yes, I do. |
| 2 | Q. | Where was it in relationship to the room where |
| 3 | | the lab equipment was? |
| 4 | A. | It was above, in the-- there was, I guess, what |
| 5 | | appeared to be housing in the upper floors, and |
| 6 | | the lab was all the way down at the bottom of |
| 7 | | the stairs behind the door that was chain |
| 8 | | locked. |
| 9 | Q. | Okay.  Now, when you first went there to survey |
| 10 | | the situation with Lupe, Gunnar, and Skinner, |
| 11 | | when you entered the building, describe what |
| 12 | | you saw and what happened. |
| 13 | A. | I had been in a few other silos before, and it |
| 14 | | was similar, maybe a bit nicer.  You walk down |
| 15 | | the stairs.  There were a few bedrolls in |
| 16 | | around the upper floors, clothing, computers. |
| 17 | | We had tried to cut the chain with a bolt |
| 18 | | cutters, but it wouldn't cut. |
| 19 | Q. | Chain on the door we just talked about? |
| 20 | A. | That's right.  And so Todd went to a room and |
| 21 | | brought back this grinder and started grinding |
| 22 | | on the chain, and before that happened, he said |
| 23 | | that the first thing we were going to do is |
| 24 | | start clearing out the upper floors, so we |
| 25 | | started just putting things in boxes, getting |

```
 1        ready to move them.
 2   Q.   What type of things?
 3   A.   Just the same kind of things I mentioned
 4        before, clothing, suitcases, computers, disk
 5        player, CDs.
 6   Q.   And were you there when that chain came off the
 7        door and the door was opened?
 8   A.   No.  At that-- I mean, I was in the building,
 9        but not right there.
10   Q.   And did you subsequently look into that area or
11        go into there?
12   A.   Yes, I did.
13   Q.   And describe that.
14   A.   There was a dimly lit hallway and another
15        doorway, and outside that doorway there were
16        metal canisters.  There weren't any white
17        lights, they were all red lights, and it was
18        just pretty much cluttered up.
19   Q.   Describe the metal canisters, if you would,
20        please.
21   A.   They were round, black, I'd say probably five
22        gallon canisters with what appeared to be
23        chemicals.
24   Q.   Do you recall any chemical names on them?
25   A.   I remember seeing a methyl.  That's the only
```

```
 1        thing I can recall.
 2   Q.   Do you recall how many of the canisters you
 3        saw?
 4   A.   Approximately ten.
 5   Q.   And were these behind the large blast doors?
 6   A.   They were behind the door that was chained
 7        shut.
 8                  (THEREUPON, there was a conversation
 9        in low tones between Mr. Hough and the Clerk.)
10   Q.   And did you notice any odors?
11   A.   Yeah, I did.  Chemical odor.
12   Q.   How would you compare it to the chemical odor
13        you had smelled on that trailer of Mr. Apperson
14        in Santa Fe previously?
15   A.   They probably compare.
16   Q.   Did Mr. Skinner give you any instructions as
17        that door was opened and you went in there?
18   A.   Eventually, when the second door was opened, he
19        was the only one that went in, carried in a
20        bottle of bleach, and he told us all to stay
21        back.
22   Q.   Did he ultimately come back out?
23   A.   Yes, he did.
24   Q.   About how long was he in there before he came
25        back out?
```

```
 1    A.   Just a few minutes.

 2    Q.   What did he say and do, and how did he act?

 3    A.   I don't know.  He seemed kind of upset that it

 4         was-- he said it was dirty in there.

 5    Q.   And at that point, did you have a chance to

 6         look into that room?

 7    A.   Not at that point.

 8    Q.   Shortly thereafter, did you?

 9    A.   Shortly thereafter.

10    Q.   And describe for us as best you can what you

11         saw.

12    A.   There was glassware.  Pretty much reminds me of

13         the movie Frankenstein, where the guy had a

14         laboratory set up, just with the curly glass, a

15         lot of glass, maybe some flasks.

16    Q.   Had you ever seen anything like that before

17         other than on TV?

18    A.   No.

19                    (THEREUPON, there was a conversation

20         in low tones between Mr. Hough and the Clerk.)

21    Q.   After observing that in there, did you have

22         some idea of what that was, what was going on?

23    A.   I formulated my own opinion at that point.

24    Q.   And it was what?

25    A.   LSD lab.
```

```
 1    Q.  Why?

 2    A.  Once again, Skinner had started passing out

 3        Valium to all the people present.

 4    Q.  Why?

 5    A.  At that point, he went ahead and told us that

 6        there was a possibility that we could be dosed

 7        with LSD.

 8    Q.  And your understanding of taking the Valium in

 9        relationship to that was what, if anything.

10    A.  I guess it would just countereffect, counteract

11        the effects of the LSD.

12    Q.  Let me show you what's been caused to be

13        admitted into evidence in this case as

14        Government Exhibit 33 and identified as a

15        photograph of some five-gallon black containers

16        taken from a vehicle driven by Mr. Apperson in

17        November of the year 2000.  Do you recognize

18        the black metal containers in there at all

19        similar to what you have described in your

20        testimony?

21    A.  That appears to be the same ones.

22    Q.  After you had been given the Valium by Mr.

23        Skinner-- strike that.  I'll show you what's

24        been caused to be marked Government's Exhibit

25        468 and admitted into evidence in this case and
```

```
 1            identified as items of glassware and chemical
 2            containers that were taken from that same
 3            vehicle driven by Mr. Apperson in November of
 4            2000.  Do you recognize any of these items here
 5            and here (indicating), the glassware items as
 6            similar to what you saw?
 7      A.    They are.
 8      Q.    And all these metal five-gallon containers
 9            shown in the photograph (indicating), are they
10            also similar to what you saw?
11      A.    Yes, they are.
12      Q.    After you were then given the Valium by Mr.
13            Skinner, as well as Mr. Guinan and Lupe getting
14            those Valium, what happened?
15      A.    At that point, Todd decided to go ahead and
16            close that door and instructed us all to stay
17            out of there.
18      Q.    Did he say why?
19      A.    He just-- I guess he was upset just because of
20            how dirty he thought it was in there.
21      Q.    Was he actually-- had you been around him
22            enough to know what he was like when he was
23            unhappy, upset?
24      A.    Yes, I had.
25      Q.    And that's the way he was acting at the time?
```

```
1    A.   Yes.
2    Q.   Did he give any indication whether or not he
3         had been in there or had some other expectation
4         of the condition of the place prior to that
5         day?
6    A.   No.
7    Q.   After he locked the doors and told you guys not
8         to go into that room, what happened?
9    A.   At that point, he told us we should go ahead
10        and gather everything in the above-- up above
11        in that floor up there, and went ahead and
12        loaded up the truck with all that stuff.  Mr.
13        Skinner took off to go.  He drove down to
14        Oklahoma to pick up his father, and we were all
15        to meet back at the site in Wamego the next
16        morning.
17   Q.   And did you, Mr. Guinan, and Lupe then load
18        that truck that day?
19   A.   Yes, we did.
20   Q.   And what time of day was it, then, when you
21        attempted to depart or departed the Atlas F?
22   A.   It was around seven o'clock.
23   Q.   And what kind of conditions were there?
24   A.   It had started raining out, and so we decided
25        we should go ahead and take off because there
```

1      were so many dirt roads we had to pull out

2      onto.

3   Q.   What happened?

4   A.   Well, we tried to pull out, and the rain

5      started coming down so hard that the roads were

6      muddy, and the truck ended up in a ditch, and

7      we were stuck there overnight.  We just walked

8      back to the site there and slept there

9      overnight.

10  Q.   How did you ultimately get out of there?

11  A.   The next morning, Gunnar took off on foot,

12     because the only vehicle we had there was the

13     truck that was stuck, so Gunnar took off.  He

14     was going to go to the first house he could

15     find and just try to call a wrecker to come

16     pull us out.  Ultimately, it ended up that the

17     person's house he went to was a farmer who had

18     a huge farm-- piece of farm equipment that he

19     thought he could easily pull us out, which it

20     did.

21  Q.   And did he then come to the site and pull you

22     guys out?

23  A.   He did.

24  Q.   And what happened next?

25  A.   After that, we were on our way, and we took off

```
1              and we went to Wamego to meet with Skinner and
2              his father.
3       Q.    What happened when you got there?
4       A.    I think we beat them back, so went ahead and
5              unloaded the truck and--
6       Q.    Where did you unload these items to?
7       A.    It was above ground in the building that we
8              called the Lester building.
9       Q.    And what types of containers had you put these
10             personal items and effects into?
11      A.    At this point, we just off loaded them into the
12             building.
13      Q.    When you took them out of the location at the
14             lab site near Ellsworth, near Carneiro, Kansas,
15             what types of containers were they in going
16             into the truck?
17      A.    At that point, we weren't using any containers.
18             We just had loose things in there that we just
19             threw off the truck.
20      Q.    Where in the Lester building did you end up
21             putting those when you off loaded them?
22      A.    At that point, we just moved them to the side
23             out of the way.  Eventually, we started moving
24             things into these green military bins.  There
25             were some in the photo you showed me.
```

```
 1    Q.   We'll go back to Exhibit 468.  You're talking

 2         about these green military boxes there?

 3    A.   That's correct.

 4    Q.   Or boxes of that nature?

 5    A.   Yes.

 6    Q.   Thank you.  After you had done that, what

 7         happened next?

 8    A.   Skinner showed up with his father.  At that

 9         point, we made a run into town and grabbed some

10         supplies, including mops, sponges, plastic

11         bags, bleach, and that's about all I can

12         remember.

13    Q.   And then what happened?

14    A.   And then we left together, the five of us,

15         which would be myself, Skinner, Guinan, Lupe,

16         and Skinner's father.  We drove to the

17         Ellsworth site.

18    Q.   How many vehicles?

19    A.   Two.

20    Q.   Was one of them the big Gardner Springs truck

21         you have described?

22    A.   Yes, it was.

23    Q.   And what happened, then, when you arrived at

24         the Atlas F?

25    A.   At that point, we started to go down.  There
```

```
 1            were still quite a few things upstairs, and we

 2            just kept on loading the truck.  We went down

 3            and got the metal canisters, the black round

 4            metal canisters that you pointed out on the

 5            photo, loaded those up.

 6        Q.  What were you loading them into?

 7        A.  We brought both five gallon plastic buckets and

 8            a few of the large green containers, which is

 9            where the black canisters went, into the green

10            military containers.

11        Q.  Anything else?

12        A.  I think that was pretty much another full load,

13            so we had to go back to Wamego to unload.

14        Q.  Were you given any instructions about how to

15            handle these items or what you should do?

16        A.  We had latex gloves we were wearing.  That's

17            pretty much all the protection we had.

18        Q.  Did Mr. Skinner give you any instructions about

19            using protection as you were handling these

20            items?

21        A.  Yeah.  He said we should be careful, we

22            definitely should not open anything, and just

23            try to keep gloves on so we don't get exposed

24            to anything.

25        Q.  Did you then dismantle and pack away these
```

1       items out of the lab?

2    A.   Eventually, we did get to that.

3    Q.   How did that occur?

4    A.   In the beginning, it was Skinner and his father

5         were mainly inside dismantling.  They would

6         carry it out into a larger room where we had

7         more room to work, and just piece by piece, we

8         would put things into either five gallon--

9         mostly five gallon buckets, just one piece at a

10        time, and then we'd carry the things upstairs

11        and load them into the green containers that

12        were in the truck.

13   Q.   Did this take pretty much all of the day?

14   A.   Yes, it did.  It was a very lengthy process.

15   Q.   And after you had filled the truck, what

16        happened?

17   A.   Just as the truck would get full, we would go

18        to Wamego and off load it.

19   Q.   How many trips did you make that day, if you

20        recall, or was there more than one?

21   A.   There were several days.  I think we did maybe

22        two trips a day, sometimes only one.

23   Q.   You indicated that Mr. Skinner had given you

24        guys some Valium that first day.  Did you or

25        anyone else in your presence take any of that

1           while you were working in and around the lab?
2    A.    Yes.
3    Q.    Describe that for us, please.
4    A.    It was pretty much just an open container, a
5           few different ones, there were Valium and
6           hydrocodone, and pretty much if we started
7           feeling funny, they were there, if we felt like
8           we were getting high, needed to come down.
9    Q.    Did that happen to you at all while you were
10          there?
11   A.    No.  I may have noticed some mild effects, but
12          it just could have been from insomnia.
13   Q.    What type of mild effects did you feel?
14   A.    I guess it would be the beginning stages of an
15          LSD trip, just--
16   Q.    For those of us that are unaware of what that's
17          like, how would you describe it?
18   A.    Heart rate increases.  I guess heightened
19          awareness.  That's pretty much all I remember.
20   Q.    Was it similar-- now, you indicated earlier
21          that you had tried LSD before.
22   A.    (Witness nods head up and down.)
23   Q.    Was this similar to what you had previously
24          experienced at the beginning of an LSD
25          experience?

```
 1    A.   Similar.
 2    Q.   Okay.  Now, you talked about loading these
 3         items into the green military boxes as shown
 4         here in Exhibit 468.  Now, once those military
 5         boxes-- strike that.  Once all of the contents
 6         were loaded into the truck, and you had come
 7         back to Wamego, where were those military boxes
 8         placed?
 9    A.   Looks like right where they are now.  Maybe-- I
10         can't tell which--
11    Q.   And this has been previously identified as the
12         inside of the Lester building.  Is that what
13         you're talking about?
14    A.   That's correct, at the Wamego site.
15    Q.   Okay.  Let me show you now Government's Exhibit
16         No. 6, which has been entered into evidence in
17         this case and identified as an aerial view of
18         the Wamego site, and previously this building
19         has been identified as the Lester building.  Is
20         that what you're talking about?
21    A.   That is the building.
22    Q.   Okay.  After all of these items in the military
23         boxes were unloaded there at the Lester
24         building, where within the Lester building were
25         they placed?
```

```
 1    A.   To the-- one of the walls.  I can't remember
 2         which direction it is.  They were all stacked
 3         up against the walls.
 4    Q.   When you walked in, was it to the right, left,
 5         back?
 6    A.   To the right.
 7    Q.   Okay, and did you ever see the contents of
 8         those boxes, that lab set up, or unloaded in
 9         Wamego ever?
10    A.   No.
11    Q.   Did you ever see any type of laboratory set up
12         at Wamego while you were there?
13    A.   No, sir.
14    Q.   During the course of the movement, did anyone
15         other than you, to your knowledge, feel the
16         effects of the LSD?
17    A.   Yeah.  Mr. Guinan, I think, was probably hit
18         the heaviest.
19    Q.   Describe your observations, if you would,
20         please.
21    A.   The only time I saw him was the next day after
22         this had occurred, and he was still pretty much
23         out of it.  I don't know if it was from being
24         sedated after he had gotten high, but he was
25         very incoherent, didn't look like he was having
```

```
 1            much fun.
 2       Q.   What do you mean by that?
 3       A.   Just very spaced out.  He was having trouble
 4            putting sentences together.
 5       Q.   How long did that last?
 6       A.   Approximately from the point I saw him, which
 7            was the next morning, until that evening.
 8       Q.   So a day?
 9       A.   A day.
10       Q.   And did you know when it was that he first
11            started feeling the effects?
12       A.   Yeah.  He had later told me that he had left
13            the Ellsworth site and was driving the truck
14            while Todd and his father was following in
15            Todd's car, and right as they were pulling off
16            the highway to get into Wamego, he started
17            feeling the effects, and he mentioned it to
18            Skinner and his father, who is a doctor, and so
19            I guess they sedated him at that point.
20       Q.   After the items arrived at Wamego and were
21            there in the Lester building, do you recall Mr.
22            Skinner having you and maybe others go through
23            that stuff and look for some Pringles like
24            cans?
25       A.   Yeah.  That was on one of the first trips.
```

1    Q.   Describe that for us, please.

2    A.   There were two wooden crates, and the contents

3         of the crates were silver cans, looked just

4         like Pringles cans, almost like the same

5         height, maybe a little bit thicker.

6    Q.   Talking about Pringles potato chips?

7    A.   That's right.

8    Q.   Okay?

9    A.   And they had plastic lids on them.  They were

10        sealed.

11   Q.   Did you ultimately find them?

12   A.   Yeah, we did.  As soon as we got back, that's

13        one of the first things Skinner was looking for

14        on the truck, and we got them off the truck,

15        and we took them inside the facility, not above

16        ground but below ground, and we took the

17        containers out of the wooden boxes, and we

18        moved them into a secret little corner of

19        Skinner's bedroom closet.

20   Q.   Let me show you what's been admitted into

21        evidence in this case as Government's Exhibit

22        57 and identified previously as Pringles type

23        cans.  To your knowledge, is that the cans

24        you're talking about?

25   A.   That is them.

```
 1    Q.   About two weeks later, do you recall being at
 2         the missile base in Mr. Skinner's bedroom and
 3         seeing the cans again?
 4    A.   Yes, I do.
 5    Q.   Tell us about that, please.
 6    A.   He wanted to move them out of there.  He wasn't
 7         quite sure where he was going to go with them,
 8         and for some reason he wanted to get them out
 9         of there pretty quickly, and so we got a big
10         suitcase, and we loaded them into a suitcase,
11         which we then carried over to a hotel in
12         Manhattan, and Mr. Kendall was with us.  He
13         rented a room at the Holiday Inn there, and I
14         stayed overnight with the suitcase at the
15         Holiday Inn.
16    Q.   In Manhattan?
17    A.   In Manhattan.
18    Q.   And then what happened?
19    A.   The next morning I was picked up by Skinner and
20         his fiance.
21    Q.   What was her name?
22    A.   Emily Reagan.
23    Q.   And then what happened?
24    A.   We decided that the best place to put them
25         would be in Emily's bedroom in a footlocker.
```

```
1    Q.  And then what happened?

2    A.  We went to the house where no one was home and

3        carried the suitcase in, and we opened up the

4        footlocker and put most of the cans inside the

5        footlocker.

6    Q.  Do you recall how many cans there were?

7    A.  Gosh, if I had to guess, I'd say somewhere

8        around 25.

9    Q.  Were you able to get all of them into the

10        footlocker?

11   A.  No.  There was a few that didn't fit in there.

12   Q.  Did you secure the footlocker?

13   A.  Yeah, we did.  We shut it and put a lock on

14        there, and we also put some epoxy type glue

15        around the edges where it shut together so we

16        would know if anyone has been in there when we

17        came back to open it.

18   Q.  Did you know what was in those Pringles like

19        cans?

20   A.  Not at that point, no.

21   Q.  Did you return the footlocker to its original

22        place in the house?

23   A.  Yes, we did.  There was-- it was pretty much at

24        the foot of her bed with a television on top of

25        it.
```

```
 1   Q.   And the remaining two cylinders or Pringles
 2        cans, what happened to them?
 3   A.   We put those up in the top of her closet in the
 4        bottom of a box that had been sitting there for
 5        years and never had moved.
 6   Q.   When was the next time you saw that footlocker?
 7   A.   That would be when I returned to Kansas from--
 8        I flew from Tucson, Arizona, to Kansas City,
 9        took a shuttle over here to Topeka, actually,
10        and then I had someone drive me out to
11        Manhattan to pick up the footlocker.
12   Q.   Was this in January of the year 2001?
13   A.   That sounds right, yes.
14   Q.   And what was it that caused you to come back to
15        Kansas then from Tucson?
16   A.   At that point, I guess arrangements had been
17        made to turn the footlocker over to the DEA.
18   Q.   How did you know that?
19   A.   This is all information I got from Skinner.
20   Q.   What did he tell you about that?
21   A.   He told me that it was a precursor for making
22        LSD, and that it needed to be turned in, and so
23        he asked me if I would go pick it up, and I
24        agreed to do it.
25   Q.   After you then flew into Kansas City, how did
```

```
 1        you get to Topeka and then wherever?
 2   A.   I took the Road Runner shuttle to Topeka and
 3        checked into a hotel room, then from there--
 4   Q.   Do you recall the hotel?           .
 5   A.   AmeriSuites.
 6   Q.   Okay, then what happened?
 7   A.   I had some cash to deliver to Tom Haney, who
 8        was Skinner's attorney.
 9   Q.   From Skinner?
10   A.   Yes.
11   Q.   Okay.
12   A.   And then I had some money that I gave to Brent
13        Nichols, who was controlling the Wamego site.
14        We had bills to pay, so I brought him some
15        money to pay some bills.
16   Q.   Do you recall how much that was?
17   A.   I think it was a few thousand dollars.
18   Q.   And while you were there with Mr. Nicholson
19        (sic), what happened, if anything, that you
20        recall?
21   A.   We put in a conference call.  I paid Tom Haney
22        some money.  I gave Brent Nichols some money,
23        and then we all called and spoke with Todd.
24        Then Todd was talking to Mr. Nichols about what
25        bills to pay, and then I went back to my hotel
```

```
 1              room from there, and I called up another person
 2              who was a missile base owner here in Kansas,
 3              who Mr. Skinner is friends with, as well as
 4              myself, and he came and picked me up and gave
 5              me a ride out to Manhattan to actually recover
 6              the footlocker.
 7       Q.    How much money was it that you brought from
 8              Tucson to Topeka to pay these bills, if you
 9              recall?
10       A.    It was $10,000.
11       Q.    And you indicated you had a conference call
12              with Mr. Skinner.  What was the call about?
13       A.    He had some things to discuss with his
14              attorney, and then he also just discussed what
15              bills to pay with Mr. Nicholson (sic).
16       Q.    This trunk you're talking about, let me show
17              you what's been caused to be marked
18              Government's Exhibit 699 and admitted into
19              evidence in this case.  Do you recognize that?
20       A.    Yes, I do.
21       Q.    Is that the trunk you're talking about?
22       A.    That's the one or one just like it.
23       Q.    So after the gentleman drove you to the
24              Manhattan residence, what happened?
25       A.    I knocked on the door.  Emily's brother was
```

```
 1              there, and I guess Todd had called previously

 2              and told him that I was going to be coming to

 3              pick up the footlocker.  So we arrived there,

 4              knocked on the door, brother answered, and I

 5              went inside, opened the garage door.  My friend

 6              pulled in and opened the trunk, and got the

 7              footlocker, put it in the trunk, and took off.

 8    Q.    Did you tell anyone why you were in Kansas was

 9          to pick up this precursor for LSD?

10    A.    No, I didn't.

11    Q.    Now, what did you tell them was the purpose of

12          being in town?

13    A.    I had money to bring to pay bills, and then

14          also, I think what we told both the driver and

15          Emily's brother is that there were some wedding

16          gifts in this footlocker.

17    Q.    And so then you got the footlocker, and what

18          did you do with it?

19    A.    Loaded it into the trunk, shut the trunk, and

20          drove back to my hotel room at AmeriSuites.

21    Q.    What happened to the remaining two cans.

22    A.    The remaining two cans I was supposed to get as

23          well, but I left those behind.

24    Q.    How come?

25    A.    Just spaced it off.  I didn't remember they
```

```
 1            were there.

 2       Q.   Okay.

 3       A.   And I was just trying to get in and out of

 4            there.

 5       Q.   When was it that you realized that you'd

 6            forgotten them and left them behind?

 7       A.   When we were almost back to Topeka, and at that

 8            point, I didn't feel like making this person

 9            make another round trip just for those two

10            canisters.  I felt like they were in a safe

11            enough spot that they would still be there.

12       Q.   And so what happened?

13       A.   So I was dropped at my hotel room, went-- let's

14            see-- I went over to the Amtrak station and got

15            a train ticket.  The next morning I went and

16            hopped on the train and took the train from

17            Topeka down to Tucson.

18       Q.   Taking the footlocker with you?

19       A.   Yes.

20       Q.   Then what happened?

21       A.   I was met at the Tucson Amtrak station by Mr.

22            Skinner and turned the footlocker over to him.

23       Q.   Did you tell him about forgetting the two cans?

24       A.   Yes, I did.

25       Q.   And how did that play out?
```

```
 1    A.   I mean, of course, I should have gotten them.
 2         It was my mistake, but he said we could deal
 3         with it eventually.  He was just happy that I
 4         had gotten the rest of it there in one piece.
 5    Q.   Did you know what happened to the footlocker
 6         after you delivered it?
 7    A.   As far as I know, Mr. Skinner hopped on another
 8         train and carried it to San Francisco and
 9         turned it in.
10    Q.   Let me show you now what's been marked
11         Government's Exhibit 674 and admitted into
12         evidence in this case, identified as a Ryder
13         truck receipt in your name.  Take a moment and
14         look at that, if you would, please, and see if
15         you can tell us if that means anything to you.
16    A.   Yeah.  This is a truck that I rented in San
17         Rafael, California.
18    Q.   When was that?
19    A.   The date is November of '99.
20    Q.   And what was the purpose of your renting that
21         truck?
22    A.   That would be to move-- we had rented a house
23         in Stinson Beach, and we were moving-- we had
24         been carrying things, just personal items to
25         this house that we were renting just like--
```

```
 1          let's see-- we brought a few beds, furniture,

 2          stereo system, and just personal things,

 3          clothes, whatnot.

 4     Q.   And it indicates a period of time November 7 of

 5          '99 to November 14 of '99 as the rental time.

 6          Is that correct?

 7     A.   Yes, it is.

 8     Q.   And then after you loaded these items up around

 9          San Rafael, California, what did you do?

10     A.   We drove south from there.  We went and stayed

11          with a friend of Todd's in Santa Barbara

12          overnight, and then we kept driving on to the

13          midwest, went down to Barstow, cut across I-40,

14          and then back up to Kansas.

15     Q.   Did you go through New Mexico on that trip?

16     A.   Yes, we did.

17     Q.   Now, let me show you Government's Exhibit 510

18          that has been admitted into evidence in this

19          case.  It's been identified as a piece of mail

20          addressed to you that was found in the Ryder

21          truck driven by Mr. Apperson on November 6 of

22          2000 at the time of his arrest.  Take a moment

23          and look at that, if you would, please.

24     A.   (Witness complies.)

25     Q.   Do you recognize that?
```

```
 1    A.   It's just a piece of mail.  I've seen something
 2         similar to this.  I don't know about this exact
 3         thing.
 4    Q.   Can you tell us why Mr. Apperson would have
 5         that in his possession on November the 6th of
 6         2000?
 7    A.   I can't explain that.  I don't know.
 8    Q.   When was the last time that you spoke with Mr.
 9         Pickard prior to your testimony here today?
10    A.   Probably two weeks ago.
11    Q.   And how did that occur?
12    A.   I don't think I understand.  I mean, he called
13         me.
14    Q.   Okay, he called you at your residence?
15    A.   Yes.
16    Q.   Did you have a conversation with him?
17    A.   Yes, I did.
18    Q.   How long did the conversation last?
19    A.   It was brief.
20    Q.   How long, approximately?
21    A.   A few minutes.
22    Q.   Did your-- do you have caller ID on your phone?
23    A.   Yes, I do.
24    Q.   And did you look at the caller ID after the
25         conversation terminated?
```

1   A.  Yes, I did.

2   Q.  And did it tell you where the call was coming

3       from?

4   A.  The call was coming from the Bay area, from

5       Natasha.

6   Q.  Natasha whom?

7   A.  I'm not sure what the last name is.

8   Q.  Did you-- was there any recording at all in the

9       phone call immediately prior to you being

10      connected with Mr. Pickard, any type of a

11      recorded message?

12  A.  Not that I know of.

13  Q.  Okay.  And during conversation, did you discuss

14      your testimony here?

15  A.  No.

16  Q.  Did you discuss Mr. Skinner?

17  A.  He told me that he had been arrested in

18      Seattle.

19  Q.  Did he make any comments about that?

20  A.  Not really.  He just asked me if I had heard

21      about it.

22  Q.  Were you surprised that you got this phone call

23      from Mr. Pickard?

24  A.  Sure.

25  Q.  Prior to this phone call two weeks ago, when

```
 1              was the last time you had spoken with Mr.
 2              Pickard?
 3    A.   I don't recall.
 4    Q.   I mean, had it been a week, a month, a year?
 5    A.   Been a while.  I'm not sure when the last time
 6              was before that.
 7    Q.   Had it been over a month?
 8    A.   Over a month.
 9    Q.   Over a year?
10    A.   No.
11    Q.   Do you recall the circumstances around the
12              prior conversation?
13    A.   I don't.
14    Q.   Was it a telephone call or a face-to-face
15              meeting?
16    A.   Let's see.  The last time-- I can't remember
17              the last time I saw him-- would have been face
18              to face.
19    Q.   You don't recall where that was?
20    A.   I guess it must have been Santa Fe when I
21              unloaded the-- when I was loading up the
22              storage unit into the white trailer to pull to
23              Wamego.
24    Q.   At the conclusion of the conversation, did you
25              form a belief of the purpose of the call from
```

1      Mr. Pickard, why he had called you?

2    A.  From what I gather, he was just trying to gain

3        some sympathy.

4    Q.  When was the last time you saw Mr. Skinner?

5    A.  That would be in Oregon, probably six to eight

6        months ago.

7    Q.  Do you feel like you owe Mr. Skinner anything

8        at all?

9    A.  I think it's probably the other way around.

10   Q.  Why is that?

11   A.  Well, first of all, I'm several thousand

12       dollars in debt because of him, renting trucks

13       and not returning them, and there were actually

14       promises of payments, even from previous to any

15       of this thing happening.  He already owed me

16       back pay.  So I'm probably $20,000 in the hole.

17   Q.  So you don't feel you owe Mr. Skinner anything?

18   A.  Not one bit.

19   Q.  Does your testimony here have anything to do

20       whatsoever with any relationship that you may

21       or may not have with Mr. Skinner?

22   A.  No.

23   Q.  Do you have any concerns about offering your

24       testimony here today?

25   A.  I'm just here to tell the truth.

```
 1   Q.  And you have testified regarding Mr. Pickard.
 2       Is he in the courtroom today?
 3   A.  Yes, he is.
 4   Q.  Would you point to him and identify him for the
 5       jury and the record?
 6               MR. RORK:  Well, Judge, again,
 7       there's no question as to the identity of Mr.
 8       Pickard.
 9               THE COURT:  All right, thank you.
10               MR. HOUGH:  May I have just a moment,
11       Judge?
12               THE COURT:  Yes, sir.
13               (THEREUPON, there was a conversation
14       in low tones between Mr. Hough and Agents
15       Nichols and Hanzlik.)
16               MR. HOUGH:  That's all the questions
17       I have for the witness, Judge.  Now may be an
18       appropriate time for lunch.
19               THE COURT:  Yes.  Ladies and
20       gentlemen, we'll now recess until 1:30, and if
21       you will be back here at that time, we will
22       hear further testimony.  Mr. Bailiff.
23               THE BAILIFF:  All rise.  Stand in
24       recess until 1:30.
25               (THEREUPON, a recess was had.)
```

```
 1              THE COURT:  All right, Mr. Rork.
 2              MR. RORK:  Thank you, Judge.
 3                   CROSS-EXAMINATION
 4       BY MR. RORK:
 5       Q.  Good afternoon, Mr. Hobbs.
 6       A.  Afternoon.
 7       Q.  You understand by the government's questions
 8           asked of you earlier today that the testimony
 9           that you're providing, you're not going to be
10           charged with any offenses or crimes about what
11           you have to say here.  Do you understand?
12       A.  Yes, I understand.
13       Q.  And I want to direct your attention back to
14           August of 2000 when Mr. Skinner and you were at
15           the Wamego missile base and these items are in
16           the green military boxes, some of the items you
17           testified had been brought back from this
18           Ellsworth location to Wamego.  Do you recall
19           that testimony?
20       A.  Yes, I do.
21       Q.  And do you recall after sometime in August of
22           2000 having a long talk with Mr. Skinner at the
23           Wamego missile base about those items and who
24           owned them?
25       A.  No, I sure don't.
```

```
1    Q.  Do you recall an indication of Mr. Skinner
2        indicating to you around August of 2000 that he
3        had wanted to move those to Nevada?
4    A.  Yes, I do.
5    Q.  And how did that come about?  Do you recall
6        that conversation?
7    A.  We were at the mall in Manhattan.  His wife--
8        fiance, I'm sorry-- was making wedding plans.
9    Q.  That would be Emily Reagan?
10   A.  Emily Reagan, and we were just walking in the
11       mall, and he asked me if I was interested in
12       moving the whole thing, and at that point, I
13       wasn't really interested.
14   Q.  And did he indicate to you that he, being Mr.
15       Skinner, that he owned the whole thing and
16       needed to move to Nevada?
17   A.  He never claimed ownership, but he did say that
18       he was thinking about moving it.
19   Q.  And was he thinking about moving it to Nevada?
20   A.  Yeah, I think he said somewhere near the Nevada
21       California border.
22   Q.  In Gardner Springs, the business in Tulsa, when
23       you worked there, can you describe, in other
24       words, like how many employees were involved in
25       that business there?
```

```
1    A.   In Tulsa there were probably 35 to 40.
2    Q.   And do you know how many pieces of equipment
3         were in there?
4    A.   There were several different pieces of
5         equipment.  There was everything from packaging
6         machinery to hand machines that would put coils
7         on extension springs.
8    Q.   And was it like the size of-- like, you have
9         been to Wamego, so there's-- and in Topeka and
10        Manhattan was it the size of a Quik Shop
11        building or bigger than that?
12   A.   About the same size.
13   Q.   About the same size as a Quik Shop building.
14        And when you were paid there, was that on a
15        weekly or monthly basis, do you recall?
16   A.   Weekly.
17   Q.   And did you receive a paycheck?
18   A.   Yes, I did.
19   Q.   And do you recall, that paycheck, I assume
20        continued while you worked at Gardner Springs
21        until some period of time you didn't any longer
22        receive a paycheck.
23   A.   That's correct.
24   Q.   And would that have been a time period when you
25        were mainly working for Mr. Skinner out of the
```

```
 1           Wamego location?
 2     A.    Shortly after that.  There were times as I was
 3           traveling back and forth, when I was doing work
 4           for Gardner Springs is what I would get paid
 5           for, yeah.
 6     Q.    That's when you would receive a check then?
 7     A.    Correct.
 8     Q.    And other times you would be paid cash by
 9           Skinner?
10     A.    There were pretty much times I would have
11           expense money if I was traveling for him and
12           with him.
13     Q.    And the springs and the manufacturing that went
14           on at the missile base in Wamego, did that not
15           just consist of about three pieces of
16           equipment?
17     A.    There were three pieces of machinery for
18           bending the steel, then there's just all the
19           associated tooling and different parts.
20     Q.    And the piece of equipment about the size of
21           the area that you're sitting in or smaller?
22     A.    Close to this size, yes.  Some were smaller,
23           some were bigger.
24     Q.    And those pieces of equipment, was there about,
25           other than the tools that were needed to bend
```

```
 1            items, that was about basically what the spring
 2            equipment manufacturing consisted of at Wamego?
 3    A.      Yes, it is.  Each piece of machinery also had a
 4            spool, unspooled wire, fed it into the machine.
 5    Q.      And you indicated that one time when you had
 6            come out to Stinson Beach and taken a vehicle
 7            out to Mr. Skinner, he had stayed in a
 8            penthouse.  Do you recall that?
 9    A.      Yes, I do.
10    Q.      Do you recall, during the course of your
11            association with Mr. Skinner, he frequently
12            stayed in penthouses and expensive locations?
13    A.      Yes, he did.
14    Q.      And did you ever rent some of those penthouses
15            for him under your name or check in for him
16            under your name?
17    A.      Never in the penthouse, but there were homes
18            that I rented.
19    Q.      And where were those homes at that you rented
20            for Mr. Skinner?
21    A.      The one in Stinson Beach I rented, and there
22            was a property in Bolinas, California, that I
23            rented.
24    Q.      And that would be for, like, a couple of weeks
25            or a month or something?
```

```
 1    A.   Short period of time, yes.

 2    Q.   And then he would have them rented in your

 3         name?

 4    A.   Yes.

 5    Q.   When you indicated that Skinner had called you

 6         in Albuquerque and asked you to come back to

 7         Kansas to help him out of this situation he

 8         said he was in sometime in July of August of

 9         2000, when was the last time you had worked for

10         Mr. Skinner in any capacity prior to that

11         point, approximately?

12    A.   Approximately maybe six months before that.

13    Q.   And in that six-month time period, I would

14         assume that you didn't have any day-to-day or

15         frequent contact with Mr. Skinner.

16    A.   Just sporadically.

17    Q.   And so when you arrived in Tulsa, that's where

18         Skinner met you.  Is that right?

19    A.   That's correct.

20    Q.   And then as you indicated, he drove you to

21         Wamego first where you had some discussions?

22    A.   Correct.

23    Q.   And then you testified this morning that he

24         indicated, "Well, let's first go down here to

25         Ellsworth to do an inspection," is more or less
```

1           how you described it.  Do you agree?

2     A.    I agree.

3     Q.    Did Mr. Skinner happen to tell you that he had

4           been down to this Ellsworth site just a day or

5           two before you arriving in Tulsa to meet him?

6     A.    He didn't mention it, no.

7     Q.    Did Mr. Skinner happen to mention to you how

8           many occasions he had been at this Ellsworth

9           facility in the days and months before you had

10          arrived back there?

11    A.    I didn't ask, and he didn't say.

12    Q.    And as you know Mr. Skinner, in your

13          association with him, he pretty much went and

14          did what he more or less wanted to, did he not?

15    A.    I'm sorry.  Could you say that again?

16    Q.    He pretty much did or went where he wanted to,

17          did he not?

18    A.    Sure.

19    Q.    He didn't have anything tying him down like a

20          job or--

21    A.    His kids.

22    Q.    And those kids lived with his spouse or former

23          spouse most of the time?

24    A.    It was shared custody, yeah.  They would both

25          have periods where they would spend time with

```
 1            the kids.
 2       Q.   And then other than that, he pretty much went
 3            and travelled about quite frequently?
 4       A.   Just like the rest of us, that's true.
 5       Q.   And when he went down there after this
 6            inspection, you don't know how many times Mr.
 7            Skinner had been to that location and how many
 8            items of anything he had taken down there
 9            before you arrived do you?
10       A.   The only indication I have is that he had keys
11            to the place.
12       Q.   And he indicated he had keys to the place, and
13            did he tell you that he had actually changed
14            some locks down there at that location prior to
15            you being there?
16       A.   No.  I just assumed it was him that put the
17            locks on since he had the keys.  That may or
18            may not be true.
19       Q.   And when you were down there and went down
20            there for these four or five days and removed
21            the items you have indicated, this Gardner
22            Springs truck that was used, was it like a
23            blank truck, or did it have any writing on it?
24       A.   It was blank.
25       Q.   It was blank?
```

1    A.   Yes.

2    Q.   And when the farmer was asked to pull you out,

3         do you recall what was told to the farmer?

4    A.   Just said we slipped off in the ditch.  It got

5         rainy.  He said it had happened to him before.

6         He didn't really ask any questions.

7    Q.   Do you recall whether or not there was any

8         conversation about who you were, where you were

9         from, or anything?

10   A.   No, not that I recall.

11   Q.   When you were at the Wamego site, do you recall

12        that there was cameras and a lot of security

13        features at that location at Wamego?

14   A.   No.  The only thing I'm aware of was a small

15        plant that had a camera inside it somewhere,

16        and then there was a VCR, I believe, that was

17        connected to it, to record.

18   Q.   And do you recall-- so the time that you came

19        back in June of-- or August of 2000 to Wamego,

20        you had not been there for six or seven months

21        prior to that point in time?

22   A.   That's correct.

23   Q.   Do you know whether or not Mr. Skinner

24        indicated to you if he installed any security

25        system or cameras at the missile base in your

```
 1        absence?
 2    A.  No.
 3    Q.  Mr. Skinner has previously indicated and
 4        provided to us a list of about 163 drugs and
 5        different compounds, some prescription, some
 6        not, some legal, some not, that he has ingested
 7        over a period of time.  During your time at the
 8        Wamego missile base, did you see on frequent
 9        occasion Mr. Skinner handing out drugs to other
10        people?
11    A.  On a few occasions, yes.
12    Q.  And on those occasions, did you know of Mr.
13        Skinner, did he indicate to you that he had had
14        prior experience in the manufacture of DMT?
15    A.  No.
16    Q.  Did Mr. Skinner indicate to you or share with
17        you that he had prior experience and knowledge
18        of how to manufacture MDMA and other compounds?
19    A.  No.
20    Q.  Do you recall during the period of time that
21        you were at this Wamego missile base what's
22        been referred to as Ayahuasca parties?
23    A.  Yes, I do.
24    Q.  And did that occur on quite a frequent
25        occasion?
```

```
1    A.   Maybe when I wasn't there.  I saw probably two
2         or three occasions.
3    Q.   And you indicated in your testimony you had
4         been to some silos before.  Other than the
5         Ellsworth location and the Wamego location,
6         what other silos had you been at in Kansas, do
7         you know?
8    A.   There's one-- I can't remember the town, but a
9         man named Ed Peden owns a real estate company
10        called Twenty First Century Castles.
11   Q.   The one in Dover?
12   A.   Dover, that's it.
13   Q.   Any other ones?
14   A.   Yeah, there's one in Denver.
15   Q.   And what was the occasion of being at that one,
16        do you know?
17   A.   This was before the Wamego site was secured,
18        while he was still looking at different
19        options.
20   Q.   And do you remember when that would have been,
21        like, 1995 or 1994?
22   A.   It was pretty early on, yeah, probably '95.
23   Q.   And this Mr. Peden with the Twentieth Century
24        Castles, when there was conversation earlier
25        this morning between you and Mr. Hough about
```

```
 1           this gentleman and the individual that went to

 2           Manhattan, are you aware Mr. Skinner has

 3           previously identified that individual's name

 4           that helped recover these cans as Mr. Peden?

 5           That would be the same individual, would it

 6           not?

 7       A.  Yes, it's the same person.

 8       Q.  And Mr. Peden was the one that drove to Emily

 9           Reagan's house in Manhattan and then drove into

10           the garage and had the garage door shut, at

11           which time you then loaded the items in, and

12           then opened the garage door, and you left.  Is

13           that correct?

14       A.  That's correct.

15       Q.  And after November of 2000, do you recall being

16           with Mr. Skinner in Tucson, Arizona?

17       A.  Yes, I do.

18       Q.  And that was in the early part of 2001?

19       A.  Early part of 2001.

20       Q.  And were you working for him at that point in

21           time?

22       A.  Not really working for him, just kind of living

23           in the same house.

24       Q.  And who else was living there?

25       A.  Mr. Guinan, Emily Reagan, and Krystal Cole, and
```

```
1          Lupe lived there for a short period.
2     Q.   And while you were there during that period of
3          time, do you recall seeing what's been referred
4          to as a river of MDMA around?
5     A.   I did see MDMA, yes.
6     Q.   In what kind of quantities, and in what nature?
7     A.   The only quantities I saw is what he had given
8          me.
9     Q.   He being Skinner?
10    A.   Skinner had given to myself, just a single
11         dosage size.
12    Q.   And then you indicated after the Tucson contact
13         with Mr. Skinner, you then last saw him in
14         Oregon, the state of Oregon?
15    A.   Yes?
16    Q.   And would that have been at some storage
17         locations Mr. Skinner had rented there?
18    A.   That's correct.
19    Q.   And do you know if he rented those storage
20         locations in Oregon-- that would have been
21         sometime in 2001.  Right?
22    A.   That's when-- the last time I saw him.  Let's
23         see.  It was rented late in 2000, probably
24         November of 2000.
25    Q.   So it was about November of 2000 that this
```

1           Oregon storage location was rented by Mr.

2           Skinner?

3       A.  Yes.

4       Q.  And that would have been about the last time, I

5           mean, it was rented in November of 2000, but

6           sometime after the Tucson, Arizona, period of

7           time, you then again saw Mr. Skinner in Oregon

8           in 2001 by this storage house?

9       A.  That's true.

10      Q.  And do you mind telling what the purpose of

11          that contact was or--

12      A.  Yeah.  He called me up.  I was living in

13          California already, and I had some of my

14          personal belongings in the storage unit, and I

15          had been trying to get up there forever and

16          never could connect with him, because he had

17          all the keys.  So he was on his way up through

18          Northern California going to the storage unit,

19          and so I rode up there with him and recovered

20          my belongings.

21      Q.  And didn't happen to recover any more money

22          that Mr. Skinner owed you?

23      A.  No.

24      Q.  And direct your attention back to July and

25          August of 2000 at the Wamego missile base, do

1          you recall an occasion when Krystal Cole was on

2          the phone to Skinner and talking about some

3          packages of MDMA to her had been intercepted?

4     A.   I wasn't around during that time.

5     Q.   You weren't around there?

6     A.   No.

7     Q.   And as far as the living quarters in the

8          missile base, you talked about this hidden room

9          in Skinner's closet or hidden location in

10         Skinner's closet where some items were placed.

11         Do you know if that was above the ceiling or

12         below the ground?

13    A.   Above the ceiling.

14    Q.   Do you recall any secret room in the living

15         quarters of the missile base that's in the

16         floor part that's removable that has a large

17         area?

18    A.   No.

19    Q.   You haven't seen anything of that nature?

20    A.   There is a large area that's under where--

21         directly under where the missile would take off

22         from.  There's a blast tunnel that goes down

23         pretty far under ground.

24    Q.   And is there a hidden door that goes to that,

25         or just a wide open door?

```
 1    A.   Usually it's all wide open.  We had placed
 2         metal plates across it because we had set a
 3         sound system up on top of that.  It's kind of
 4         like a stage area.
 5    Q.   And so if the metal plates were in place and
 6         someone wasn't familiar with that location with
 7         the sound stage on in, they wouldn't know that
 8         this tunnel and large area were underneath
 9         there, then, automatically, would they?
10    A.   No.
11    Q.   And did Skinner ever tell you that these cans
12         that he had you get in this trunk out of this
13         house in Manhattan were worth $100,000 a can?
14    A.   No, he didn't.
15    Q.   And did he ever tell you anything about that he
16         had at one point in time four boxes of these
17         cans?  Did he ever tell you that?
18    A.   No, he didn't.
19    Q.   All you ever saw, then, during the time that
20         you talked about was two boxes?
21    A.   Two wooden crates.
22    Q.   And I understand you talked with Mr. Pickard
23         about Mr. Skinner's arrest in Washington.  Had
24         you been aware that was for impersonating a
25         doctor and writing prescriptions?
```

```
1    A.   I later found that out.

2    Q.   During the time that you knew Mr. Skinner, did

3         he ever represent himself as a medical doctor

4         to other people and write prescriptions here in

5         Kansas or elsewhere?

6    A.   No, not that I know of.

7    Q.   If I could have just a second.

8                    (THEREUPON, there was a conversation

9         in low tones between Mr. Rork and Defendant

10        Pickard.)

11   Q.   Mr. Hobbs, did you tell me what time period

12        that was when you were walking in the Manhattan

13        mall and this conversation about moving items

14        to Nevada took place?

15   A.   Let's see.  That would have been maybe October

16        of 2000.

17   Q.   All right, sometime after August of 2000 when

18        the items had been moved from Ellsworth to

19        Wamego?

20   A.   Yes.

21   Q.   And then sometime prior to the arrest on

22        November 6, 2000, of Mr. Pickard?

23   A.   Yes, that's correct.

24                    MR. RORK:  Thank you, sir.  I have no

25        further questions at this time.  Mr. Bennett
```

```
 1          may, or Mr. Hough may.
 2                    THE COURT:  Mr. Bennett.
 3                    CROSS-EXAMINATION
 4          BY MR. BENNETT:
 5     Q.   Mr. Hobbs, you indicated, I believe, that Mr.
 6          Skinner had provided you with MDMA, an illegal
 7          drug.  Is that right?
 8     A.   That is correct.
 9     Q.   What other illegal drugs did he provide you
10          with during the time you knew him other than
11          MDMA?
12     A.   Many prescription drugs.
13     Q.   Well, when you say he provided you with
14          prescription drugs, were those prescribed by a
15          doctor?
16     A.   Prescribed by a doctor to him, which he then
17          passed on to me.
18     Q.   Okay, just give me an idea or give the jury an
19          idea of what kinds of drugs.
20     A.   Valium, hydrocodone.
21     Q.   Any illegal drugs or substances in addition to
22          MDMA that he provided you with at any time?
23     A.   Yes, there was MDA, MDMA, and then MMDA, which
24          are just analogs of the same basic thing.
25     Q.   Anything else?
```

| | | |
|---|---|---|
| 1 | A. | As far as illegal drugs, no, I don't think |
| 2 | | anything else was actually scheduled. |
| 3 | Q. | All right. |
| 4 | A. | Except, actually, DMT is probably scheduled. |
| 5 | Q. | You say DMT is probably scheduled? |
| 6 | A. | DMT. |
| 7 | Q. | When you say probably scheduled, do you mean |
| 8 | | illegal to possess? |
| 9 | A. | I'm not sure what its status is. |
| 10 | Q. | All right, anything else that you can think of? |
| 11 | A. | That's all that I can think of. |
| 12 | Q. | All right.  You told us about being out at |
| 13 | | Stinson Beach with Mr. Skinner back in '99.  Do |
| 14 | | you recall that testimony? |
| 15 | A. | Yes, I do. |
| 16 | Q. | Mr. Apperson wasn't there, was he? |
| 17 | A. | No, he wasn't. |
| 18 | Q. | Okay.  Now, you testified in response to some |
| 19 | | of-- a series of questions by Mr. Hough that |
| 20 | | it's your understanding that you have immunity |
| 21 | | from any illegal activity related to your |
| 22 | | testimony.  Correct? |
| 23 | A. | That's correct. |
| 24 | Q. | Do you have an understanding or an opinion or a |
| 25 | | belief as to what the potential penalty would |

 1          be for whatever those illegal-- those

 2          violations were if you did not have the

 3          immunity?

 4                    MR. HOUGH:  Judge, we'll object.  The

 5          penalty is irrelevant and inflammatory.

 6                    THE COURT:  Well--

 7                    MR. BENNETT:  Judge, can we approach

 8          the bench?

 9                    THE COURT:  Yes, you may.

10                    MR. BENNETT:  I thought we resolved

11          this issue.

12                    (THEREUPON, the following proceedings

13          were held at the bench and outside of the

14          hearing of the jury.)

15                    MR. BENNETT:  I thought a couple days

16          ago that the Court indicated that this was

17          proper when it goes to the issue of immunity

18          and the witness testifying, and I thought that

19          the Court had indicated that it was proper and

20          appropriate, that it was not a penalty-- an

21          improper inquiry into the penalty.  I'm not

22          asking about the penalty of-- to these

23          defendants, but I think the Court had

24          previously ruled on it.

25                    THE COURT:  I think we said that

```
 1          quite often courts have held that if you're
 2          talking about the immunity and you're
 3          questioning about their credibility and so
 4          forth about the immunity, you can ask a
 5          question like that.  Otherwise, it is not
 6          allowed.
 7                    MR. BENNETT:  I agree.
 8                    MR. HOUGH:  Judge, our position is
 9          that it's irrelevant and it's inflammatory and
10          under 403 it should be barred.
11                    THE COURT:  Now, I know why you're
12          doing it.
13                    MR. HOUGH:  Judge, that--
14                    THE COURT:  You're trying to get the
15          penalty in here in front of the jury, but I
16          suppose if there's a way you can do it, why,
17          it's not necessary-- so I'm going to overrule
18          the objection and allow you to go into it.
19     Q.   (By Mr. Bennett)  You can go ahead and answer
20          the question.  Do you remember what the
21          question was?
22     A.   I certainly do.  I guess if you're asking me if
23          DMT-- if there are consequences to possessing
24          it, I guess we're all going to be in trouble,
25          because it's something that naturally occurs in
```

```
 1           the human brain.
 2     Q.    Well, that's really not my question, and if you
 3           want the reporter to read it back, I can have
 4           her read it back.
 5                   MR. HOUGH:  Well, Judge, we'll
 6           object.  This is argumentative.  Counsel may
 7           not be satisfied with the answer, but it is an
 8           answer that the witness has sincerely given,
 9           and it's responsive.
10                   THE COURT:  Well, do you think you
11           understand the question?
12                   THE WITNESS:  I think so.
13                   THE COURT:  All right.  You can ask
14           another question if you want to.
15     Q.    (By Mr. Bennett)  Well, my question is, Mr.
16           Hobbs:  Do you have an opinion or a belief as
17           to what the-- if you did not have the immunity,
18           what the penalty would be for whatever you've
19           done?
20     A.    Yeah, I think it's probably way too harsh.
21     Q.    Well--
22                   THE COURT:  If you don't know what it
23           is, well, just say so and, you know, or--
24     A.    I know there are penalties, for example, for
25           smoking marijuana, at least here.  Where I'm
```

```
 1        from, there's not.
 2   Q.   Well, do you not know what the penalty is?  Is
 3        that what you're saying?
 4   A.   It depends on specifically what your're talking
 5        about.
 6   Q.   Well, I'm talking about anything you've
 7        testified with regards to that you think you
 8        needed immunity for or that you have received
 9        immunity for.
10   A.   There are probably some things I said that
11        would get me in trouble if I did not have
12        immunity.
13   Q.   My question is:  Do you know what the penalties
14        are?
15   A.   No, I'm not familiar with the exact--
16   Q.   All right, if you don't know-- excuse me.  I
17        don't mean to step on your answer.  Go ahead.
18   A.   Go ahead.  What I'm trying to say is I'm not
19        sure what exactly, how the law reads.
20   Q.   If you don't know, that's all you need to say.
21   A.   I don't know.
22   Q.   All right, we got there eventually.  Now, you
23        told us during your previous examination about
24        Mr. Skinner contacting you and asking you to
25        move the white trailer that was parked at the
```

```
 1          residence in-- was it Las Campanas?
 2      A.  In that region of Santa Fe.
 3      Q.  In that area?
 4      A.  Yes.
 5      Q.  And at that time, you then went ahead and moved
 6          it.  Is that right?
 7      A.  That's correct.
 8      Q.  And Mr. Apperson wasn't involved in that, was
 9          he?
10      A.  He was not present.
11      Q.  Okay.  And as I understand it, Skinner, Mr.
12          Skinner is the individual that contacted you,
13          wanted you to do that, and you carried out his
14          directions or requests.  Is that right?
15      A.  That's correct.
16      Q.  Now, I want to go to the laboratory when you
17          moved the items from Ellsworth to Wamego.  Do
18          you recall that testimony?
19      A.  Yes, I do.
20      Q.  And at that time, as I understand it, you went
21          out to the Ellsworth site, you loaded up the
22          items, and then moved them to Wamego.  Correct?
23      A.  That's correct.
24      Q.  Excluding the time that it took to actually
25          move them from Ellsworth to Wamego, how long
```

```
 1          did it take you to load the items into the

 2          truck or trucks that you moved them in?

 3     A.   It took quite some time, probably 20 hours.

 4     Q.   Okay, and that's over a several day period of

 5          time?

 6     A.   Yeah, it is.  We had breaks in between.

 7     Q.   All right, and then as I understand it, this

 8          truck or trucks would be driven to Wamego, and

 9          then you would-- you unloaded the items.  Is

10          that right?

11     A.   That's correct.

12     Q.   And did it take you 20 hours to unload the

13          items?

14     A.   I'd say altogether it probably took 20 hours

15          for the actual physical labor part.

16     Q.   Of unloading them?

17     A.   Unloading and loading, everything except the

18          driving.

19     Q.   All right.  I want to back up, then, because I

20          think earlier you said 20 hours to load, but

21          are you now saying 20 hours to load, exclude

22          the driving, you get to Wamego, and you unload

23          them, and that takes a total of 20 hours?  Is

24          that right?

25     A.   Yes.  You've got everything there except
```

```
 1        actually physically dismantling things.
 2    Q.  All right, you're just talking about the
 3        loading and the unloading.
 4    A.  The loading and the unloading.  I thought
 5        that's what you were talking about.
 6    Q.  Yeah, it is.  I just want to make sure I
 7        understand it.  A total of 20 hours, about ten
 8        hours loading and ten hours unloading?
 9    A.  You're talking about just carrying the things
10        up the stairs, putting them in the truck, and
11        taking them off the truck.
12    Q.  Okay, thank you.  And when this transfer was
13        made that you were talking about that you--
14        that occurred, you and Mr. Apperson, when you
15        said Mr. Apperson unloaded the truck and put
16        items in-- or unloaded the trailer and put the
17        items into the truck, that took about 25
18        minutes?
19    A.  It was a very short period of time, yes.
20    Q.  Now, the move from-- of the lab from Ellsworth
21        to Wamego, Mr. Apperson wasn't involved in
22        that, was he?
23    A.  That's correct.
24    Q.  At the time that you moved or were in the
25        process of moving the lab from Ellsworth to
```

```
 1            Wamego, did you have any conversation with Mr.
 2            Skinner, or did he have a conversation with you
 3            or in your presence about any intentions of
 4            turning this lab in to the DEA?
 5       A.   No.
 6       Q.   Did he ever indicate to you-- and I think you
 7            have answered this somewhat with regards to Mr.
 8            Rork, one of Mr. Rork's questions-- but did he
 9            ever indicate to you that it was his intention
10            or his desire to move the lab to Nevada?
11       A.   Yes, he did mention that.
12       Q.   All right.  And what did he tell you about
13            that?
14       A.   He just asked me if I was willing to drive it.
15       Q.   Willing to what, drive it?
16       A.   Drive the trailer.
17       Q.   Containing the lab?
18       A.   Containing the lab.
19       Q.   To somewhere in Nevada?
20       A.   That's correct.
21       Q.   Did he tell you where?
22       A.   He just said somewhere near the Nevada
23            California border.
24       Q.   And did he tell you why he wanted to move it to
25            Nevada?
```

```
1    A.   He didn't say.
2    Q.   He just asked you, and your response was what?
3    A.   No.
4    Q.   And that was the end of it then?
5    A.   That was the end of it.
6    Q.   Now, you told us about seeing the wooden boxes.
7         Do you recall that?
8    A.   Yes, I do.
9    Q.   And where did you first see that?
10   A.   The first time I saw them was taking them off
11        of the truck.  I guess I was maybe upstairs or
12        something when they were loaded onto the truck.
13   Q.   And do you remember which trip it was that you
14        saw them coming off the truck?
15   A.   Yeah, it was the second trip we made.  After we
16        got stuck in the ditch, unloaded that, then we
17        came back with Todd and his father.
18   Q.   And that was the time, then, when that load got
19        to Wamego that you saw the boxes?
20   A.   That's correct.
21   Q.   And how many boxes were there?
22   A.   There were two wooden crates.
23   Q.   All right, and can you describe or demonstrate
24        about the size of those two boxes?
25   A.   Maybe three foot tall by a foot wide.
```

```
1    Q.   Okay.  And how deep, or how--

2    A.   Maybe a foot and a half by a foot by three or

3         four feet tall.

4    Q.   About a foot by a foot and a half by--

5    A.   Three and a half.

6    Q.   Three and a half?

7    A.   Approximately.

8    Q.   Okay, and were those boxes, when you saw them,

9         were they opened or were they secured in some

10        way?

11   A.   One of them was all the way nailed shut or

12        stapled shut or something.  The other one

13        looked like it had already been opened.

14   Q.   All right, and what was it about the box that

15        made it look like it had already been opened.

16   A.   The wood, the piece of wood that was on the

17        top, the nails were pulled back.  It wasn't all

18        the way sealed.

19   Q.   Were you able to look in or tell what the

20        contents of either of those boxes were on that

21        first occasion when you saw them?

22   A.   Not until we moved them inside.

23   Q.   And were they moved directly from coming off

24        the truck, were they moved inside?

25   A.   Yes.
```

```
 1    Q.  And when you say inside, you mean into where?

 2    A.  Into Mr. Skinner's bedroom closet.

 3    Q.  All right.

 4    A.  Where we'd stashed them up overhead.

 5    Q.  And when you say you stashed them up overhead,

 6        you mean just the boxes with their contents, or

 7        were the boxes opened and their contents

 8        stashed?

 9    A.  The boxes were opened and the silver Pringles

10        like cans were put up there individually.

11    Q.  You and Mr. Skinner did that?

12    A.  Yes.

13    Q.  Anybody else involved in that?

14    A.  No.

15    Q.  About when would that have been, then?  You

16        were moving this lab in July of 2000?

17    A.  Yes.

18    Q.  So it would have been the second trip, whenever

19        it was, in 2000?

20    A.  Yes.

21    Q.  Is that right?

22    A.  That's correct.

23    Q.  And then I believe your testimony was you saw

24        the cans again about two weeks later?

25    A.  It was pretty soon after that that we moved it
```

```
 1              to the hotel room.
 2       Q.  All right.
 3       A.  And eventually to Ms. Reagan's residence.
 4       Q.  Tell me how that came about.  What prompted you
 5              to get involved in taking the cans down or out
 6              of the ceiling or wherever they were and doing
 7              something else with them?
 8       A.  I'm not sure what prompted it.  He said, "Hey,"
 9              Mr. Skinner said, "I need a favor.  I need you
10              to just take this suitcase and sit with it
11              overnight at the hotel room."
12       Q.  And when he said take the suitcase, had he
13              already taken the cans down, or did you help
14              him do that?
15       A.  I helped him do that.
16       Q.  All right, and you took those down and put them
17              in a suitcase, and he asked you to what, go and
18              sit with them?
19       A.  Yes.
20       Q.  Did he tell you why he wanted you to sit with
21              them?
22       A.  No, he didn't.
23       Q.  Did he tell you-- I think you testified earlier
24              Skinner said he wanted to get them out quickly
25              and put in the suitcase.  Did he tell you what
```

```
 1          the urgency was?

 2    A.    I'm not sure what the urgency was.

 3    Q.    Did he tell you that he was withholding those

 4          from the government?

 5    A.    No, he didn't say that.

 6    Q.    Did he tell you what the reason was for

 7          secreting them, for taking them out of the

 8          ceiling, putting them in a suitcase, you going

 9          to the hotel and sitting with them and then

10          taking them and putting them in Emily Reagan's

11          bedroom?

12    A.    He didn't say, and I didn't ask.

13    Q.    Okay.  Were you curious?

14    A.    I was curious.

15    Q.    But you just didn't ask?

16    A.    I figured he would just give me some bogus

17          answer anyway, so didn't waste my time.

18    Q.    Was that kind of his practice to give bogus

19          answers on occasion?

20    A.    I have seen him do that, yes.

21    Q.    So you get over to Emily Reagan's, and you told

22          us you put them in a footlocker, some of the

23          cans, and some of the cans in the closet.  Is

24          that right?

25    A.    That's correct.  Two would not fit in the
```

```
 1        footlocker.
 2    Q.  Do you know how many cans there were total?
 3    A.  I'm guessing 26.
 4    Q.  Okay, and what's the basis for your guess that
 5        it was 26?
 6    A.  I mean, I never just took a physical count.  I
 7        just saw them as they were going into the
 8        suitcase and into the footlocker.  That's just
 9        the best number I can come up with.
10    Q.  All right.  To your knowledge, were those cans
11        ever in Missouri?
12    A.  The first time I saw them was in Kansas, and
13        that's it.
14    Q.  Do you know of anyone who maintained
15        surveillance on the cans for an extended period
16        of time, several days or more?
17    A.  No, I don't.
18    Q.  Did you maintain surveillance on the cans for
19        any period of time other than while you were
20        sitting with them at the hotel?
21    A.  Only to take them from Kansas down to Tucson.
22    Q.  Okay, and when you took them from Kansas to
23        Tucson, that lasted-- that was when?
24    A.  That was July of 2000-- no, probably January of
25        2001.
```

1    Q.   All right, and that was a trip on a train?

2    A.   That's right.

3    Q.   And where was the footlocker or suitcase,

4         whatever they were in-- what were they in on

5         the train?

6    A.   On the train, they were in a footlocker.

7    Q.   All right.

8    A.   Like the picture we saw.

9    Q.   All right.

10   A.   Same thing.

11   Q.   And where was the footlocker while you were

12        taking this train trip?

13   A.   I rented a sleeper cabin and kept it with me

14        the whole time.

15   Q.   Okay, and the trip lasted what, a couple days?

16   A.   A couple of days.

17   Q.   Other than that, those two days and the day you

18        sat with it in the hotel room, that would be

19        the extent of your--

20   A.   Relationship with the cans.

21   Q.   -- looking after the footlocker.  Right?

22   A.   That's correct.

23   Q.   Okay.  Now, during the course of this, you

24        looking after this substance or whatever was in

25        those cans, was it your understanding or belief

1    that it belonged to Mr. Skinner?

2  A.  Sure.

3  Q.  Okay.  I mean, he indicated, did he not, that

4    these were his?

5  A.  He never came out and said, "These are mine,"

6    but--

7  Q.  He conducted himself--

8  A.  -- I assumed it.

9  Q.  He conducted himself in such a way that they

10    appeared to be his.  Right?

11  A.  Yes.  It seemed like he had control of them.

12  Q.  Now, Mr. Rork asked you about this situation in

13    Oregon.  Was there anything else involved in

14    the meeting that you had with Skinner in Oregon

15    other than just getting some of your items out

16    of his storage space?

17  A.  No.

18  Q.  Your-- you had had articles of yours

19    intermingled with things of his for some period

20    of time.  Correct?

21  A.  That's correct.

22        MR. BENNETT:  And there wasn't--

23    well, strike that.  That's all I have, Your

24    Honor.

25        THE COURT:  Mr. Hough?

REDIRECT EXAMINATION

BY MR. HOUGH:

Q.  Mr. Hobbs, when Mr. Rork was asking you
    questions, you indicated that the Ellsworth
    site, an Atlas F, when you first went there,
    that Mr. Skinner had the keys.  Do you recall
    saying that?

A.  Yes.

Q.  Did he have all the keys?

A.  No.

Q.  And to the area where the lab was, did he have
    the keys to that?

A.  No.

Q.  And how was access gained to that area?

A.  We tried cutting with bolt cutters.  They
    didn't work, so he got out the grinder, to
    grind through the chain link.  One of the links
    came off, and then the rest of the chain came
    off.

Q.  Mr. Skinner give you any reason to believe that
    all of the items there in the Atlas F that you
    were moving out were his?

A.  No.  I wasn't quite sure who they belonged to.
    At one point, I think I even asked him, "Is
    this a robbery," half-way joking.

124

```
1    Q.  But, so, and the point is that you had no
2        reason to believe it was his stuff, in fact,
3        you thought he may have been taking it from
4        someone?
5    A.  That's correct.
6    Q.  Part of that being because he didn't even have
7        the keys to get into the place?
8    A.  Exactly.
9    Q.  You also answered Mr. Rork indicating that you
10       recalled a plant with a camera in it.  Do you
11       recall that?
12   A.  Yes, I do.
13   Q.  The transition of the questioning was such that
14       I wasn't sure whether you indicated seeing that
15       near Salina in the Atlas F or in Wamego.  Where
16       was it?
17   A.  It was at the Atlas F, and it was moved to
18       Wamego with everything else.
19   Q.  In one of the military boxes?
20   A.  Yes.
21   Q.  Thank you.  And Mr. Rork asked you about
22       Ayahuasca parties at the Wamego location.  Are
23       we talking about 300 or 400 people?
24   A.  No.
25   Q.  What are you talking about, an Ayahuasca party?
```

```
 1    A.  Very, very small gatherings.  There's usually
 2        one person who's a facilitator who stays sober
 3        in case someone gets into a serious mental
 4        condition or falls or something, and then
 5        usually maybe four or five people.
 6    Q.  And is this something that is just, in your
 7        presence when it occurred, a recreational
 8        thing, people wanting to get high and bang off
 9        the walls and break stuff?
10    A.  No, it was actually more like being in church.
11            MR. RORK:  I would indicate in his
12        situation, Mr. Hobbs indicated it occurred one
13        or two times when he was there.  He didn't know
14        how many times it occurred when he wasn't
15        there.
16            MR. HOUGH:  I'm trying to figure out
17        what the objection is, Judge.
18            THE COURT:  I'm not sure what the
19        objection is.
20            MR. RORK:  He was asking about when
21        all these had occurred.  I was digging into the
22        foundation, when he was saying all these
23        occurred, not in the context of all the time,
24        but limited to the times Mr. Hobbs had
25        testified to was my objection.
```

1          THE COURT:  I'll overrule the

2     objection.  You may go ahead.

3          MR. HOUGH:  Thank you.

4  Q.  (By Mr. Hough)  Your understanding of the

5     Ayahuasca sessions that occurred there was

6     based on your participation two or three times.

7     Is that your testimony?

8  A.  Yes.

9  Q.  And had there been other times when you had

10    been present at other locations for an

11    Ayahuasca session, or was this it?

12 A.  As far as Ayahuasca goes, that was it.

13 Q.  Okay.  Both Mr. Rork and Mr. Bennett asked you

14    about the number of crates and the number of

15    cans, Pringles cans.  Do you recall that?

16 A.  Yes, I do.

17 Q.  You indicated that you believed there were 26

18    cans.

19 A.  I'm not positive on that.  Don't hold me to

20    that.  That's just the best my memory serves

21    me.

22 Q.  Do you recall seeing, when you were putting the

23    cans in the ceiling, any cans that were not in

24    the crates already, and were there other cans

25    in addition to the two crates?

1   A.  Not that I know of, no.

2   Q.  Do you think that you saw all of the cans

3       there, or were you and Mr. Skinner together

4       from the time that the cans came out of the

5       crate until they were up in the ceiling, or did

6       you come in as he was doing that, or how did

7       that work?

8           MR. RORK:  Judge, I'd just object to

9       the form of the question as compound.  He asked

10      three different things, and the answer, I

11      think, is significant.

12          MR. HOUGH:  Did you understand the

13      question?

14  A.  Yes, I do, and I can, I guess, answer by saying

15      that I wasn't there when they were carried

16      inside.  He had came above ground where we were

17      unloading the truck, and he asked me to come

18      down, and one of the crates was already

19      partially opened, so it could have been him

20      that opened it.  I didn't say, "Hey, did you

21      open this, because it's already open."  It was

22      just obvious someone had already been in it.

23  Q.  Okay, and was the ceiling area opened in your

24      presence, or was it already open when you got

25      down there?

```
1    A.   It had already been opened.

2    Q.   So it's possible there were already some cans

3         in there by the time you got down there?

4    A.   Sure.

5    Q.   You indicated under questioning by Mr. Bennett

6         that Mr. Skinner had in the past provided you

7         with MDMA, MDA, MMDA, and DMT.  Do you recall

8         that?

9    A.   Yes, I do.

10   Q.   And you also indicated the prescription drugs

11        Valium and hydrocodone.  Do you recall that?

12   A.   Yes.

13   Q.   As to the Valium and the hydrocodone, other

14        than you being given that when you were

15        handling this LSD lab, moving it from the Atlas

16        F to the Atlas E so that you wouldn't get sick

17        or overdosed, did he give you Valium and

18        hydrocodone, or was that the only occasion?

19   A.   There was an occasion right as we were going

20        into a meeting with the DEA that I was really

21        nervous, and that I actually had a prescription

22        of Valium at one time, and so I knew it was

23        safe for me, and so he said, "Here.  Would this

24        help?"  I said, "Sure," and I took it.

25   Q.   And as to the MDMA, MDA, MMDA, and DMT, was Mr.
```

```
1            Skinner just doling this stuff out all the
2            time, or how was it that he came to give you
3            those items?
4       A.   There was a few occasions where I was going out
5            maybe to a dance club or to do something
6            recreational that he offered it to me, and
7            there were other times when it's just a few,
8            small group at the missile base.
9       Q.   And the times at the missile base and the small
10           groups, was that similar to the Ayahuasca
11           sessions that you described earlier, or was
12           that some other type of a thing?
13      A.   It was similar to that, it was just like coming
14           together, bonding, sharing, you know.  Trying
15           to work through problems pretty much.
16      Q.   Other witnesses have indicated taking these
17           types of substances as a sacrament or as a
18           spiritual vehicle, if you will.  Did you take
19           them for that purpose, or just purely for
20           recreational, to get the high?
21      A.   No, not for recreation at all.  Sacrament is a
22           good way to describe it.  Like I said, it's
23           like going to church.  It has been used, you
24           know, in that way for many thousands of years.
25      Q.   Mr. Bennett asked you about the movement of the
```

```
 1              white trailer at the Las Campanas area of Santa

 2              Fe.  Do you recall him asking about that and

 3              indicating that Mr. Apperson was not present

 4              then?

 5         A.   Yes.

 6         Q.   Is that the same white trailer, though, that

 7              Mr. Apperson later unloaded into the Ryder

 8              truck while you were acting as the lookout with

 9              the walkie-talkies?

10         A.   Yes, that's true.

11         Q.   Mr. Bennett asked you about it taking Mr.

12              Apperson 25, 30 minutes to unload that trailer

13              into the Ryder truck versus 20 hours over

14              several days that you were unloading the items,

15              loading and unloading the items at the Atlas F

16              to the Atlas E.  Do you recall that?

17         A.   Yes, I do.

18         Q.   And all of the things that you found in that

19              Atlas F that were loaded up and moved

20              subsequently to the Wamego Atlas E, would they

21              all have fit in the white trailer that was

22              unloaded at Santa Fe?  Would it all have fit in

23              that, had it not been in the military boxes?

24         A.   Now, that would change the answer.  I don't

25              know if it would or not.  I mean, it's hard to
```

```
 1          tell.  If it did, it would be very full.
 2     Q.   Okay.  And did the 20-hour time frame that you
 3          gave us include the time going down the
 4          hallways and up the stairs at the Atlas F?
 5     A.   Yes, just doesn't include the time it took to
 6          take everything apart and get it all into the
 7          boxes.  That seemed to take up the most, the
 8          bulk of the time we were there.
 9     Q.   It did or did not include that time?
10     A.   It did not include that time.
11     Q.   Okay.  And when Mr. Skinner got ahold of you
12          and-- strike that.  After the laboratory was
13          moved from the Atlas F near Carneiro or
14          Ellsworth County over to the Atlas E at Mr.
15          Skinner's place in Wamego, was Mr. Skinner--
16          how was he?  Was he happy about that being
17          there, nervous, what?
18     A.   He was nervous.  I think Tim Schwartz's father
19          was really pressing to get in there.  Seemed
20          like he didn't have enough time, so he was
21          really pushing the thing along.
22     Q.   And after it was all unloaded and it was at
23          Wamego, did he still seem uneasy, or did that
24          subside, or was it-- how did that play out?
25     A.   He seemed to be more relaxed after it all got
```

```
1              there.
2        Q.    And after the lab was unloaded at Wamego, are
3              you aware of a time that Mr. Apperson or Mr.
4              Pickard were at the Wamego location after that
5              lab had been unloaded?
6        A.    Only what I saw in the papers where they had
7              been arrested.
8                   MR. BENNETT:  Well, now, Judge, I'm
9              going to object to what he saw in the paper.
10                  THE COURT:  Well, sustained.
11       Q.    (By Mr. Hough)  Were you aware of them coming,
12             or either one of them coming to or being at
13             Wamego, Salina, or that area, in Kansas at all,
14             between the time that the lab was moved from
15             the Atlas F to the Atlas E and before the
16             arrest November 6?
17       A.    No.
18       Q.    Were you in Kansas during that period of time?
19       A.    No.
20                  MR. HOUGH:  Thank you.  Nothing
21             further.
22                  THE COURT:  Anything further?
23                  MR. RORK:  Judge, I have no further
24             questions.
25                  MR. BENNETT:  I have nothing further,
```

1       Your Honor.

2               THE COURT:  All right, you may step

3       down and be excused.

4   A.  Thank you.

5               THE COURT:  You may call your next

6       witness.

7               MR. HOUGH:  Your Honor, we would ask

8       the witness be permanently excused.

9               THE COURT:  I'm willing to do that.

10              (THEREUPON, the following proceedings

11      were not ordered transcribed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPY                                                            134

```
 1        UNITED STATES OF AMERICA  )
                                    )    ss:
 2        DISTRICT OF KANSAS        )

 3                      C E R T I F I C A T E

 4            I, Roxana S. Montgomery, Certified

 5        Shorthand Reporter in and for the State of

 6        Kansas, do hereby certify that I was present at

 7        and reported in machine shorthand the

 8        proceedings had the 19th day of February, 2003,

 9        in the above-mentioned court; that the

10        foregoing transcript is a true, correct, and

11        complete transcript of the requested

12        proceedings.

13            I further certify that I am not attorney

14        for, nor employed by, nor related to any of the

15        parties or attorneys in this action, nor

16        financially interested in the action.

17            IN WITNESS WHEREOF, I have hereunto set

18        my hand and official seal at Topeka, Kansas,

19        this ___21st___ day of ___July.___, 2003.

20

21        _____

22        Roxana S. Montgomery

23        Certified Shorthand Reporter

24

25
```