COPY [1]

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

2003 MAR 11  P 1: 1

RALPH L. DELOACH
CLERK
BY _____ DEPUT
AT TOPEKA. KS.

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2

 3      UNITED STATES OF AMERICA,        )
        -------------------- Plaintiff,)
 4                                       )
                vs.                      )  Case No.
 5                                       )  00-40104-01/02
        WILLIAM L. PICKARD and           )
 6      CLYDE APPERSON,                  )
        -------------------- Defendant.)
 7

 8                      VOLUME I
              TRANSCRIPT OF TESTIMONY OF
 9                    CARL NICHOLS
        UPON CROSS-EXAMINATION BY MR. BENNETT
10          HAD DURING THE JURY TRIAL
                      BEFORE
11          HONORABLE RICHARD D. ROGERS
                 and a jury of 12
12                      on
                  March 3, 2003
13

14      APPEARANCES:

15      For the Government:    Mr. Gregory G. Hough
                               Asst.  U.S. Attorney
16                             290 Federal Building
                               444 Quincy Street
17                             Topeka, Kansas 66683

18      For the Defendant:     Mr. William Rork
        (Pickard)              Rork Law Office
19                             1321 SW Topeka Blvd.
                               Topeka, Kansas 66603
20

21      For the Defendant:     Mr. Mark Bennett
        (Apperson)             Bennett, Hendrix & Moylan
22                             5605 SW Barrington Ct. S.
                               Topeka, Kansas 66614

23      Court Reporter:        Roxana S. Montgomery, CSR
                               Nora Lyon & Associates
24                             1515 South Topeka Avenue
                               Topeka, Kansas 66612
25
```

294

COPY 2

1                        I  N  D  E  X

2          Certificate ------------------------------- 47

3                      W I T N E S S

4          ON BEHALF OF PLAINTIFF:                    PAGE

5          CARL NICHOLS (Contd.)

6               Cross-Examination by Mr. Bennett       3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NORA LYON & ASSOCIATES, INC.
1515 S.W. Topeka Blvd., Topeka, KS  66612
Phone:  (785) 232-2545        FAX:  (785) 232-2720

1                        CARL NICHOLS,

2          called as a witness on behalf of the Plaintiff,

3          was previously sworn, and testified upon

4          cross-examination by Mr. Benett as follows:

5                      CROSS-EXAMINATION

6          BY MR. BENNETT:

7      Q.  Agent Nichols, in your-- early on in your

8          direct examination in your response to one of

9          Mr. Hough's questions, you have indicated, I

10         believe, that the-- in the course of your

11         investigation, the DEA generated a list from

12         files maintained by them relating to LSD and ET

13         traffickers, I think was generally what you

14         said.  Do you recall that?

15     A.  Yeah, generally, that's what formed the basis

16         of my knowledge about the LSD and ergotamine

17         tartrate organization.

18     Q.  All right, and in that, you indicated that-- or

19         in that testimony you indicated that it

20         produced some names or some groups of people

21         that had a history of being involved in that

22         type activity.  Is that correct?

23     A.  Yes.

24     Q.  You didn't find Mr. Apperson's name in those

25         files, did you?

| | | |
|---|---|---|
| 1 | A. | No, but I did find Mr. Pickard's name. |
| 2 | Q. | All right, but you didn't find Apperson's name? |
| 3 | A. | I did not. |
| 4 | Q. | Now, you also indicated-- early in your |
| 5 | | testimony you recited some rules, I believe is |
| 6 | | the way you put it, that the DEA had with |
| 7 | | regards to dealing with informants or |
| 8 | | confidential sources.  Do you recall that |
| 9 | | testimony? |
| 10 | A. | Yes. |
| 11 | Q. | And can you tell us what the purpose-- what |
| 12 | | your understanding of the purpose was for those |
| 13 | | rules that you told us about? |
| 14 | A. | Well, the purpose is to, first of all, find out |
| 15 | | and classify what type of an informant the |
| 16 | | agency might be talking to.  Secondly would be, |
| 17 | | basically, guidelines for how to deal with an |
| 18 | | informant, what things need to be done, how |
| 19 | | they need to be debriefed, what type of reports |
| 20 | | need to be generated, what type of background |
| 21 | | needs to be done on the informant or on the |
| 22 | | person who wants to cooperate before they are |
| 23 | | established as an informant. |
| 24 | Q. | All right, and if I understood your testimony, |
| 25 | | in the course of doing that, according to my |

```
 1              notes, you said that there's an assessment done
 2              of the informant on paper.  Is that right?
 3       A.     That's true.
 4       Q.     Was there an assessment done on paper of Mr.
 5              Skinner?
 6       A.     Yes, there was.
 7       Q.     Do you have that assessment?
 8       A.     It is in the confidential source file, and I
 9              believe that's something that has been
10              presented to the Court in camera, and I believe
11              that, through Mr. Hough, you had an opportunity
12              to review it.
13                   MR. BENNETT:  Judge, I would ask that
14              we be provided with a copy of that assessment.
15              The only thing that I was allowed to have a
16              copy of out of the confidential source file was
17              the confidential source agreement, which has
18              been marked as an exhibit, but the assessment I
19              was not allowed to have.
20                   MR. HOUGH:  Judge, we made it
21              available, and as the Rule requires, we make it
22              available, and individual copies are not
23              required under the Rule.  The Court has
24              previously visited that and held that providing
25              counsel with their own individual copies was
```

1    not necessary.  We have fulfilled our discovery

2    obligation in making it available to both

3    counsel.

4              MR. RORK:  Judge, on behalf of Mr.

5    Pickard, I would just indicate that you made a

6    different file that we couldn't have copies of

7    unrelated to this one, and I've never seen this

8    assessment.  It hasn't been made available to

9    me.

10             MR. BENNETT:  Judge, I don't want to

11    make a speech.  I don't know if it's

12    appropriate to respond.  Maybe we ought to

13    approach the bench.

14             THE COURT:  I think so, yes.

15             (THEREUPON, the following proceedings

16    were held at the bench and outside of the

17    hearing of the jury.)

18             MR. BENNETT:  Judge, I would

19    respectfully submit to the Court that that

20    assessment is something that goes to

21    credibility of the witness, and I think should

22    be-- a copy should be provided to us.  We would

23    ask for a copy of it.  I've looked at it.  Let

24    me restate that.  I don't recall looking at the

25    assessment of this particular witness.  There

1       was a written assessment in there with regards

2       to, oh, the lady that got the $14,000.

3                 MR. RORK:  Debra Harlow.

4                 MR. BENNETT:  Debra Harlow, but I

5       don't recall any written assessment of this

6       witness.  I think it's certainly relevant to

7       credibility.  I may or may not decide that I

8       want to offer it as an exhibit, but I would ask

9       that we would be provided with a copy of it.

10                MR. HOUGH:  Pursuant to the Court's

11      prior orders, we made it available in our

12      office.  It is not impeaching.  In fact,

13      Skinner's CI file the Court viewed in camera,

14      and we made it available in our office, the

15      documents that the witness has just referred

16      to, as well as all the matters in that CI file,

17      so we have fulfilled our obligation under the

18      rule; and in addition to that, there's no

19      requirement for copies.  Additionally, DEA regs

20      prohibit dissemination of the documents in the

21      CI file absent the consent of the Chief

22      Counsel.  The regs, the CFRs, don't allow that.

23      So for those reasons, we believe the

24      defendant's objection should be overruled and

25      denied.

1              MR. RORK:  Judge, I would just like

2      to look at it at a break.  I don't want to take

3      it away from Mr. Bennett, and if you want to

4      get a copy, fine.  I looked at a CI file about

5      18 inches thick, and I recall no assessment.

6      That's the first I heard of one for him, Judge.

7              MR. HOUGH:  Judge, it's in my office,

8      and if they would like to look at it once again

9      at the end of the day, they are more than

10     welcome to do that.

11             MR. BENNETT:  Judge, this came in--

12     this testimony about this assessment came in on

13     direct examination and was, in effect,

14     proffered by the government, and now they've

15     put the testimony in about an assessment, but

16     they say it's-- it can't be used, and I think

17     they have opened the door when they-- they

18     brought this out from the witness.  It's not

19     something Mr. Rork brought out, not something I

20     brought out, came out in the first 20 minutes

21     or 30 minutes of this witness's testimony on

22     direct.

23             MR. HOUGH:  Judge, that's painting

24     with an awfully broad brush.  I asked him:  How

25     do you handle a CI?  And the witness testified,

1           "Among other things, we do an assessment."

2           "Was one done here?"  "Yeah."  And then I moved

3           on.  So the specifics and the particulars of

4           the assessment are not a matter of record, and

5           again, we have made it available.  If counsel

6           would like to come down after the break and

7           look at the CI file again, they're welcome to

8           do that.

9                     THE COURT:  Well, we've talked about

10          it.  Give it to them.  I'll order you to give

11          it to them.  Let's move on, on these things.

12          Give them as many copies as they want.

13                     (THEREUPON, the bench conference was

14          concluded and the following proceedings were

15          held within hearing of the jury.)

16     Q.   (By Mr. Bennett)  Mr. Nichols, I'll come back

17          to that question and go a little further with

18          it later on, and go on to some other questions

19          now.  Okay?

20     A.   That's fine.

21     Q.   Now, the confidential source agreement-- or

22          there was a confidential source agreement

23          signed with Mr. Skinner, between Skinner and

24          the government.  Correct?

25     A.   Yes, there was.

```
 1                    MR. BENNETT:  Do you have that
 2       confidential source agreement?  I don't know
 3       the exhibit number.
 4                    MR. RORK:  801.
 5                    MR. BENNETT:  801 I think maybe.
 6                    MR. RORK:  Yeah, it is 801.
 7                    MR. BENNETT:  That's it.  Thank you.
 8       Judge, can I approach?
 9                    THE COURT:  Yes, you may at any time.
10    Q.  (By Mr. Bennett)  Agent Nichols, I'm going to
11        show you what has been marked as Government's
12        Exhibit 801 and ask you, sir, if you recognize
13        that.
14    A.  I do.
15    Q.  And is that the confidential source agreement
16        that was entered into between the government
17        and Mr. Skinner?
18    A.  It's a copy of it, yes.
19    Q.  All right.  It's not the original but it's an
20        exact copy, is it not?
21    A.  It's a copy, yes.
22    Q.  All right.  And who were the parties that
23        signed that agreement?
24    A.  Gordon Todd Skinner, also signed it as Gordon
25        Todd Rothe Skinner, Nancy L. Carter.
```

1    Q.   Who is Nancy Carter?

2    A.   She was an intelligence analyst, and she was

3         present during the debriefings of Mr. Skinner

4         on October 17th and 18th.

5    Q.   In California?

6    A.   In California.

7    Q.   All right, then, go ahead.

8    A.   And myself.

9    Q.   All right, and that is dated-- are the

10        signatures dated?

11   A.   Yes, they are.

12   Q.   What are the signatures-- or the dates beside

13        the signatures?

14   A.   October 18th, 2000.

15   Q.   All three of them?

16   A.   All three of them.

17   Q.   And in that confidential source agreement, is

18        there a provision that requires, or is part of

19        the agreement that the informant or the source

20        will be completely truthful?

21   A.   Well, paragraph No. 1 says, "I will provide

22        truthful information at all times."

23   Q.   All right, and then is there also a provision

24        in the agreement about committing illegal acts?

25   A.   Yes, there is.

```
 1    Q.   All right.  What does that provision read?
 2    A.   It says, paragraph No. 3, "I will abide by
 3         instructions given to me, will not take any
 4         independent action, and I will not engage in
 5         any unlawful acts for which I may be subject to
 6         prosecution except as specifically authorized
 7         by representatives of the DEA."
 8    Q.   All right.  In the course of Mr. Skinner's
 9         acting as a confidential source for the DEA or
10         the government, you subsequently determined,
11         did you not, that he did not provide truthful
12         information at all times he was working as a
13         source or an informant?
14    A.   Well, more specifically, he concealed the fact
15         he had ergocristine.
16    Q.   All right, and he-- you determined that not
17         only did he conceal it, but he lied about it,
18         didn't he?
19    A.   Yeah, you could say that.
20    Q.   Well, didn't-- you at one point ask him, did
21         you not, "Are you concealing or do you have any
22         more ergocristine?"
23    A.   I believe I did on January 22nd when he brought
24         the original 22-- 24 cans to me in Oakland,
25         California.
```

1    Q.   You asked him that question prior to him

2         bringing that to you, did you not?  Didn't you

3         ask him on--

4    A.   I--

5    Q.   Excuse me.

6    A.   I probably asked him on October 31st--

7    Q.   Right.

8    A.   -- when we were at the lab and when we found

9         the ergocristine in the lab if he had any

10        additional, and I may have asked him-- I may

11        have asked him on the 27th on the walk-through

12        that, did he have any additional.  I didn't

13        want to see it, but yes or no, did he have any

14        additional ergocristine or ET.

15   Q.   On the 27th, you believe you asked him, and his

16        response was what?

17   A.   On the 27th, I believe it was yes, he did, and

18        it was part of the lab.

19   Q.   All right.  And then on October the 31st when

20        the search warrant was served, you found, what,

21        19 and a half cans, counting the half a can

22        that was-- you had previously seen?

23   A.   No.

24   Q.   Thirteen and a half?  You tell me.

25   A.   I believe we found 13.  We may have found-- we

```
 1              found 14 cans.  We found 13 full cans plus the
 2              one can that was partially full.
 3    Q.   All right.  And on that occasion, on the 31st,
 4              you and other agents questioned Mr. Skinner to
 5              determine if there were additional containers
 6              of ergocristine in his possession, did you not?
 7    A.   We did, because there-- we were processing the
 8              lab, and at some point during us processing the
 9              lab, Mr. Skinner went up to one of the other
10              agents and said something, "When they get done
11              processing the lab, I have a surprise."  When
12              we were done processing the lab, the agent
13              brought me and others over, and I don't
14              remember who else was with me, and Mr. Skinner
15              said he had ET.  He took us up into the storage
16              shed, into the Quonset hut, and underneath a
17              box of tile was a crate, a wooden crate, and
18              inside that crate was ten cans of ergocristine.
19    Q.   Okay, but then to cut to the chase, he told you
20              he had and showed you these ten cans, but then
21              you asked him, did you not, "Do you have any
22              more?"
23    A.   Absolutely.
24    Q.   And what was his answer?
25    A.   I believe it was no.
```

1   Q.   And that was a lie, wasn't it?

2   A.   That was a lie.

3   Q.   And in these-- this confidential source

4        agreement that you just testified, he agreed,

5        did he not, that he would not take any

6        independent action and that he would not engage

7        in any unlawful act.  That's what you told us

8        earlier, right?

9   A.   I believe that's what paragraph three says.

10  Q.   Right.  But he violated that, did he not?  He

11       did take some independent action, didn't he?

12  A.   Well, yes, he did.  He brought this

13       ergocristine or ET, as he thought it was, to

14       us.  He didn't tell us he was in possession of

15       it.  Yes.

16  Q.   And he withheld it?

17  A.   Absolutely.

18  Q.   And in doing so, he was engaging in unlawful

19       acts, was he not?

20  A.   I suppose, yes.  First of all, ergocristine is

21       not a controlled substance.  It's not a

22       regulated substance, so mere possession of

23       that, my understanding, would not be a

24       violation of the law.  However, if it were used

25       to manufacture something, possession of it with

1    intent to manufacture would be, therefore, a

2    violation of the law.  So did he violate the

3    law?  Yes.  Did he conceal it from us?  Yes.

4    He eventually did bring it to us, and I don't

5    think we would ever have gotten it any other

6    way.

7  Q.  Okay, we'll come back to that a little later in

8    my questioning, and some of the specifics of

9    what occurred, but let me go on now.  As I

10   understood it, you as the case agent maintained

11   an overview of the case and were, in effect,

12   kind of a directing force of the investigation.

13   Is that a fair statement?

14  A.  For the most part, yes.

15  Q.  Okay.  And in the course of your function in

16   that capacity, did you become aware of the

17   seizure of some computers from Clyde Apperson

18   or from his possession, from a vehicle that he

19   was driving?

20  A.  Yes, from the vehicle he was driving, as well

21   as from his residence.

22  Q.  All right, and in addition to the computers

23   themselves, were there also some disks and data

24   files also seized?

25  A.  I believe there were, but I'd have to look at

| | | |
|---|---|---|
| 1 | | the evidence. |
| 2 | Q. | With regard to the seizure of those items, was |
| 3 | | there then an examination done to determine |
| 4 | | whether or not there was any arguably |
| 5 | | inculpatory evidence or information contained |
| 6 | | on those computers? |
| 7 | A. | Yes, there was. |
| 8 | Q. | And did you-- and was the same thing true of |
| 9 | | the data files and the disks? |
| 10 | A. | Everything, the computer related stuff we |
| 11 | | seized was sent to the computer forensics |
| 12 | | laboratory in Washington, DC, for analysis, so, |
| 13 | | yes. |
| 14 | Q. | And did you get the results, or have you seen |
| 15 | | the results of those analyses? |
| 16 | A. | Yes, I have. |
| 17 | Q. | There was no correspondence found in any of the |
| 18 | | computers between Mr. Pickard and Mr. Apperson, |
| 19 | | was there? |
| 20 | A. | Well, there was one computer, which we called |
| 21 | | Exhibit N-34-- I don't remember what the court |
| 22 | | number is-- that had correspondence from Linda |
| 23 | | Apperson to various people, looked like she was |
| 24 | | using the computer.  It appeared that Mr. |
| 25 | | Apperson, Clyde Apperson, was using the |

1      computer, and it also appeared that Mr. Pickard

2      was using the computer.  So was there

3      correspondence between them?  No, but there was

4      one computer where all three of them, it

5      appeared, had used the computer.

6    Q.  Didn't your investigation reveal that the one

7      computer that you say there was-- all three had

8      correspondence on it was a computer of-- that

9      belonged to Mr. Pickard that Mr. Apperson was

10     working on?

11   A.  Well, Mr. Apperson could have been working on

12     it, but it appeared that there were items,

13     personal items to Mr. Apperson, Mrs. Apperson

14     on that computer.  It appeared there were

15     drawings of Mr. Apperson's residence for

16     remodeling, so it appeared to me there were

17     personal items on that computer.  I mean, he

18     could have put that stuff on there while he was

19     fixing Mr. Pickard's computer, but that would

20     not make a whole lot of sense to me.

21   Q.  Well, let me ask you this.  The information or

22     the data that was contained on that computer

23     that you say all three used--

24   A.  Mm-hmm.

25   Q.  -- there wasn't any correspondence of Linda

1        Apperson's, Clyde Apperson's, or William

2        Leonard Pickard's that had anything to do with

3        LSD manufacturing, money laundering, the sales

4        of LSD, possession of LSD, was there?

5    A.  Well, that's not true.  There is a document on

6        the computer that had a list of coded telephone

7        numbers, and that list of coded telephone

8        numbers matches, not exactly, but its a close

9        match for the list of coded telephone numbers

10       that we seized from Mr. Apperson at the time of

11       his arrest, and a number of those telephone

12       numbers were to people who have been involved

13       and named by Mr. Skinner and others, who were

14       named in this conspiracy.  So I would disagree

15       with that and say that, yes, there is.

16   Q.  Okay.  Did you find any-- other than telephone

17       numbers, coded telephone numbers, you didn't

18       find anything else that related in any way to

19       drug manufacturing, possession or manufacture

20       of LSD, did you?

21   A.  You know, I don't recall.  I mean, I don't

22       recall-- well, I'm saying that because there

23       were-- there are volumes of evidence on--

24       volumes of information on the computer, and

25       there were-- one of the things that Mr. Pickard

1    was doing with computers, I guess what I would

2    call leapfrogging, is taking one computer and

3    the information from the hard drive on that

4    computer, buying a new computer, and putting

5    that information onto that second computer.  So

6    there were a number of e-mails, there were a

7    number of items of Mr. Pickard's on that

8    computer that also had Mr. Apperson's and Mrs.

9    Apperson's information on there; but whether

10   there was evidence of LSD manufacturing on that

11   computer in addition to that coded telephone

12   list, I don't recall without looking at it.

13  Q.  And there was no correspondence between Mr.

14   Pickard-- or Mr. Apperson or Mr. Pickard or

15   Mrs. Apperson with regards to any-- or with any

16   of the people that are alleged to be involved

17   in this matter, were there?

18  A.  As we're talking about it, no, I don't recall

19   that, but what I do recall is a note, an

20   e-mail-- well, if I can explain-- there's an

21   e-mail from Mrs. Apperson talking with-- and I

22   don't remember who it was-- but talking about

23   the legal limit for transporting cash outside

24   of the country, that there is a reporting

25   requirement for a $10,000 limit.

1    Q.   All right, and did you follow through on that

2         and learn that the Appersons were taking or

3         planning a theatre tour trip to England at

4         about that time?

5              MR. HOUGH:   Objection.   Assumes facts

6         not in evidence.

7              THE COURT:   Is it in evidence, or--

8              MR. BENNETT:   Well, let me ask it

9         this way, Judge.

10   Q.   (By Mr. Bennett)   Did you-- were you able to

11        determine in your investigation that that had

12        anything to do with any illegal exchanging of

13        money at all?

14   A.   I don't know.

15   Q.   You seized the Appersons' passports, did you

16        not?

17   A.   I did.

18   Q.   All right.   And did you compare their passports

19        to the approximate time that this entry was

20        found or was made on the computers?

21   A.   I don't recall that I specifically did that,

22        because I did find other information and

23        evidence that the Appersons were, in fact, in

24        England and in, I believe, in Ireland.

25   Q.   Okay, on some type of a tour?

```
 1    A.   I don't know if it was a tour.  I did-- in
 2         addition, I found a phone, a cellular phone in
 3         there that had-- it appears to be a European
 4         phone, cell phone, and it had Mr. Pickard's
 5         cell phone number in it.
 6    Q.   You never found any evidence in the course of
 7         this investigation that would support a
 8         contention that the Appersons were in Europe
 9         with or at the same time as Mr. Pickard, did
10         you?
11    A.   No, I don't believe so.
12    Q.   Now, in those computers that you found or that
13         you seized from Mr. Apperson, you found no
14         references to Aspen, did you?
15    A.   I'm sorry?
16    Q.   Aspen.  You found no references to Aspen,
17         Colorado, did you?
18    A.   No, I didn't.
19    Q.   You found no references to Santa Fe, did you?
20    A.   In one of the computers, and not in the-- not
21         in the computer files themselves, in one of the
22         computers there were documents, printed
23         documents for travel, travel requests for
24         Southwest Airlines or America West Airlines
25         going to Albuquerque, Tulsa, Omaha, Kansas
```

```
 1        City, so--
 2   Q.   Well, my question was:  Did you find anything?
 3        You didn't find anything in the computer
 4        relating to Santa Fe, New Mexico, did you?
 5        That's the question.
 6   A.   I don't recall anything in the computer
 7        specifically relating to that, no.
 8   Q.   And you didn't find anything in the computers,
 9        any of those that were seized from Mr.
10        Apperson, with regards to Ellsworth, Kansas,
11        did you?
12   A.   Well, yeah.  I would go back to the one
13        document I've talked about that was in the
14        computer with the coded telephone list, and
15        there were telephone numbers for Salina,
16        Kansas.  There were telephone numbers in there
17        for the Albuquerque area.  There was an
18        address, a name, address, and telephone number
19        for a woman who lived in Santa Fe, so--
20   Q.   Was it Santa Fe or Albuquerque?
21   A.   Santa Fe.
22   Q.   Who was that?
23   A.   Teresa Marquez.
24   Q.   Your testimony is she lived in Santa Fe?
25   A.   I believe that's-- that's what I recall.  It
```

1          was in Santa Fe.

2     Q.   Just a second.  I'll see if I can find

3          something that will refresh your recollection.

4          I want to show you a report or one page out of

5          a report and have you take a look at that.

6          Does that refer to the lady that you're talking

7          about?

8     A.   It does, and I'm mistaken.  It was in

9          Albuquerque, not in Santa Fe.

10    Q.   All right, okay.  So the answer to my question

11         is you didn't find any reference to Santa Fe,

12         did you?

13    A.   Well, I'd like to be able to look at the rest

14         of that document or the rest of that report to

15         make sure, so--

16    Q.   I want to show you-- let me put that page in

17         with it, then you will have the whole report.

18         I want to show you, Agent Nichols, a six-page

19         report that has your signature on it with a

20         date of November 13, 2001.  Is that the rest of

21         the report that you wanted to see?

22    A.   Yes, it is.  (Pause.)

23    Q.   Does that refresh your recollection, Agent?

24    A.   Generally.

25    Q.   You found nothing relating to Santa Fe, did

```
1            you?

2    A.   There are no specific records to Santa Fe, no.

3    Q.   And the same thing is true, is it not, you

4         found no references to Ellsworth or Wamego on

5         this computer?

6    A.   Are you asking on all the computers we seized,

7         or are you asking--

8    Q.   I'm asking about the computers you seized from

9         Mr. Apperson.

10   A.   No, I don't recall anything specifically.  I

11        mean, I would have to go review the items--

12   Q.   All right.

13   A.   -- to be sure, but I don't recall anything

14        specifically.

15   Q.   Now, on direct examination-- and I want to see

16        if I can understand, because I didn't

17        understand at the time-- you testified when you

18        talked to Mr. Skinner, I think your language

19        was the story, his story, was pretty fantastic,

20        kind of a wild guy, thought it was kind of a

21        disjointed story, and then you said it even

22        continues now or something to that effect.

23        What do you mean when you say it even continues

24        now?

25   A.   Well, let me back up and explain.  When I first
```

```
 1          met Mr. Skinner, he was full of this story.  He

 2          walk into the Sacramento hotel where we did the

 3          debriefing, and--

 4    Q.    Well, just a minute, Agent.  Excuse me for

 5          interrupting.  That's really not responsive to

 6          my question, and if you could just tell me what

 7          you mean or what you meant when you said it

 8          even continues now.

 9    A.    Well, I don't think I can adequately answer it

10          without giving a description of my impression

11          of him when I initially met him.

12    Q.    Well, let me ask it this way.  Does your

13          distrust-- or do you distrust him?

14    A.    I distrust-- I distrust all informants because

15          at some point, you know, they're likely-- if

16          you irritate them, if you anger them, they're

17          likely to come back at you and say something

18          against you and try to get you in trouble

19          because they're an informant.  That's what they

20          do.  They rat out their friends.  So, yes, I

21          distrust him.  I've told him that from the

22          beginning.  I'm not going to trust him until I

23          can prove to myself that the information he

24          provided to me or to the government was

25          credible and corroborable.
```

1    Q.   Well, you found out in the course of this

2         investigation that he-- that your distrust was

3         well founded, did you not?

4    A.   On occasion, yes.

5    Q.   Now, I want to go to the October 27th walk-

6         through.  You indicated that Agent McKibben was

7         present at that walk-through?

8    A.   From what I recall, Tim McKibben was present.

9    Q.   All right.  Were you here when Tim McKibben

10        testified he was not present?

11   A.   I was not here when he testified.

12   Q.   You testified that you had, in preparing or

13        talking with Mr. Skinner prior to the October

14        27th walk-through, that you had instructed him

15        to keep his hands off the stuff, whatever stuff

16        that was, that you had no search warrant, and

17        you didn't want him opening things or bringing

18        things to you.  Is that correct?

19   A.   I believe that's what I testified to.

20   Q.   Why did you tell him that?

21   A.   Well, because I didn't want to jeopardize any

22        future investigation that we might have.

23   Q.   How would-- what was it that you were telling

24        him not to do?  If he had done them, how would

25        that have jeopardized the investigation?

```
 1    A.   In doing searches for us, giving the impression
 2         that he was doing a search for or on behest of
 3         the government.
 4    Q.   Because he was an agent of the government at
 5         the time?
 6    A.   Well, once he became a cooperating source, yes,
 7         he was an agent of the government.
 8    Q.   Okay.  And so you didn't want him setting
 9         things out, or opening things up, or providing
10         you with things, bringing things to you until--
11         because that would, in your opinion or your
12         estimation, amount to an illegal search?
13    A.   It could be.
14    Q.   All right.  And then as I understand it, when
15         you went on the walk-through, lo and behold,
16         there was an open can of what at the time you
17         thought was ET but later turned out to be
18         ergocristine.  Is that right?
19    A.   That's correct.
20    Q.   And it was sitting on the stereo?
21    A.   That's correct.
22    Q.   And the stereo was located where?
23    A.   In the missile bay in the center of the missile
24         silo.
25    Q.   Would that be in--
```

1    A.   The missile base.

2    Q.   -- what was referred to earlier as the living

3         quarters?

4    A.   No.

5    Q.   Okay.  It would be-- there was a stereo in some

6         area other than living quarters?

7    A.   Yes.  It's-- if you were to walk or drive down

8         the driveway, the asfault driveway, it goes

9         down into the missile bay.  It opens up or

10        closes down into the missile bay.  The stereo

11        was sitting at the back of the missile bay, in

12        that area, sitting on top of a stage.  The can

13        was sitting on top of the stereo.

14   Q.   Was that all there was in that area, just the

15        stereo and the can?

16   A.   Oh, I think there was a grand piano in there.

17        There were other miscellaneous personal items.

18        I don't recall specifically what was in there,

19        but nothing of real substance, maybe a couple

20        of rugs.

21   Q.   Mr. Skinner told you, did he not, that he had

22        set that out there so you would, in effect,

23        believe him or this would corroborate what he'd

24        told you?

25   A.   Yes.

1  Q.  So he violated your rules when he did that,

2      correct?

3  A.  Yes, he did, and he was reprimanded for it.

4  Q.  All right.  And in your opinion, that could

5      jeopardize the lawfulness of the subsequent

6      search, correct?

7              MR. HOUGH:  Well, Judge, we'll

8      object.  The Court has previously ruled that it

9      was an appropriate search.  This is res

10     judicata.

11             THE COURT:  I'll sustain the

12     objection.

13 Q.  (By Mr. Bennett)  When you saw-- who-- where

14     were you when you first observed this can on

15     the stereo?

16 A.  I think, as I testified before, I was coming

17     with the other agents around the corner from

18     the reconstructed bathroom, which would have

19     been to the left of the missile bay, coming

20     around the corner.  As we came around the

21     corner, Mr. Skinner showed the stereo to us and

22     then, therefore, showed us the can sitting on

23     top of the stereo.

24 Q.  Did he point out the can to you?

25 A.  Yes, he did.

```
 1    Q.   What did he say when he pointed it out to you?

 2    A.   Something like, "Here's some evidence that I

 3         have ET," or, "that I have the ET," or, "that

 4         I'm telling you what I-- I'm telling you the

 5         truth."

 6    Q.   Did he tell you when he put it on the stereo

 7         before you came through on the 27th?

 8    A.   Well, it was sometime after he arrived in

 9         Wamego, after we had talked with him, after we

10         had done the undercover operation out in Marin

11         County on the 23rd, after he had arrived back

12         in Wamego at the base, but before we had

13         arrived at the base to do the walk-through or

14         to come through that day.

15    Q.   Did he tell you whether or not he had put it

16         out before or after the trip to Tulsa?

17    A.   The trip to Tulsa came after we arrived at the

18         missile base.  The trip to Tulsa was six days

19         later.

20    Q.   What was the date?

21    A.   The trip to Tulsa was November 3rd.

22    Q.   Okay, so it was between the Marin County and

23         the Tulsa situation?

24    A.   Well, it was between Marin County on October

25         23rd and our arrival at the base on October
```

1          27th, prior to October 27th, my understanding.

2     Q.   Did you, you or anyone else, take any

3          photographs of that one can sitting on that

4          stereo?

5     A.   No, not that I recall.  I don't think we--

6     Q.   Was there ever-- excuse me.  Didn't mean to

7          step on you.

8     A.   I don't think we photographed anything at that

9          point.

10    Q.   Was there a reason that you didn't take a

11         photograph of this can that he had set out

12         there for you?

13    A.   I don't recall having a camera at the time.

14    Q.   All right.  Do you know whether or not anyone

15         else had a camera?

16    A.   I don't.

17    Q.   Do DEA agents carry cameras as part of their

18         equipment in the car, in their vehicle?

19    A.   Most do, not always, and the people who were

20         coming in were coming in from out of state, so

21         if Tim McKibben was there-- and I don't recall

22         specifically, I believe he was-- but if he was

23         there, and then the other agents, Arthur

24         Hubbard and Jack Zajac, John Zajac, we were all

25         coming in from out of state.  Whether we had

```
 1         cameras or not, I don't recall.
 2    Q.   All right.  What if anything was done with the
 3         can that was there on the 27th, other than you
 4         standing over it and looking down and
 5         formulating an opinion as to what was in it or
 6         may be in it?
 7    A.   It was left there.  I told Mr. Skinner to leave
 8         it there, not to touch it, and that at some
 9         point we hoped to get a search warrant, and
10         then once the search warrant came, we would
11         seize that can.
12    Q.   And did that occur then?
13    A.   It did on the 31st.
14    Q.   Was that can seized from the location that you
15         had originally seen it on the 27th?
16    A.   It was there on the 31st, yes.
17    Q.   All right.  Now, when you saw the can, this one
18         can, was there any conversation about any other
19         cans at that point in time?
20    A.   Well, I believe there was generally, that Mr.
21         Skinner said, "See, here's a can, and this is
22         evidence of other cans that I have.  This is
23         evidence of cans of ET," or, "These are similar
24         to the other cans that I have."
25    Q.   Now, you say you reprimand him for setting it
```

1      out there.  Was that right there at that time,
2      or was it at some later time?
3   A.  It was right there at that time.
4   Q.  All right.  Did you tell him-- strike that.
5      Did you ask him where the other cans that he
6      said that he had were?
7   A.  You know, I may have.  I don't recall.  I don't
8      recall if he-- he had told us about the storage
9      area, the concealed storage area underneath the
10      bathroom.  He told us there was a refrigerator
11      and freezer in there and that there were some
12      items in there.  He may have told me there were
13      additional cans in that area at that point.  I
14      don't recall specifically.
15   Q.  Did you or anyone else on the 27th go and look
16      in that area?
17   A.  No, because we did not have a search warrant
18      and because, had I done that, that would have
19      been a search.
20   Q.  All right.  After he told you that there were
21      other cans, did you press him or push him on
22      how many and where they were?
23   A.  You know, I don't remember specifically
24      pressing him on how many.  I remember him
25      telling me there were more, and I vaguely

```
 1        recall him telling me there were more in the
 2        lab.  I don't recall any more specifics than
 3        that, that based on his conduct at that point,
 4        I did not want him going-- running up somewhere
 5        and saying, "Well, here's a box of ET."  I was
 6        directing him to tell me:  Did he have any
 7        more?  If he did, I needed to know about it.  I
 8        probably asked him where it was.  I don't
 9        recall specifically, but I specifically told
10        him I did not want him going to find it,
11        bringing it to us, before we had-- before we
12        had a search warrant; that we would find it, he
13        could tell us where it was, and we could find
14        it once we had a search warrant.
15    Q.  Agent, did you put anything in any report about
16        Mr. Skinner having set this one can out on the
17        stereo in violation of your instructions or
18        directions to him?
19    A.  I believe I-- in the affidavit, I put out that
20        he had shown it to us.
21    Q.  When you say in the affidavit, you're talking
22        about the affidavit for a search warrant?
23    A.  The affidavit for a search warrant.
24    Q.  All right, go ahead.
25    A.  I don't recall that I put it into any specific
```

1        report.

2    Q.  Did you put in the affidavit that at the time

3        this occurred and he set it out for you that he

4        was acting as an agent of the government?

5                    MR. HOUGH:  Well, Judge, we'll

6        object.  That's irrelevant.

7                    THE COURT:  Sustained.

8    Q.  (By Mr. Bennett)  Did you indicate in the

9        report, any report, that Mr. Skinner had told

10       you there were additional ET or ergocristine,

11       whatever you thought it was at that point in

12       time, at the missile site?

13   A.  I'd have to look at the affidavit.  I don't

14       recall specifically.  What I recall is talking

15       about the can of ET, Mr. Skinner showing the

16       can of ET to us, what he thought was ET, and

17       that Mr. Skinner said there was an LSD

18       laboratory contained in military containers at

19       his missile silo, missile base.

20   Q.  On that occasion, at the time of the walk-

21       through and at the time of seeing this one can

22       that was pointed out, did Mr. Skinner indicate

23       to you whether or not that had been moved to

24       the Wamego site from the site in Ellsworth?

25   A.  That was his portrayal to me.

1    Q.   Okay.

2    A.   That, yes, this has been-- originally had been

3         in the laboratory he had seized-- he had taken

4         it from the laboratory in Salina and then moved

5         it to Wamego.

6    Q.   And the same thing was true with regards to the

7         other cans that he said were now in the lab at

8         Wamego?

9    A.   Yes.

10   Q.   When you found the-- were you present when the

11        cans, the other cans were found at the time of

12        the search in Wamego, the other 13 cans?

13   A.   I was there at the site.  I was inside the

14        site.  I was inside one of the encapsulated

15        suits and processing the lab.  I don't recall

16        specifically finding the three cans, but I do

17        recall specifically finding and being told

18        where the box containing the ten cans was.

19   Q.   Where were the ten cans?

20   A.   The ten cans were in the Quonset hut underneath

21        some tile, in a box underneath some tile.

22   Q.   Who found those, do you recall?

23   A.   I believe I did.

24   Q.   Were they-- they were still in the wooden box?

25   A.   Yes.

```
 1    Q.   And was that-- was ten cans the capacity of the

 2         box?  Was there any room for any more?

 3    A.   I'm going to say ten cans was the capacity.  It

 4         appeared to be full.  I mean, it wasn't packed.

 5    Q.   Where were the three cans from?

 6    A.   To the best of my knowledge, they were found in

 7         the storage area or the concealed area

 8         underneath the bathroom next to the freezer.

 9    Q.   At the time of the walk-through, as I

10         understand it-- and you correct me if I'm

11         wrong-- you did not open any of the metal

12         containers.

13    A.   That's correct.

14    Q.   You did not see any laboratory equipment?

15    A.   Well, what I did see was a helium cylinder and

16         a five-gallon black can, metal can, so not

17         equipment, but--

18    Q.   Saw no glassware?

19    A.   No, I don't recall seeing any glassware, no.

20    Q.   Did you remove anything from the site, anywhere

21         on the missile site, at the time of the

22         walk-through?

23                   MR. HOUGH:  Judge, we'll object.

24         That's irrelevant.

25                   THE COURT:  I'm going to sustain the
```

1      objection.  We've spent more time on three cans

2      here-- we've spent almost an hour on three

3      cans.  Make your answers more precise, and quit

4      wandering around, and let's try to move this

5      along.

6                THE WITNESS:  Yes, sir.  I'm trying

7      to.

8   Q.  (By Mr. Bennett)  At the time you conducted the

9      search of the premises pursuant to the search

10     warrant, you searched the Quonset hut.

11     Correct?

12  A.  Yes.

13  Q.  You searched the Lester building?

14  A.  Yes.

15  Q.  You searched the missile launch area.  Is that

16     correct?

17  A.  Well, we searched the missile base.  We went

18     through the missile base and looked for items

19     within the missile base.

20  Q.  Well, were you in the living quarters and in

21     the missile site or the missile launch pad

22     area?

23  A.  We were in the base.  Yes.  I mean, if you're

24     asking of the concrete bunker underground, yes,

25     we were in there, and we searched throughout

1    that bunker underground.  It was not limited to

2    the missile launch area.

3 Q.  All right, I understand.  Did you search in the

4    ceilings and the walls?

5 A.  In some places, yes.

6 Q.  But not all?

7 A.  Not necessarily.  Didn't necessarily know they

8    were there.  If we did, we would have.

9 Q.  Now, at that point in time, you asked Mr.

10    Skinner if there was any other ergocristine, ET

11    there.  He told you no.  Is that correct?

12 A.  That's correct.

13 Q.  All right, and when was it, then, that he first

14    came clean and told you that there was-- that

15    he had some more?

16 A.  January 22nd, when he delivered it to me in

17    Oakland, California.

18 Q.  And between October 31st and January-- what did

19    you say, 22nd?

20 A.  Yes.

21 Q.  He continuously advised you that he knew where

22    there was some but indicated someone else was

23    in possession of it.  Is that correct?

24 A.  That's correct.

25 Q.  The 26 cans that he eventually turned in, based

```
 1            on your training and your experience as a DEA
 2            agent, had a value of what?
 3       A.   Well, my understanding at the time for street
 4            value of ergotamine tartrate was about $100,000
 5            per kilo.  After the arrest, my understanding
 6            is the price went up.  To what, I don't know.
 7       Q.   But we aren't dealing with ET, are we?
 8       A.   We're dealing with ergocristine, and my
 9            understanding from the manufacturer, it costs
10            about $2,500 per kilogram.  The wholesale price
11            from the manufacturer is about $2,500.
12       Q.   What's your understanding based on your
13            education, training, and experience as to the
14            street value of ergocristine?
15       A.   Well, I imagine if it were a substitute for
16            ergotamine tartrate, it would have a similar
17            value, around $100,000.
18       Q.   Similar value to the ET?
19       A.   To the ET of around $100,000 per kilo or more,
20            depending on the availability.
21       Q.   All right.  Now, you had information that the--
22            that this lab had been moved from Ellsworth to
23            Wamego.  Correct?
24       A.   Yes.
25       Q.   Did you ever-- strike that.  Was there a search
```

1          warrant applied for, for the Ellsworth base?

2     A.   Yes, there was.

3     Q.   And was that executed?

4     A.   Yes, it was.

5     Q.   And what-- strike that.  Did you search to

6          ascertain whether or not there was any ergo--

7          ergotamine tartrate or ergocristine remaining

8          at that location?

9     A.   First of all, I have to say I wasn't present

10         for that, but my understanding of the search

11         warrant that was executed, yes, it was.

12    Q.   Who was present for that?

13    A.   Oh, Ralph Sorrell, Roger Hanzlik, Tim McKibben,

14         my understanding, he may or may not have been,

15         I'm not sure, but then the Kansas City

16         clandestine lab group.  I mean, I don't know

17         who all was present specifically.

18              MR. BENNETT:  Judge, I know it's a

19         little before 4:30, but this would be a good

20         time for me to break.

21              THE COURT:  All right, let's just

22         stop right now.  Ladies and gentlemen, let's

23         recess now until 9:30 in the morning.  We will

24         see you here at that time.  Mr. Bailiff.

25              THE BAILIFF:  All rise.  Court will

1           stand in recess until 9:30 in the morning.

2                    (THEREUPON, the jury left the

3           courtroom.  WHEREUPON, the following

4           proceedings were held at the bench and outside

5           of the hearing of the jury.)

6                    MR. BENNETT:  Judge, with regards to

7           the hearing that we had in the Court's chambers

8           earlier today, I have here an affidavit that I

9           want to, in effect, proffer as support for the

10          position that I espoused in there.  This is an

11          affidavit that was obtained from Gordon Todd

12          Skinner, and by his attorney, and provided by

13          his attorney to me, and I would-- I know this

14          isn't an exhibit that would go to the Court--

15          or, I mean, would go to the jury, but-- this is

16          the only other copy I've got.

17                   MR. HOUGH:  Well, I would call it

18          mine.

19                   MR. BENNETT:  Well, I wouldn't, but

20          we can get a copy.  I'll get a copy.

21                   MR. HOUGH:  Judge, we would ask for a

22          copy of the document.

23                   MR. BENNETT:  Here.  You can read it.

24          I don't have a problem with you reading it.

25                   (THEREUPON, there was a brief pause

```
 1              in the proceedings.)
 2                   MR. HOUGH:  Judge, I can tell you
 3         that what he was shown was the same exhibit
 4         sheet that the Court, counsel, and myself have,
 5         so he has-- and I would absolutely deny the
 6         comment that we were getting inside information
 7         from Mary Beth or any other source.
 8                   MR. BENNETT:  Well, Judge, I just--
 9         I'm not offering it as an exhibit.  I'm just
10         offering it as part of the record in this case
11         in support-- as a proffer in support of the
12         motion that I made earlier today.
13                   THE COURT:  All right, we have it,
14         and we'll put it in the record.
15                   MR. HOUGH:  Can you make me a copy?
16                   MR. BENNETT:  Pat said they'd make a
17         copy.
18                   THE COURT:  Will you take that?
19                   MR. HALEY:  Yes.  Is it the original?
20                   MR. HOUGH:  Is that the original?
21                   MR. BENNETT:  That's the original.
22                   MR. HOUGH:  They're both signed.
23                   MR. BENNETT:  Well, they're both
24         signed as the originals, but I think that's a
25         different signature.
```

1          (THEREUPON, the bench conference was

2     concluded.   WHEREUPON, a recess was had.)

```
1    UNITED STATES OF AMERICA )
                              )    ss:
2    DISTRICT OF KANSAS       )

3

4              C E R T I F I C A T E

5         I, Roxana S. Montgomery, Certified

6    Shorthand Reporter in and for the State of

7    Kansas, do hereby certify that I was present at

8    and reported in machine shorthand the

9    proceedings had the 3rd day of March, 2003, in

10   the above-mentioned court; that the foregoing

11   transcript is a true, correct, and complete

12   transcript of the requested proceedings.

13        I further certify that I am not attorney

14   for, nor employed by, nor related to any of the

15   parties or attorneys in this action, nor

16   financially interested in the action.

17        IN WITNESS WHEREOF, I have hereunto set

18   my hand and official seal at Topeka, Kansas,

19   this _____ day of _____, 2003.

20

21                    _____

22                    Roxana S. Montgomery

23                    Certified Shorthand Reporter

24

25
```

COPY 47

1    UNITED STATES OF AMERICA )
                              )    ss:
2    DISTRICT OF KANSAS       )

3

4              C E R T I F I C A T E

5         I, Roxana S. Montgomery, Certified

6    Shorthand Reporter in and for the State of

7    Kansas, do hereby certify that I was present at

8    and reported in machine shorthand the

9    proceedings had the 3rd day of March, 2003, in

10   the above-mentioned court; that the foregoing

11   transcript is a true, correct, and complete

12   transcript of the requested proceedings.

13        I further certify that I am not attorney

14   for, nor employed by, nor related to any of the

15   parties or attorneys in this action, nor

16   financially interested in the action.

17        IN WITNESS WHEREOF, I have hereunto set

18   my hand and official seal at Topeka, Kansas,

19   this ____'0th____ day of ___March___, 2003.

20

21              _Roxana S. Montgomery_

22              Roxana S. Montgomery

23              Certified Shorthand Reporter

24

25

NORA LYON & ASSOCIATES, INC.
1515 S.W. Topeka Blvd., Topeka, KS  66612
Phone:  (785) 232-2545      FAX:  (785) 232-2720