COPY

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

2003 MAR 11 P 1: 16

RALPH L. DEBBACH
CLERK
BY_____ DEPUTY
AT TOPEKA. KS.

48

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS

2

3    UNITED STATES OF AMERICA,        )
     -------------------- Plaintiff,)

4                                     )
          vs.                         )  Case No.

5                                     )  00-40104-01/02

6    WILLIAM L. PICKARD and           )
     CLYDE APPERSON,                  )
     -------------------- Defendant.) 

7

8                        VOLUME II
              TRANSCRIPT OF TESTIMONY OF

9                      CARL NICHOLS
          UPON CROSS-EXAMINATION BY MR. BENNETT

10            HAD DURING THE JURY TRIAL
                       BEFORE

11          HONORABLE RICHARD D. ROGERS
                  and a jury of 12

12                       on
                  March 4, 2003

13

14   APPEARANCES:
     For the Government:      Mr. Gregory G. Hough

15                            Asst. U.S. Attorney
                              290 Federal Building

16                            444 Quincy Street
                              Topeka, Kansas 66683

17

     For the Defendant:       Mr. William Rork

18   (Pickard)                Rork Law Office
                              1321 SW Topeka Blvd.

19                            Topeka, Kansas 66603

20   For the Defendant:       Mr. Mark Bennett
     (Apperson)               Bennett, Hendrix & Moylan

21                            5605 SW Barrington Ct. S.
                              Topeka, Kansas 66614

22

     Court Reporter:          Roxana S. Montgomery, CSR

23                            Nora Lyon & Associates
                              1515 South Topeka Avenue

24                            Topeka, Kansas 66612

25

295

```
 1                    I  N  D  E  X

 2       Certificate ------------------------------ 111

 3                  W I T N E S S

 4       ON BEHALF OF PLAINTIFF:                    PAGE

 5       CARL NICHOLS

 6             Cross-Exam (Contd.) By Mr. Bennett    50

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      CARL NICHOLS,

2       called as a witness on behalf of the Plaintiff,

3       was previously sworn, and testified upon

4       cross-examination by Mr. Bennett as follows:

5                  CROSS-EXAMINATION (Contd.)

6       BY MR. BENNETT:

7    Q.  Agent Nichols, yesterday I asked you some

8        questions with regards to your experience and

9        use of informants.  Do you recall those

10       questions?

11   A.  Generally.

12   Q.  Do you recall that subject matter?

13   A.  I recall that we did discuss that, yes.

14   Q.  All right.  Based on your experience as an

15       agent, Agent Nichols, you've learned that when

16       an informant is in serious trouble or thinks

17       he's about to be in trouble, they will often do

18       anything they can to get out of trouble or stay

19       out of jail.  Would you agree?

20   A.  They often do, yes.

21   Q.  Okay, and you would agree, would you not, that

22       informants are often cunning, devious,

23       treacherous, and they lie?

24   A.  Yeah, I would agree so.

25   Q.  Okay, and you know from experience, do you not,
```

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | that informants will often blame innocent              |
| 2  |    | individuals in order to divert attention from          |
| 3  |    | themselves or their own illegal activity or to         |
| 4  |    | avoid prosecution?                                     |
| 5  | A. | That's not been my experience with informants,         |
| 6  |    | no.                                                    |
| 7  | Q. | You've never experienced that?                         |
| 8  | A. | I won't say I've never experienced that, but           |
| 9  |    | that has not been my general experience with           |
| 10 |    | informants.                                            |
| 11 | Q. | But you have experienced that, have you not?           |
| 12 | A. | I can't recall any specific incident where I           |
| 13 |    | have personally experienced that.  Basically,          |
| 14 |    | as information comes to me, I attempt to               |
| 15 |    | corroborate it, and I can't recall any incident        |
| 16 |    | where somebody has accused another person of           |
| 17 |    | doing something and it has been unfounded.             |
| 18 | Q. | Excuse me.  You're talking about your own              |
| 19 |    | personal experience, or are you talking about          |
| 20 |    | generally, that's never happened, to your              |
| 21 |    | knowledge?                                             |
| 22 | A. | I'm talking my own person experience.                  |
| 23 | Q. | You know that it has happened with DEA                 |
| 24 |    | informants in the past, do you not?                    |
| 25 | A. | I don't know whether I know it.  I believe I've        |

```
 1          heard.
 2     Q.   Okay, that's good enough.  If an informant lies
 3          to you during an investigation, that's damaging
 4          to the investigation, is it not?
 5     A.   It could be.
 6     Q.   And as an agent, you don't like to be put in
 7          the position of having to tell a jury or have a
 8          jury find out from some other source that an
 9          informant who receives something in return for
10          information was not truthful with you, do you?
11     A.   I don't like telling a jury that, no, but if I
12          have to, I certainly will.
13     Q.   I understand, and you have done that in this
14          case, haven't you?
15     A.   I believe I have, and I believe I will continue
16          to.
17     Q.   Right, but you don't like to have to do that,
18          because it is, in your opinion, damaging to the
19          case, is it not?
20     A.   It certainly can be.
21     Q.   And that's because once an informant has lied
22          to you about something, and you know that he's
23          lied to you about something, you have questions
24          about everything else that he's told you, don't
25          you?
```

```
 1    A.   Not necessarily.  What it says to me is there
 2         may be some questions about what he has said to
 3         me, but what it says to me is I have to go and
 4         do additional work and further corroborate or
 5         eliminate that statement-- I'm sorry, I can't
 6         think of a word-- but discredit that
 7         statement--
 8    Q.   Okay.
 9    A.   -- the informant has said to me.  So I have to
10         do some additional work to verify or discredit.
11    Q.   Okay, and sometimes that additional work
12         results in you verifying that he lied to you,
13         doesn't it?
14    A.   Sometimes it does.
15    Q.   Okay, and that happened in this case, didn't
16         it?  You went out and did some more work with
17         regards to these additional 26 cans of ET, and
18         you had to do some more interrogation and do
19         some further investigation, and when you got
20         that all done, it confirmed that he lied to
21         you, didn't it?
22    A.   I'm trying to remember the timing of things.
23         Once we had received the 26 cans, and the
24         further, the subsequent investigation of those,
25         then, the 40 cans we had, I confirmed that
```

1    there was but one delivery of those cans.  I

2    did talk with Michael Hobbs, who corroborated

3    Mr. Skinner's story, the story he had given to

4    us after he delivered the second set of cans,

5    the second cans, the last two cans.  So he had,

6    certainly, he had lied to me about his

7    possession of the 26 cans.  By the time he had

8    given the 26 cans to me, I believe we had the

9    story of what had happened.

10  Q.  Well, at the time that he gave you the last two

11      cans-- he gave you 24 and then he gave you two,

12      right?

13  A.  That's correct.

14  Q.  And at the time he gave you the last two, you

15      continued to interrogate him at that time about

16      whether or not he had now turned over

17      everything to you, didn't you?

18  A.  I believe we did, yes.

19  Q.  All right, and as the result of that

20      interrogation, or at the conclusion of that

21      interrogation, you still were of the opinion

22      that he had not provided you with all of the

23      cans that he had, were you not?

24  A.  I don't recall my thoughts at that time.  What

25      I recall is we had 40 cans seized either

1          October 31st, November 18th, that time period,

2          and the 26 cans Mr. Skinner brought to us.  We

3          had four boxes, wooden boxes we found in the

4          laboratory during the seizure.  Those boxes

5          contained at some point, it was my belief, ten

6          cans, Pringles cans.  Given the four boxes, I

7          believe there were probably 40 cans.  That's

8          what Mr. Skinner had told us, there were four

9          boxes.  There certainly were questions in my

10         mind.  Did he have additional precursor?  Was

11         he hiding stuff?  And I certainly questioned

12         him about that.  Where, if there was anything,

13         where was it hidden?  I was sick and tired of

14         this crap, and I didn't want to hear any more

15         of it.  So, yes, I asked him about this.  Yes,

16         I reprimanded him about this, but the

17         subsequent investigation I did revealed to me

18         that there was one delivery of cans that

19         matched these cans.

20    Q.   But you were still of the opinion after you

21         conducted that interrogation on the 22nd of

22         January, when he turned the two cans over to

23         you, you were still of the opinion at that

24         time, based on your interrogation, that he was

25         holding out on you, weren't you?

1    A.   He didn't turn over two cans to me on January

2         22nd.

3    Q.   All right, maybe I got the wrong date, but at

4         the time, whatever the date was that you

5         received the two cans from him and continued to

6         interrogate him, at that time you were still of

7         the opinion, were you not, that he'd held

8         something-- he was holding out on you.

9    A.   I was of the opinion that he could possibly--

10        he could be holding something out from us.

11   Q.   All right.

12   A.   Yes.

13   Q.   Now, Agent Nichols, yesterday I asked you about

14        Exhibit 801, which was the confidential source

15        agreement.  Do you recall that?

16   A.   I do recall you asking me that.

17   Q.   Were there any other written agreements between

18        the government and Mr. Skinner, other than

19        Exhibit 801?

20   A.   Well, there was his immunity agreement with the

21        Department of Justice.

22   Q.   And who would have been the parties to that, if

23        you know?

24   A.   The Chief of the Criminal Division at Main

25        Justice, John Roth.  He was the attorney who

1          authorized the immunity of Mr. Skinner.  Tom

2          Haney, who was Mr. Skinner's attorney at the

3          time.  Mr. Skinner was party to that, and I

4          believe those are the three people who were

5          primarily party to it.  There were other people

6          who knew about it.

7      Q.  All right.  Would that agreement have been

8          entered into before the confidential source

9          agreement or subsequent to the execution of the

10         confidential source agreement?

11     A.  Well, I think the timing was this.  Mr. Skinner

12         came out to Sacramento, and he was to be

13         interviewed by agents, by me and another agent.

14     Q.  That was on October 17th and 18th?

15     A.  On October 17th and 18th, and based on that

16         interview, we were to relay back to Mr. Roth

17         our findings and our beliefs on that, and at

18         that point, Mr. Roth would, my understanding,

19         make a decision whether Mr. Skinner should be

20         granted immunity, and based on our phone calls

21         back to Mr. Roth, Mr. Skinner was granted

22         immunity.  The paperwork may not have been

23         signed immediately that day.  From what I

24         recall, there was a document Mr. Skinner may

25         have signed, and then that was sent back over

1        to Mr. Haney, and he finalized it, but Mr.

2        Skinner would not tell us specific details of

3        the operation until he received his immunity

4        agreement, and so that was at some point during

5        the conversation midday of October 18th, and

6        then when we talked with Mr. Roth and told him

7        that we believed-- at this point, we believed

8        that he did have some verifiable, actionable,

9        credible information, Mr. Roth gave a verbal

10       approval for immunity.

11   Q.  But which came first, though, the written CS

12       agreement or the written agreement signed by

13       Mr. Roth, if you know?

14   A.  Well, I think-- I believe the CS agreement was

15       signed on the 18th of October, and then the

16       immunity agreement was signed maybe the 19th or

17       may have been a later date.

18   Q.  Now, other than those two, were there any other

19       written agreements entered into between Mr.

20       Skinner and the government with regards to his

21       serving in the confidential source or informant

22       capacity?

23   A.  Anything that Mr. Skinner signed?

24   Q.  Yeah, or that Mr. Haney signed on behalf of Mr.

25       Skinner.

```
1    A.   You know, I don't recall anything.  I mean,
2         there could be, but I really don't recall
3         anything.
4    Q.   You don't recall, that's fine.  On October 17th
5         and 18th, at the meeting in Sacramento, who all
6         was present during that debriefing?  I know you
7         were and Mr. Skinner was.
8    A.   Right.
9    Q.   Who else?
10   A.   Nancy Carter, who was an intelligence analyst.
11   Q.   All right.  Where does she office presently?
12   A.   I believe she is in the Miami Field Division at
13        the current time.
14   Q.   All right, and who else, if anyone?
15   A.   John, Jack Zajac, who was a special agent.
16   Q.   And where is he located now?
17   A.   At the time, he was assigned to DEA
18        headquarters in the dangerous drugs desk.  He
19        is now retired.
20   Q.   Who else, anyone?
21   A.   Robert Dey, D-E-Y.
22   Q.   And who is Mr. Dey?
23   A.   He was the ASAC, Assistant Special Agent in
24        Charge of the Sacramento district office.  He
25        is now retired.
```

1   Q.   Anyone else?

2   A.   No, that's it.

3   Q.   Okay.  Who was, if there was one person in

4        charge of the debriefing or the interview, who

5        would that have been?  Would that have been you

6        or--

7   A.   Well, initially, it would have been Mr. Dey.

8        He was covering some of the bases in the first

9        part of it, asking a few questions, and then at

10       some point Mr. Skinner presented some evidence

11       to me that was really an indication I knew he

12       was knowledgeable about this organization, and

13       at that point I took over the invest-- I took

14       over the questioning.

15  Q.   All right.  During that discussion on October

16       17th and 18th in Sacramento, did anyone, you or

17       anyone else that was there, suggest or tell Mr.

18       Skinner to place that can of ergocristine or ET

19       out where it could be seen during the

20       walk-through?

21  A.   No.

22  Q.   Okay.  At the time of the walk-through, did

23       anyone indicate to Mr. Skinner that the can

24       wasn't out and he needed to put the can out?

25  A.   No, not at all.

| | | |
|---|---|---|
| 1 | Q. | Okay. Now, I think you told me yesterday, but |
| 2 | | I apologize, I'm going to ask you again. On |
| 3 | | the walk-through, there was yourself, Agent |
| 4 | | McKibben you believe, and who else? |
| 5 | A. | I believe Mr. McKibben was there. He may not |
| 6 | | have been. |
| 7 | Q. | All right. |
| 8 | A. | He may have arrived shortly after that. |
| 9 | Q. | That's what you indicated yesterday. Who else? |
| 10 | A. | John, Jack Zajac and Arthur Hubbard. |
| 11 | Q. | Were they all present when the can was first |
| 12 | | seen by someone? |
| 13 | A. | Yeah, we were all taking a tour. Mr. Skinner |
| 14 | | was leading the tour of the base. |
| 15 | Q. | And who was leading the tour, Mr. Skinner? |
| 16 | A. | Mr. Skinner was. |
| 17 | Q. | Now, I know yesterday you testified that you |
| 18 | | went over to the can and stood over it and |
| 19 | | looked down into it. Is that right? |
| 20 | A. | Yes. |
| 21 | Q. | And it had an opaque top on it? |
| 22 | A. | Yes, it did. |
| 23 | Q. | When you say opaque top, I've got my idea what |
| 24 | | opaque is, but can you tell us what you mean |
| 25 | | when you use the term "opaque"? |

```
 1    A.   It's a plastic top.  It's not clear, so you
 2         can't see through it clearly, but it's-- if you
 3         held it up to the light, you could certainly
 4         see light through it, you could certainly--
 5    Q.   You mean if you held the top up to the light?
 6    A.   If you held the lid, the plastic lid to the
 7         light, you could see through it.
 8    Q.   How were you able to determine the color
 9         through that opaque top?
10    A.   I don't know.  With my eyes.  I mean, I looked
11         at it.  I could see there was a ring of powder.
12    Q.   All right.  Did you pick it up and open it?
13    A.   No.
14    Q.   Did anyone else?
15    A.   Not to my knowledge, no.
16    Q.   Did you at any time smell of it or attempt to
17         smell it?
18    A.   Not likely, because I know that ergocristine--
19         or, well, excuse me-- ergotamine tartrate
20         causes convulsions, so I doubt I smelled it.
21    Q.   Mr.-- or Agent Nichols, were you at the base
22         when the trust documents were discussed?
23    A.   Yes.
24    Q.   And who was present when those-- when that
25         occurred?
```

1              MR. HOUGH:  Judge, we'll object to

2       this as irrelevant.  The Court has previously

3       determined that the consent, the warrants, the

4       ownership issue is appropriate.  That's a legal

5       question the Court's previously determined.

6              MR. BENNETT:  Judge, could we

7       approach?

8              THE COURT:  Yes, I would like to have

9       you approach.

10             (THEREUPON, the following proceedings

11      were held at the bench and outside of the

12      hearing of the jury.)

13             THE COURT:  Before we get into that,

14      Mr. Bennett, I was about ready to get into that

15      can thing.  We've gone over that can.  Well,

16      you didn't object for being repetitious.  We

17      have covered that can enough times.  I couldn't

18      understand what you were doing, but I was just

19      about--

20             MR. BENNETT:  Well, Judge, excuse me.

21             THE COURT:  Well, I know you've got

22      some purpose, but my purpose is to finish this

23      trial and not to just go over and over and over

24      and over things.  Now, what's your point on

25      this?

1          MR. BENNETT:  Well, my point with

2     regard to this, Judge, is that I don't think

3     that the record has fully established what has

4     occurred with regard to these trust documents,

5     and all I wanted to do was to establish what

6     was looked at, who looked at it, who was

7     present, and move on.

8          MR. HOUGH:  Well, Judge, we went

9     through all that in a pretrial hearing, if the

10    Court will recall, and the Court ruled relative

11    to motions to suppress and dismiss by both

12    defendants.  The Court's considered that.  That

13    is a legal issue the Court has determined.

14    It's res judicata, so it's irrelevant now for

15    purposes of the jury.

16          THE COURT:  Well, what does this man

17    know about the legal aspects of a trust

18    agreement, which most of them are phony anyway,

19    so what--

20          MR. BENNETT:  Well, Judge, I wasn't

21    going to ask him about the legal aspects.  I

22    was just going to ask him about the

23    circumstances surrounding it and what was

24    there, and if--

25          MR. HOUGH:  Well, Judge, I believe

1          that there was some questioning yesterday about

2          the trust documents being there because of

3          debts, and so this would be cumulative.

4                    MR. RORK:  Well, Judge, I did ask

5          about some of the issues regarding the trust

6          documents, and when Kendall was moved, and some

7          facts about who went to the bank, and some

8          other things but, I mean, that's what I asked

9          and that was some yesterday and some the other

10         day, but not specifically.

11                   THE COURT:  Well, I'm going to allow

12         you to go ahead, but I tell you, I'm frankly

13         amazed.  But all right, let's go ahead.

14                   (THEREUPON, the bench conference was

15         concluded and the following proceedings were

16         held within hearing of the jury.)

17    Q.   (By Mr. Bennett)  Who was present, Agent

18         Nichols, at the time these trust documents were

19         discussed?

20    A.   Agent Hubbard was, Task Force Officer Sorrell,

21         I was, Agent Zajac, there were a number of

22         other people, agents from the Kansas City

23         office who were present.

24    Q.   And you reviewed them, did you?

25    A.   I did.

```
 1    Q.   All right.  And in the course of reviewing
 2         them, were you able to determine or did you
 3         determine who had an interest, a beneficial
 4         interest in the trust?
 5    A.   Without looking at the trust documents again, I
 6         mean, what I specifically recall is Graham
 7         Kendall was the trustee and that Graham Kendall
 8         was the property owner, the deed holder on the
 9         base.  Bill Wynn's name was in the trust
10         document.  There were a couple of other names,
11         but without looking at the document, I don't
12         specifically remember.
13    Q.   Was either Mr. Pickard's or Mr. Apperson's name
14         in the document?
15    A.   No, neither one.
16    Q.   With regards to the taped, both phone
17         conversations and body pack, what I call body
18         pack recordings, do you know what I'm talking
19         about?
20    A.   A recorder.
21    Q.   Yes.  With regards to those recordings, was
22         there anything-- well, you heard them played
23         here for the jury-- was there anything deleted
24         from those recordings by you or anyone else, to
25         your knowledge, between the time they were
```

1          initially made and they were presented as

2          evidence in this case?

3      A.  No.

4      Q.  Well, you say that somewhat hesitantly.  I

5          accept the answer, but I'd like you to go a

6          little further with it.

7      A.  Well, I say that hesitantly because I'm not

8          sure that-- I believe that the tapes were

9          played in entirety, or the tapes that we did

10         play.  Now, not all of the recordings were

11         played because there were phone calls we made

12         to a phone number Mr. Pickard gave to us.

13     Q.  That weren't completed?

14     A.  That weren't completed or were, I mean, they

15         weren't wrong numbers.  They weren't completed.

16     Q.  I understand that.  That's not really my

17         question.  My question was whether or not there

18         had been anything either accidentally or

19         purposely deleted from any of those tapes.

20     A.  There is one tape, and I believe it's Exhibit

21         N-19, where it is a one-sided conversation with

22         Mr. Skinner.

23     Q.  You've already testified about that, haven't

24         you?

25     A.  I don't believe I have.

1    Q.   Okay, go ahead then.

2    A.   That tape, when I gave Mr. Skinner the phone

3         and asked him to record that phone call, he

4         either put the microphone in the wrong ear, put

5         the phone up to the wrong ear, or the

6         microphone fell out, but somehow it did not

7         work.  It did not record both sides of the

8         conversation.  When I listened to the tape--

9         and this is my policy and the policy of my

10        agency, that once a recording is made, we

11        should go back, listen to the tape, verify what

12        the informant said to us was on the tape, and

13        then put a trailer on it to say, this recording

14        was made at such-and-such a time, such-and-such

15        a place.  I did that, and when I did that, I

16        inadvertently recorded over part of that

17        conversation.  I believe I recorded over part

18        of that conversation to give that trailer.

19        When I went back and reviewed it, I thought

20        because it was a one-sided conversation,

21        because there was a long pause, I thought the

22        conversation had ended and so, therefore, I put

23        the trailer in there.  I later found out, after

24        reviewing the tape, that I was mistaken, and I

25        had put the trailer in the middle of the

1      conversation, not at the end.

2  Q.  Had you been privy to that conversation at the

3      time it was occurring?  I mean by that, were

4      you able to overhear that conversation?

5  A.  Well, I was able to overhear Mr. Skinner's

6      portion of the conversation.  I was not able to

7      overhear the other end of the conversation.

8  Q.  And what was taped over was the other end of

9      the conversation, or part of Mr. Skinner's

10     conversation?

11 A.  Part of Mr. Skinner's conversation.  It's a

12     one-sided conversation.

13 Q.  All right.

14 A.  It was a conversation I directed Mr. Skinner to

15     have with Mr. Pickard or Mr. Apperson, whoever

16     would answer that phone, to let them know that

17     they had forgotten and not picked up the ET,

18     that they did not look in the proper place to

19     get it, and we directed them to look in the

20     Quonset hut.

21 Q.  And that conversation that you're talking about

22     was a conversation between Skinner and who,

23     Pickard?

24 A.  Mr. Skinner told us it was between him and Mr.

25     Pickard.

```
 1    Q.  Okay.  Now, there was also the tape that-- and
 2        the audio that didn't record at all on the trip
 3        to Tulsa.  Right?
 4    A.  There were two tapes that did not record, yes.
 5    Q.  All right.  Now, is it-- do I understand your
 6        testimony, then, correctly that other than the
 7        incident you just told us about and the Tulsa
 8        incident, nothing else has been deleted from
 9        any of those tapes?
10    A.  That's correct.
11    Q.  Okay.  I want to go back to, I think, where we
12        left off yesterday.  You had testified in your
13        direct examination about some Pac Bell or
14        Pacific Bell records that were obtained
15        pursuant to a subpoena.  Am I correct, was it
16        pursuant to a subpoena?
17    A.  Yes.
18    Q.  All right.
19    A.  It was, it would have been.
20    Q.  And those Pac Bell records, at least some of
21        them, pertain to Mr. Apperson and his phones.
22        Is that correct?
23    A.  Yes, they do.
24    Q.  And you didn't find anything in those Pac Bell
25        records of any phone calls or conversations
```

1    between Clyde Apperson and Mr. Pickard, or Mr.

2    Savinelli, or Mr. Skinner, or Mr.-- or Petaluma

3    Al, or James Miller, did you?

4    A.  Well, they were subscriber records, so they

5    were records of who subscribed to the

6    telephone--

7    Q.  Well--

8    A.  -- requested.

9    Q.  Well, the subscriber records had all the phone

10   conversations made from the subscriber's phone,

11   didn't it?

12   A.  No.

13   Q.  I mean, not the conversation, but it had the

14   phone numbers that were-- the long distance

15   numbers that were called, didn't it?

16   A.  No, absolutely not.  That's not what we

17   requested.

18   Q.  What did you request?

19   A.  We requested subscriber records.

20   Q.  All right, and what--

21   A.  And I believe that's what is presented to the

22   Court in the Pacific Bell records.

23   Q.  All right.  Tell us what you mean when you say

24   subscriber records.

25   A.  Subscriber record is the person who subscribes

```
 1              to the telephone.  It is not toll records,

 2              which would be the telephone calls made from a

 3              telephone.

 4         Q.   Did you obtain the toll records for Pac Bell?

 5         A.   I did obtain toll records for some telephones

 6              from Pacific Bell.  I don't recall if we

 7              obtained toll records for Mr. Apperson's

 8              telephone.

 9         Q.   Let me ask the question this way.  You didn't

10              obtain any toll records from any phone company

11              that revealed any phone calls from Mr.

12              Pickard-- or from Mr. Apperson to Mr. Pickard,

13              or to Alfred Savinelli, or to Skinner, or

14              Petaluma Al, or James Miller, did you?

15         A.   There are some cell phone records, and I would

16              have to review those records to be certain.  I

17              don't recall.  There were cell phones we

18              subpoenaed, we obtained records for.

19         Q.   Okay.

20         A.   That cell phone, yeah, I would really have to

21              review my notes on that before I answer that

22              accurately.

23         Q.   All right.  Your answer, then, would be you

24              don't recall at this time.  Is that right?

25         A.   No.  I do recall telephone records, and what I
```

1          believe I recall is that there were records

2          subpoenaed from a cellular telephone that was

3          in possession of Mr. Apperson, and it showed

4          phone calls to another cellular telephone that

5          was in possession of Mr. Pickard, but I need to

6          review the records before I can accurately make

7          that statement.

8     Q.   Well, can you-- we'll give you the opportunity

9          to do that, but can you recall or do you recall

10         that you found no records of any calls-- leave

11         Pickard out of it for right now-- you found no

12         calls between Mr. Apperson, Mr. Skinner, Mr.

13         Savinelli, Petaluma Al, or James Miller, did

14         you, to the best of your recollection?

15    A.   Not that I recall, no.

16    Q.   Okay.  You also testified on direct examination

17         about some records that were obtained from the

18         Belagio Casino in Las Vegas and the Paris

19         Casino in Las Vegas.  Do you recall that

20         testimony?

21    A.   Yes.

22    Q.   And you didn't find any records at either of

23         those-- from either of those entities

24         indicating, number one, that Clyde Apperson had

25         ever been there, did you?

1     A.  No.

2     Q.  Okay, and you didn't find any records in either

3         the Belagio or the Paris Casino records that

4         indicated that Clyde Apperson had exchanged any

5         Guilders for United States currency at either

6         of those entities, did you?

7     A.  No, I did not.

8     Q.  Okay.  The Native Scent records that you

9         obtained didn't show any contacts or orders

10        being placed or picked up by Clyde Apperson

11        from Native Scents, did they?

12    A.  The records, no, they did not.

13    Q.  Okay.  And Mr. Savinelli told you he didn't

14        even know Clyde Apperson, didn't he?

15    A.  That's my recollection.

16    Q.  Okay.  Now, this vehicle that-- this truck that

17        Mr. Apperson was in at the time of his arrest,

18        that was a Ryder truck, correct?

19    A.  Yes, it was.

20    Q.  All right.  And you obtained the records for

21        that, did you not?

22    A.  Yes, we did.

23    Q.  And it was rented in Clyde Apperson's true

24        name, was it not?

25    A.  It was.

1    Q.   And it gave his true address, did it not?

2    A.   From what I recall, it did.

3    Q.   It gave his true driver's license number, did

4         it not?

5    A.   Yes.

6    Q.   And the investigation revealed that there was

7         no attempt made by Mr. Apperson to hide his

8         identity in renting that truck.  Would you

9         agree?

10   A.   Not in renting that truck, no.  I would agree

11        that he did not hide his identity in renting

12        that truck.

13   Q.   Okay, and the same thing is true with regards

14        to the automobile.  That was also rented in his

15        name, was it not?

16   A.   It was rented in his name.

17   Q.   And again, he gave his true address and his

18        true driver's license number.  Correct?

19   A.   To the best of my recollection, yes.

20   Q.   Okay.  Now, I don't recall which storage locker

21        it was, but the one that the $170,000 in cash

22        was found, do you recall which locker that was,

23        the name of the company?

24   A.   The name of the company was National Self-

25        Storage in Roseville, California.

1    Q.  All right, and were you present in the course

2        of that-- of the opening of that locker and the

3        search of that locker?

4    A.  I was not.

5    Q.  Okay.  You have seen the reports and discussed

6        it with the agents that were, have you not?

7    A.  Yes, I have.

8    Q.  And there was nothing found in that locker that

9        in any way linked it to Clyde Apperson, was

10       there?

11   A.  No.

12   Q.  And in the course of this investigation, there

13       were a number of storage facilities that you or

14       other agents working on the investigation were

15       involved in opening and searching or seizing

16       items from, correct?

17   A.  That's correct.

18   Q.  And based on your overview and your

19       participation in this investigation, there

20       weren't any documents obtained from any of

21       those lockers that indicated Clyde Apperson had

22       any interest in any of them, were there?

23   A.  I need to think about it a second or two.

24   Q.  Okay, take as much time as you want.

25   A.  Not that I recall, no.

1    Q.   Okay.  You also knew, you or someone involved

2         in the investigation obtained gaming control

3         records from the State of Nevada.  Is that

4         correct?

5    A.   That's correct.

6    Q.   What was the purpose for obtaining the gaming

7         control records?

8    A.   Well, it's an additional resource of records

9         for the casinos.  It would be to see if there

10        were additional casinos where Mr. Skinner and

11        others went to game.

12   Q.   Did you locate other casinos other than the

13        Belagio and the Paris Casino where Mr. Skinner

14        and others went to gamble?

15   A.   I did.

16   Q.   Mirage?

17   A.   The Mirage and the Horse Shoe.  There may have

18        been other casinos.  I don't recall

19        specifically.

20   Q.   You didn't obtain or find in the records that

21        you obtained from the Gaming Control Agency in

22        the State of Nevada, you didn't find any

23        records relating to Clyde Apperson, did you?

24   A.   I don't believe so, no.

25   Q.   Okay.  Then I believe you testified that you

|     |     |                                                         |
| --- | --- | ------------------------------------------------------- |
| 1   |     | had obtained some records from May of 1999 from         |
| 2   |     | the Santa Fe Hilton.  I believe it was Exhibit          |
| 3   |     | 746.  Do you recall that?                               |
| 4   | A.  | Yes.                                                    |
| 5   | Q.  | You didn't find any records in May of 1999 at           |
| 6   |     | the Santa Fe Hilton that would indicate that            |
| 7   |     | Clyde Apperson was present or staying there at          |
| 8   |     | that time, did you?                                     |
| 9   | A.  | I don't believe I did.                                  |
| 10  | Q.  | And you also testified, I believe, on direct to         |
| 11  |     | some obtaining of some records, I think it              |
| 12  |     | was-- I think you called it Windom Peak records         |
| 13  |     | in Telluride?                                           |
| 14  | A.  | It's the Peaks Hotel.  It's run by Windom               |
| 15  |     | group--                                                 |
| 16  | Q.  | All right.                                              |
| 17  | A.  | -- in Telluride.                                        |
| 18  | Q.  | Do you remember what time period you obtained           |
| 19  |     | those records for?                                      |
| 20  | A.  | Well, I believe the subpoena was a request for,         |
| 21  |     | generally, stays by people who were-- we had            |
| 22  |     | identified were involved in the conspiracy.             |
| 23  | Q.  | So did you have--                                        |
| 24  | A.  | -- from--                                               |
| 25  | Q.  | Excuse me.                                               |

1    A.   From what I recall, the response back was

2         during the period 1998, August of 1998.  There

3         may have been an additional response for

4         another time, but I don't recall specifically.

5    Q.   All right, but you-- the records that you

6         received didn't indicate that Clyde Apperson

7         was at that location at any time during the

8         period that you requested records for?

9    A.   The records do not show that.

10   Q.   Do not show that he was present?

11   A.   Do not show he was present, no.

12   Q.   All right.  Now, you found in the course of

13        your investigation no airline records, no car

14        rental records, or no hotel records indicating

15        that Clyde Apperson was in either Aspen or

16        Telluride during the time that there was

17        allegedly an LSD lab in Aspen, did you?

18   A.   I don't recall finding anything, no.

19   Q.   Now, in the course of your investigation, Agent

20        Nichols, you sought out airline travel records

21        of Mr. Apperson for a certain period of time,

22        did you not?

23   A.   We sought out airline and travel records.  Yes,

24        there probably was a time frame on it.

25   Q.   Okay.

1    A.   I don't recall specifically what the subpoena

2         said.

3    Q.   Do you have something that you can look at so

4         you can tell us what period of time you

5         requested that those records be provided to

6         you?

7    A.   If I could look at the records, I might be able

8         to.  The original or a copy of the original

9         subpoena might be in the records.

10                  MR. BENNETT:  Well, my problem is I

11        didn't write fast enough, and I don't have the

12        number down.  Do you know what number that is,

13        counsel?

14                  MR. HOUGH:  I should be able to find

15        it.  I'd do that in exchange for a Kleenex.

16                  THE CLERK:  Which exhibits are you

17        looking for?

18                  MR. BENNETT:  I'm going to give you a

19        whole box of Kleenex, so I expect a whole box

20        of records.

21                  MR. HOUGH:  733.

22                  MR. BENNETT:  743?

23                  MR. HOUGH:  733 is the America West.

24        Southwest is 739, 753, and that's it.

25                  MR. BENNETT:  Thank you.

```
 1              MR. BENNETT:  733, 39 and 53.
 2              THE CLERK:   Thirty-three?
 3              MR. BENNETT:  Thirty-three-- 733,
 4         739.
 5              THE CLERK:  Thirty-nine?
 6              MR. BENNETT:  Thirty-nine and 753.
 7         Thank you.
 8    Q.   (By Mr. Bennett)  Agent Nichols, I want to show
 9         you Government's Exhibit 733, which at least
10         the first page relates to America West
11         Airlines; 739, which relates to Southwest
12         Airlines; and 753, which relates to United
13         Airlines.  And could you look in those and see
14         if you can determine what the time period was
15         that you requested information or records for?
16    A.   For the Southwest Airlines, Exhibit No. 739,
17         there is no subpoena or no copy of the subpoena
18         in here.  So, no, I can't tell you specifically
19         what the subpoena said.  What I generally
20         remember is the subpoena covered at least a
21         couple years' time from 2000 back.  It may have
22         covered as many as five years' time.  I don't
23         recall specifically.
24    Q.   All right.  Look at the others then.
25    A.   Again, the same thing for America West
```

```
 1              Airlines, Exhibit No. 733.
 2      Q.   You think it was about the same time period,
 3           though?
 4      A.   Probably the same time period, and what the
 5           response letter says is that, "our computer
 6           records only go back two years."  So--
 7      Q.   Which would--
 8      A.   Which indicates to me that the subpoena was for
 9           a much broader period than two years.  For
10           United Airlines, Exhibit No. 753, there is a
11           copy of the face page of the grand jury
12           subpoena, but there is not an attachment to it
13           which would indicate the date range of this.
14      Q.   Well, based on your normal mode of operation,
15           would you expect that the time period for all
16           three airlines would have been the same or
17           approximately the same?
18      A.   Approximately the same period of time.  This
19           actually has dates going back to 1994, but what
20           I generally recall was it was requested for
21           records 1995 forward.
22      Q.   All right, and when you say, "this," you're
23           talking about Exhibit 753?
24      A.   For 753.
25      Q.   Now, once you received those records, did you
```

```
 1           determine that Mr. Apperson had made a number
 2           of trips to Albuquerque?
 3    A.     Yes, I did.
 4    Q.     And you also determined in the course of your
 5           investigation, did you not, that some of the
 6           tickets that were purchased weren't actually
 7           used?
 8    A.     I would have to look at the records again.  I
 9           don't recall determining that.  I'll look at
10           the America West first.  (Pause.)  It appears
11           from the America West Airlines records, Exhibit
12           No. 733, that those tickets were used.
13           (Pause.)  I'm sorry for taking so long, but the
14           Southwest tickets are-- their printouts are a
15           little bit confusing.
16                 MR. BENNETT:  Judge, I know it's a
17           little early, but maybe we could kill two birds
18           with one stone and take a recess now and let
19           him look through those, or--
20                 THE COURT:  Yeah, that may save us
21           some time.  Ladies and gentlemen, let's take a
22           15-minute recess at this time, then we'll come
23           back for further questioning.
24                 MR. BAILIFF:  All rise.  Court will
25           stand in recess for 15 minutes.
```

1              (THEREUPON, a recess was had.)

2              THE COURT:  All right, I believe

3        we're all present.  You may continue.

4    Q.   (By Mr. Bennett)  Agent Nichols, have you now

5         had sufficient time to look through those

6         records?

7    A.   I believe I have had time.

8    Q.   I believe that the question that prompted the

9         necessity of looking at the records was whether

10        or not you had determined that some of the

11        tickets purchased or some of the flights that

12        tickets were purchased for weren't used.  Did

13        you-- were you able to determine, from

14        reviewing those documents, an answer?

15   A.   It appeared-- yes, I was.

16   Q.   Okay, and what did you determine?

17   A.   Well, it appears that a flight-- and this is in

18        the Southwest Airlines record, and that is

19        Exhibit No. 739-- that a flight on September

20        10th of 1999 from Albuquerque to San Francisco

21        was not used.

22   Q.   All right.  Any others?

23   A.   I don't have anything marked on my notes.

24   Q.   All right.  Do you recall, during the course of

25        the investigation and the seizure of items from

1          Mr. Apperson, whether or not there were any

2          unused airline tickets that were recovered from

3          his possessions?

4     A.   I don't recall anything.  There may have been,

5          but I just don't recall anything.

6     Q.   All right.  Now, I indicated to you over the

7          break that there was another question that I

8          was going to ask you and gave you a heads-up on

9          it so you could look at the records with

10         regards to that as well.  In the records that

11         you have there, did you determine or were you

12         able to determine what the pattern of travel to

13         Albuquerque was as shown by those flights, that

14         is, the periods of time or approximate periods

15         of time that Mr. Apperson was in Albuquerque

16         when he flew on the flights that he did fly on?

17    A.   Well, there's some travel in 1999, there's some

18         travel in 2000, and several of the trips are

19         two-day, possibly three-day trips.

20    Q.   All right, and that was kind of the pattern

21         that you picked up from looking at those

22         records.  Is that right?

23    A.   Generally the pattern, yes.

24    Q.   All right.  Now, in the course of the

25         investigation, I believe you indicated in

1   response to a question yesterday or the day

2   before that you found some phone records or

3   some phone numbers for a lady by the name of

4   Teresa Marquez.  Do you recall that?

5   A.  Yes.  What I recall is I found a computer

6   generated letter with the name Teresa Marquez

7   and address on it in Albuquerque.

8   Q.  And that's the lady that you first indicated

9   you thought lived in Santa Fe, but then when I

10  showed you your report, you changed it to

11  Albuquerque.  Is that right?

12  A.  That's right.

13  Q.  Now, in the course of your investigation did

14  you determine that Mr. Pickard-- or not--

15  strike that-- Mr. Apperson and Ms. Marquez had

16  a relationship?

17  A.  No, I didn't determine that.  Basically, when

18  Mr. Skinner was testifying, and I was reviewing

19  some of these records during his testimony, it

20  struck me that, based on his testimony that Mr.

21  Apperson had a girlfriend in the Santa Fe area,

22  that Ms. Marquez might be that person--

23  Q.  All right.

24  A.  -- but I never determined that.

25  Q.  And-- excuse me-- did you determine in the

1          course of your investigation that the occasions

2          that Mr. Apperson flew to or from Albuquerque

3          were days that-- or were flights that coincided

4          with meetings or get-togethers that he would

5          have with his girlfriend?

6     A.   I never talked to her, so I couldn't, no; and I

7          didn't talk to your client, so I couldn't

8          ascertain that.

9     Q.   Okay.  You wouldn't-- you don't know of any--

10         well, strike that.  I'll withdraw it.  When you

11         say you didn't interview her, to your

12         knowledge, did anyone interview her?

13    A.   Not to my knowledge.  No one interviewed her.

14         As I said, it didn't really strike me until Mr.

15         Skinner's testimony that this might have been

16         the girlfriend Mr. Skinner was talking about

17         that Mr. Apperson had.

18    Q.   All right.  Now, some of the-- I've looked at

19         some of the exhibits and some of the records,

20         travel records, hotel records, car rental

21         records that have been marked and admitted as

22         exhibits in this case.  Some of them that

23         relate to Mr. Apperson are for travel to Kansas

24         City and Topeka after or subsequent to November

25         the 6th, 2000, aren't they?

```
 1   A.  Well, there are travel records before and
 2       after, yes.
 3   Q.  Right.
 4   A.  My assessment of those records would be it was
 5       travel for Mr. Apperson to attend court
 6       appearances.
 7   Q.  All right, and so the fact that they're marked
 8       as part-- or a part of some exhibit that's
 9       marked, you're not asserting or taking the
10       position that the travel to Topeka or Kansas
11       City or the car rentals or the hotels had to do
12       with any illegal activity, are you, after
13       November the 6th?
14   A.  For the records that are after November 6th,
15       no, I am not.
16   Q.  Okay.  Now, there was some testimony-- you gave
17       some testimony, I believe, on direct
18       examination about two Exhibits, 681 and 682,
19       which were letters from Mr. Pickard to you.  Do
20       you recall that?
21   A.  I do recall that.
22   Q.  Do you recall generally the content of those
23       letters?
24   A.  Yes, generally.
25   Q.  All right.  There was no reference in either of
```

|      |    |                                                    |
|------|----|----------------------------------------------------|
| 1    |    | those letters to you that indicated that--         |
| 2    |    | where Mr. Pickard indicated that Mr. Apperson      |
| 3    |    | had any complicity in any conspiracy or            |
| 4    |    | manufacturing of LSD, did it?                      |
| 5    | A. | There was no reference in those letters.           |
| 6    | Q. | Now, you also testified with regards to Mr.        |
| 7    |    | Pickard's reported income or lack of reported      |
| 8    |    | income.  Do you recall that testimony?             |
| 9    | A. | I do.                                              |
| 10   | Q. | And I believe your testimony also dealt with       |
| 11   |    | tax returns or the lack of tax returns by Mr.      |
| 12   |    | Pickard.  Is that correct?                         |
| 13   | A. | Generally, those were one and the same.            |
| 14   | Q. | Did you make an identical investigation with       |
| 15   |    | regards to Mr. Apperson and his tax returns and    |
| 16   |    | his reported income?                               |
| 17   | A. | We did request tax returns for Mr. Apperson,       |
| 18   |    | yeah.                                              |
| 19   | Q. | All right.  Now, in the investigation, what, if    |
| 20   |    | anything, did you determine with regards to Mr.    |
| 21   |    | Apperson's employment for the years back prior     |
| 22   |    | to November 6 of 2000?                             |
| 23   | A. | Well, you know, I would specifically have to go    |
| 24   |    | to the records to make-- to lay that out, to       |
| 25   |    | review those.                                      |

```
 1    Q.   What records would you need to look at?
 2    A.   Well, I would have to look at the tax records.
 3         If you're asking me about tax records, I would
 4         have to look at those.
 5    Q.   Well, my question just right now is:  Did you
 6         make a determination as to whether or not he
 7         was employed?
 8    A.   Off and on, yes.
 9    Q.   What do you mean off and on?
10    A.   Well, generally, he was employed, and I can't
11         remember the specific date, up until a specific
12         date.  And I can't remember if it was 1999 or
13         2000 where there's some-- up to that point,
14         there are employment records, and at some point
15         there are, from what I recall, no employment
16         records.
17    Q.   All right.  At some point you determined,
18         though, did you not, that he went from being
19         employed by a company or companies to self-
20         employment?
21    A.   What I recall from the search, the records,
22         that he was employed, self-employed, and then
23         went to other companies, but it could be vice
24         versa.  It could be that he started at a
25         company, self-employed, and then went back to
```

```
 1            another company.

 2    Q.     Do you recall the names of any of the

 3            employers?

 4    A.     Bliss Industry was one employer, Lobaugh,

 5            L-O-B-A-U-G-H, was another employer.

 6    Q.     All right.

 7    A.     There may be others.  I don't recall.

 8    Q.     And then at whatever point it was he was self-

 9            employed, that was as in the name, business

10            name of C. W. Enterprises?

11    A.     That's what I recall.

12    Q.     All right.  Now, generally, what did you

13            determine with regards to whether or not he

14            filed tax returns for each year, filed them or

15            didn't file them for each year that you were

16            interested in?

17    A.     It was my understanding, in reviewing the

18            records, that there were tax returns for the

19            period of time we asked.

20    Q.     What period of time did you ask for the records

21            for?

22    A.     I believe it was 1995 until, well, at that

23            point the most current filing, which would have

24            been 1999.

25    Q.     Did you subsequently go back and get the filing
```

```
 1        for 2000?
 2   A.   No, we did not.
 3   Q.   Okay.  And what is your recollection of the
 4        amount of reportable income that he set out in
 5        those tax returns?
 6   A.   You know, I don't remember specific numbers,
 7        but generally between he and his wife, over
 8        $100,000, in the neighborhood of-- I'm hedging
 9        a guess-- between $120,000 and $140,000.
10   Q.   All right.  And in the course of that
11        investigation into his taxes and his reportable
12        income, you didn't find any record or
13        indication that the Internal Revenue Service
14        ever found that there had been any unreported
15        income, did you?
16   A.   Not to the best of my knowledge, no.
17   Q.   Okay.  And you didn't find any indication in
18        the course of your investigation that Mr.
19        Apperson underreported any income, did you?
20   A.   Well, I do.  I believe he did.
21   Q.   My question is, Agent Nichols, you don't find
22        anything in the IRS records that you requested
23        that indicated that he underreported any
24        income, did you?
25   A.   I didn't believe that was your question, but--
```

```
1    Q.   Okay, maybe it wasn't, and I apologize if it
2         wasn't.
3    A.   In the IRS records, I don't believe there is
4         any indication of underreporting.
5    Q.   Okay.  In your direct testimony, you testified
6         about some incidents which--
7              MR. HOUGH:  Excuse me.  Your Honor,
8         may we approach?
9              THE COURT:  Yes, you may.
10             (THEREUPON, the following proceedings
11        were held at the bench and outside of the
12        hearing of the jury.)
13             MR. HOUGH:  Your Honor, I just
14        received the risk assessment that the Court had
15        ordered disclosed.  For the record, I am
16        disclosing that to counsel now, and I would
17        provide the Court also with a copy, and the
18        adverse information it mentioned is the New
19        Jersey matter, of which we're all aware, and we
20        would ask that the Court continue in its ruling
21        that that not be inquired into in any form or
22        fashion.
23             THE COURT:  All right, thank you, and
24        I will stay with that ruling.
25             MR. BENNETT:  Well, and I would--
```

1      Judge, I haven't had a chance to read it, so I

2      don't know if I'm going to try and offer it,

3      but I understand that, and if I were to offer

4      it, I would offer it in a redacted form so that

5      that's not in there.

6              MR. HOUGH:  Can you make me a copy of

7      that?  That's my last copy.

8              MR. HALEY:  Okay.

9              MR. HOUGH:  That's all I had, Judge.

10             THE COURT:  Okay, thank you.

11             (THEREUPON, the bench conference was

12     concluded and the following proceedings were

13     held within hearing of the jury.)

14  Q.  (By Mr. Bennett)  Agent Nichols, in your

15     testimony on direct examination, you testified

16     about some incidents in which Mr. Skinner stole

17     or availed himself, without authorization, of

18     large amounts of money from Mr. Pickard.  Do

19     you recall that testimony?

20  A.  I do recall that.

21  Q.  Okay.  And there wasn't any evidence presented

22     or that you uncovered in the course of this

23     investigation that Mr. Skinner had stolen any

24     money from Mr. Apperson, was there?

25  A.  Not that I recall, no.

```
 1    Q.   And there wasn't any evidence, or you didn't
 2         develop any evidence in the investigation,
 3         that-- well strike, that.  In the course of
 4         your testimony, there was an exhibit introduced
 5         that was Exhibit 527.  Do you remember that?
 6         That's that little red address book.
 7    A.   Ms. Kruglova's address book?
 8    Q.   Yes.
 9    A.   Yes, I do.
10    Q.   And you have been through that address book on
11         several occasions, have you not?
12    A.   I have.  I generated a report based on some of
13         the information in that.
14    Q.   And you didn't find Mr. Apperson's name in that
15         book did you?
16    A.   I would have to review the report or review the
17         book, if I could do that.
18              MR. BENNETT:  Could we have 527,
19         please?
20    Q.   (By Mr. Bennett)  Agent Nichols, I'm going to
21         hand you what's marked as Government Exhibit
22         527.  While you're looking through that, I'm
23         going to be looking at another document, but as
24         soon as you're ready to give me an answer,
25         you've completed your review, let me know, if
```

1          you would, please.

2     A.   (Pause.)  I've completed.

3     Q.   Are you finished?

4     A.   I believe I am.

5     Q.   All right.  And the question, I believe, was:

6          There's no reference in there to Mr. Apperson,

7          is there?

8     A.   Specifically, no; but indirectly, yes.  And the

9          references I believe indirectly are February

10         11th of 2000, Ms. Kruglova has written in here

11         about United Airline travel from San Francisco

12         to Denver to Kansas City; and from my review of

13         Mr. Apperson's records, there's also a

14         reference here on February 18th from San

15         Francisco to Kansas City.  My review of Mr.

16         Apperson's travel records was that he was in--

17         had rented a vehicle in Kansas City, had flown

18         to Kansas City during that period-- I don't

19         recall the specific days, but somewhere around

20         the-- this may be a little bit broad, but

21         somewhere around the 10th of February until the

22         18th or 19th of February.

23    Q.   So-- go ahead.

24    A.   And during that time period, Mr. Guinan told us

25         that Mr. Apperson was in-- Mr. Apperson and Mr.

1    Pickard were in Kansas, and they asked Mr.

2    Guinan to exchange some Dutch Guilder for him,

3    and he did that at the Kaw Valley Bank in

4    Wamego.  In addition, there's a reference in

5    the back of the journal for an individual by

6    the name of Bill with, in parenthesis, Anton,

7    and closed parenthesis, and it appears that

8    someone, maybe Ms. Kruglova, maybe Mr. Pickard,

9    was supposed to meet Bill at 890 Walsh Street

10   in-- well, what I later determined was that

11   this was in the South Bay of the San Francisco

12   Bay area.  I don't recall the exact city,

13   whether it was Menlo Park or Redwood City, or

14   exactly where it was; but further investigation

15   of that individual, that information, along

16   with other information we got from the case,

17   led me to a determination that Bill or Anton

18   was, in fact, William Truitt Roberts, and when

19   we did a search of Mr. Apperson's residence,

20   there were receipts in his residence for a

21   currency exchange on February 16th of 2000 for

22   exchanging Dutch Guilder, 23,000 Dutch Guilder

23   into about $9,100 U. S. currency.  That was

24   done at the San Francisco airport, and the

25   vehicle license plate for the parking receipt

1           was registered to William Truitt Roberts.

2    Q.    Well, is it your contention that-- well, go

3          ahead.  I didn't mean to interrupt you.

4    A.    In addition, there's a reference June 23rd.  It

5          appears in here it's across the page from June

6          23rd, maybe June 24th for it says, "See,"

7          S-E-E, "Bill" and then in parenthesis, "Anton."

8          So it's-- to answer what I believe is maybe

9          your next question is that, yes, do I believe

10         there are references to Mr. Apperson in this

11         book.

12   Q.    All right, and that's speculation on your part

13         as to what those entries that you have just

14         told us about refer to.  Isn't it?

15   A.    Well, it's taking the information that I

16         obtained from witnesses and obtained by

17         subpoena and piecing the puzzle together.

18   Q.    But it's speculation on your part, isn't it?

19   A.    Well, part of it is speculation, but the

20         records seized from Mr. Apperson's residence

21         clearly show there was a currency exchange on

22         February 16th of Dutch Guilder.

23   Q.    There's nothing in that book that specifies or

24         specifically refers to Clyde Apperson, his

25         address, his phone number, his e-mail, anything

1    like that, is there?

2  A.  No, I don't believe there is.

3  Q.  Now, I want to go next to the-- or go back and

4      visit the missile site again, and you indicated

5      on direct examination that you-- that there

6      were some video, audio recording devices

7      present at the base before you ever-- before

8      the government ever became involved in this.

9      Is that right?

10 A.  There were items Mr. Skinner had installed,

11     yes.

12 Q.  All right, and some of those functioned, and

13     some of them didn't?

14 A.  Yes.

15 Q.  Is that right?

16 A.  At the time I was there, some functioned, some

17     did not.

18 Q.  Did you or anyone else on the government's

19     behalf avail yourselves of those video or audio

20     recording devices during any of the period of

21     time that you were involved, either in control

22     of the base, or back and forth to the base?

23 A.  Yes.

24 Q.  And what did you use those or avail yourselves

25     of those facilities for?

1   A.   On November 6th, we had had several

2        conversations-- I should-- we-- Mr. Skinner had

3        several conversations with Mr. Pickard and Mr.

4        Apperson concerning the return of the ET to Mr.

5        Pickard and Mr. Apperson.  There was a

6        disagreement, a fight.  Mr. Pickard at some

7        point told Mr. Skinner he believed Mr.

8        Skinner-- or they believed Mr. Skinner was

9        under surveillance, that they had seen some

10       vehicles they might-- they believed or

11       suspected were law enforcement vehicles.  I

12       mean, that's the context of an assumption or a

13       generalized view of it, about the conversation,

14       that Mr. Pickard and Mr. Apperson were

15       concerned about being discovered.  Based on

16       some of those conversations, Mr. Skinner, along

17       with Mr.-- Agent Hubbard, myself, Mr. McKibben,

18       went back over to the base, and we locked

19       ourselves inside the base, and we used the

20       video equipment to observe the goings on

21       outside.

22   Q.   All right.  And was that-- was the goings on

23       outside recorded?

24   A.   No, because the recorder did not work.  We

25       attempted to do it.  The recorder never worked.

```
1    Q.   Neither the video recorder or the audio

2         recorder worked?

3    A.   Well, there was no audio recorder as far as I

4         know.  The audio/video recording equipment put

5         into the base was installed by DEA.  It was in

6         a room where Graham Kendall had resided.  The

7         audio equipment, I believe-- or excuse me-- the

8         video equipment I believe you're talking about

9         was in a separate monitoring room.  There was a

10        separate video system, security system for the

11        base.  I don't believe it had an audio

12        recording capability.  It may have.  I didn't

13        see if it did.  We used the video, the cameras,

14        to observe what was happening on the base, and

15        even at that, the video-- not all the video

16        cameras worked, and they certainly did not

17        record.  We could not get them to record.

18   Q.   Were there any cameras that showed any of the

19        interior of the base?

20   A.   Not to my knowledge, no.

21   Q.   Did you observe on any of those cameras at any

22        time Mr. Apperson attempting to leave and

23        anyone holding a knife to his throat to keep

24        him from leaving?

25   A.   I have never heard anything like that.  As far
```

| | |
|---|---|
| 1 | as I know, never anything like that ever |
| 2 | happened. My understanding was Mr. Apperson |
| 3 | was there on the property voluntarily. |
| 4 | Q. Well, did you-- do you recall in one of the |
| 5 | recordings where Bret Nicholson talks about |
| 6 | going and getting his blade? |
| 7 | A. I do recall that. |
| 8 | Q. Okay. And do you recall on the tape Mr. |
| 9 | Nicholson making some comment at some point in |
| 10 | time after he'd gotten the blade that now he |
| 11 | felt better because he had his blade? |
| 12 | A. I don't recall that statement. |
| 13 | Q. All right. |
| 14 | A. It could be there. I just don't recall it. |
| 15 | Q. Now, there was also a camera, as I understand |
| 16 | it, installed outside that the government |
| 17 | installed up on a power pole in some type of a |
| 18 | transformer or what appeared to be a |
| 19 | transformer. Is that right? |
| 20 | A. That's correct. |
| 21 | Q. Were there any recordings made of anything that |
| 22 | occurred using that camera? |
| 23 | A. I don't believe there were. |
| 24 | Q. And that camera was working, was it not? |
| 25 | A. It was. |

1    Q.   Why were there no recordings made of what was

2         going on within the view of the camera?

3    A.   I don't know.  I don't know.

4    Q.   Who was in charge of that camera?

5    A.   Well, there was somebody sitting in a motor

6         home where there was a monitor.  I don't know

7         if there was a recording device attached to

8         that monitor so that that camera could be

9         recorded, that signal could be recorded.

10   Q.   Well--

11   A.   I just don't know, and I don't remember.

12   Q.   Was that camera placed there pursuant to the

13        warrant that you obtained for video recording?

14   A.   No, it was not.

15   Q.   What authority was it placed where it was

16        placed?

17   A.   I believe we obtained a court order to do an

18        installation camera, but it was not-- because

19        it was on public property, there was not a

20        warrant obtained.  That's a separate warrant

21        for the video/audio installation.

22   Q.   All right.  It was on a power pole that was off

23        the premises, in effect, is that what you're

24        saying?

25   A.   Yes.

```
 1    Q.   But you don't-- do you know who made that
 2         application for that warrant?
 3    A.   I don't know.  And I don't know-- I know within
 4         California the--
 5    Q.   Well, I don't want to get into the California--
 6    A.   Well, but--
 7    Q.   -- unless it has something to do with this
 8         case.
 9    A.   I believe it has something to do with my
10         answer.  I know in California the power company
11         requires a court order to do an installation.
12         I believed at the time, and I believe now, that
13         there may have been a court order.  I could be
14         mistaken, and there may not be a court order
15         required to install a camera on public
16         property.
17    Q.   I don't care if there was a court order or not,
18         and that's not really what I'm getting at, but
19         to your knowledge, there was no recording made?
20    A.   To my knowledge, no.
21    Q.   Was that camera equipped with an audio as well
22         as a video capability?
23    A.   I don't believe so.  I believe it was just
24         strictly video.
25    Q.   And other than that camera, was there-- were
```

```
 1              there any other cameras installed at any place
 2              on the base?
 3         A.   Well, there were cameras installed in what was
 4              Graham Kendall's room.
 5         Q.   By the government, I'm talking about.
 6         A.   By the government.  There were cameras
 7              installed in what was Graham Kendall's room.
 8              There were microphones installed in what was
 9              Graham Kendall's room.  There were no other
10              cameras, recorders, microphones, to the best of
11              my knowledge, installed anywhere else on the
12              property.
13         Q.   To your knowledge, was there any occasion,
14              during the time between the 4th and the 6th of
15              November, where any of the individuals, Gordon
16              Skinner, Clyde Apperson, or William Pickard
17              were in Graham Kendall's room and their
18              activities or conversations recorded that
19              haven't been introduced into this case?
20         A.   I don't believe so.
21         Q.   Were any of the conversations that have been
22              admitted as exhibits in this case, did they
23              take place, any of the activities or the
24              conversations take place in Graham Kendall's
25              room or in close enough proximity that they
```

1      were recorded?

2   A.  I don't believe so.  There could have been.  I

3      just don't believe so.

4   Q.  Well, you would be the logical person to know,

5      because you were in charge of the case, if it

6      had occurred, would you not?

7   A.  Well, that's correct.

8   Q.  Okay, and you don't know of any?

9   A.  Not that I know of, no.

10  Q.  The camera that I believe there's been some

11     testimony-- I don't know if you testified about

12     it-- but the camera that was located outside

13     the Lester building or on one end of the Lester

14     building, do you recall that?

15  A.  I recall the testimony about it.  I don't

16     recall a camera sitting there.  There could

17     have been.  I don't recall one.  If there was

18     one there, I don't recall it being functional.

19  Q.  Would that have been one that was there before

20     the government got involved in this

21     investigation or one that was placed there by

22     the government?

23  A.  It would have been one that was there prior to

24     the government arriving, prior to the

25     government being involved in the investigation.

```
 1    Q.   And when you say it wasn't-- you don't recall
 2         it being functional, what do you mean?  Do you
 3         mean it wasn't functional to the extent that it
 4         could record something, or it wasn't functional
 5         to the extent that you could observe something
 6         on it but it wouldn't be record, or what?
 7    A.   Well, first and foremost, I don't recall there
 8         being a video camera there.  And secondly, if
 9         there was a video camera there, I don't believe
10         it sent any video signal that it was functional
11         in that fashion.
12    Q.   You testified that you had reprimanded Mr.
13         Skinner for, number one, withholding the ET
14         and, number two, for placing the one can of ET
15         out where it could be observed during the walk-
16         through.  Do you recall that?
17    A.   There are separate incidents.
18    Q.   Yes.
19    A.   Several separate incidents, yes.
20    Q.   Were there more than those two incidents that
21         you reprimanded him for?
22    A.   Reprimanded him on the walk-through on October
23         27th, reprimanded him again on October 31st
24         when he told us he had a surprise, that he
25         wanted to show us something, and in the Quonset
```

```
 1          hut there underneath the tile, there was a box
 2          of ergocristine.
 3     Q.   Okay.
 4     A.   And then reprimanded him again on January 22nd
 5          for not being truthful with me that he had
 6          possession of the ergocristine, reprimanded him
 7          again on February 21st when, in the presence of
 8          his attorney, he brought into a hotel outside
 9          of Kansas City two additional cans of
10          ergocristine.
11     Q.   And with regards to at least one of those, I
12          believe you testified on direct-- or on-- maybe
13          it was on cross by Mr. Rork, that you told Mr.
14          Skinner that you would report that indiscretion
15          or activity to Mr. Hough.  Did you do that?
16     A.   Yes, I did.
17     Q.   Was Mr. Skinner disciplined in any way, to your
18          knowledge, after you reported those activities?
19     A.   Not to my knowledge, no.
20     Q.   Okay.  Now, I want-- you reminded me of
21          something, and that's this October 31st
22          incident.  As I understand it, that's the day
23          of the search warrant.  Correct?
24     A.   That's the day of the search warrant.
25     Q.   And you and other agents searched the Lester
```

1      building and other areas of the site, missile

2      site, correct?

3   A.  That's correct.

4   Q.  And at the point in time when Mr. Skinner came

5      to you and said, "I've got a surprise for you,"

6      had the search been concluded?

7   A.  No, it had not.

8   Q.  And had the Quonset hut been searched?

9   A.  I don't know whether it had been thoroughly

10      searched or whether people-- agents had walked

11      through and looked at things.  I can't answer

12      that because I spent most of the day in a fully

13      encapsulated suit inside the laboratory.

14   Q.  Inside the Lester building?

15   A.  Well, inside the Lester building processing the

16      laboratory.

17   Q.  Who searched the Quonset hut, if anyone, prior

18      to Mr. Skinner saying, "I've got a surprise for

19      you guys"?

20   A.  I can't answer that.  I don't know.

21   Q.  Okay, and who did Mr. Skinner report to that he

22      had a surprise for you?

23   A.  I believe it was initially Arthur Hubbard, then

24      Arthur approached me and told me, "You need to

25      talk to Mr. Skinner."

1    Q.  And did you talk to him?

2    A.  Yes, I did.

3    Q.  And what was that discussion?

4    A.  Well, he said he needed to show me something,

5        that he had a surprise, and he walked me up to

6        the Quonset hut, and underneath some tile in a

7        large, wooden crate, was a smaller wooden box,

8        and inside that box were ten cans of

9        ergocristine.

10   Q.  Who else was with you, if anyone, other than

11       Mr. Skinner up to--

12   A.  Well, I'm sorry.  That day?

13   Q.  Who else went with you up to the Quonset hut

14       when Skinner said, "I have a surprise for you,"

15       and you say he walked you up there and pointed

16       that out?  Was there anyone else present?

17   A.  Yes.  I believe Arthur Hubbard was.  I believe

18       Ralph Sorrell was.  I don't know if there was

19       anyone else present and with us at that point.

20   Q.  But at that point in time, the agents, in the

21       course of searching the premises, had not

22       located those cans.  Is that correct?

23   A.  At that point we had not.

24            MR. BENNETT:  Judge, I believe that's

25       all I have.

COPY

1      UNITED STATES OF AMERICA  )
                                 )      ss:
2      DISTRICT OF KANSAS        )

3                C E R T I F I C A T E

4           I, Roxana S. Montgomery, Certified

5      Shorthand Reporter in and for the State of

6      Kansas, do hereby certify that I was present at

7      and reported in machine shorthand the

8      proceedings had the 4th day of March, 2003, in

9      the above-mentioned court; that the foregoing

10     transcript is a true, correct, and complete

11     transcript of the requested proceedings.

12          I further certify that I am not attorney

13     for, nor employed by, nor related to any of the

14     parties or attorneys in this action, nor

15     financially interested in the action.

16          IN WITNESS WHEREOF, I have hereunto set

17     my hand and official seal at Topeka, Kansas,

18     this ____10th____ day of ____March____, 2003.

19

20     _____

21                Roxana S. Montgomery

22                Certified Shorthand Reporter

23

24

25