COPY

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF KANSAS

                                        FILED
                                  U. S. DISTRICT COURT
                                  DISTRICT OF KANSAS

2

3    UNITED STATES OF AMERICA,      )   2003 MAR 14  P 1: 09
     ------------------- Plaintiff,)
                                    )
                                        RALPH L. DELOACH
4            vs.                     )   Case Clerk
                                    )   BY_____ DEPUTY
                                    )   00-40104-01-RDR
5    WILLIAM L. PICKARD and         )       AT TOPEKA, KS
     CLYDE APPERSON,                )
6    ------------------- Defendants.)

7        TRANSCRIPT OF MOTION HEARING AND TESTIMONY OF
                     GORDON TODD SKINNER,
8                     CARL NICHOLS, and
                       RALPH SORRELL
9        HAD DURING THE JURY TRIAL BEFORE
             HONORABLE RICHARD D. ROGERS
10                  and a jury of 12
                          on
11                  March 6, 2003

12   APPEARANCES:

13   For the Government:    Mr. Gregory G. Hough
                            Assistant U.S. Attorney
14                          290 Federal Building
                            444 Quincy Street
15                          Topeka, Kansas    66683

16   For the Defendant:     Mr. William Rork
     (Pickard)              Rork Law Office
17                          1321 SW Topeka Blvd.
                            Topeka, Kansas    66603
18
     For the Defendant:     Mr. Mark Bennett
19   (Apperson)             Bennett, Hendrix & Moylan
                            5605 SW Barrington Ct. S.
20                          Topeka, Kansas 66614

21   For the Witness:       Mr. Ronald Wurtz
     (Skinner)              Asst. Fed. Pub. Defender
22                          U. S. Post Office
                            424 South Kansas Avenue
23                          Topeka, Kansas   66603

24   Court Reporter:        Roxana S. Montgomery, CSR
                            Nora Lyon & Associates
25                          1515 South Topeka Avenue
                            Topeka, Kansas 66612

I   N   D   E   X

Certificate ------------------------------ 104

W I T N E S S

ON BEHALF OF DEFENDANT PICKARD:                    PAGE

GORDON TODD SKINNER
        Direct Examination by Mr. Rork          26
        Cross-Examination by Mr. Bennett        72
        Cross-Examination by Mr. Hough          79


ON BEHALF OF THE PLAINTIFF:

CARL NICHOLS
        Direct Examination by Mr. Hough         82
        Cross-Examination by Mr. Rork           87

RALPH SORRELL
        Direct Examination by Mr. Hough         89
        Cross-Examination by Mr. Rork           90

E X H I B I T S

PLAINTIFF'S EX. NO.:                     OFRD   RECD

909.  Video recorded by Agent Zajac     79     79
910.  Affidavit of Carl Nichols         94     95
911.  Video and Cover Letter re
      Washington State                   94     95
912.  Reports of Skinner Interviews     96    101

1            THE COURT:  All right, let the record

2       disclose that we're meeting in the courtroom.

3       The jury is not present.  The defendants are

4       present.  The matter has to do with-- I'm not

5       sure whether anything's been filed yet about

6       this matter.  Mr. Hough, do you know where we

7       are?

8            MR. HOUGH:  I do not.  I would ask to

9       approach as a preliminary matter.

10           THE COURT:  All right, you may do so.

11               (THEREUPON, the following

12           proceedings were had at the bench.)

13           MR. HOUGH:  Judge, we have received

14      nothing from either defendant relevant to this,

15      so we have no idea where we're going, as an

16      initial matter.  However, based upon the scant

17      representation that was made yesterday, it

18      would be our belief that it would be

19      appropriate for the Court to close the

20      proceedings.  The press is here.  In the event

21      that a juror or one of the jurors' friends or

22      family were to read something in the paper, we

23      believe that that would result in a mistrial,

24      which we believe is the ultimate thing that the

25      defendants are after here to begin with.  So we

1         would ask that the proceedings be sealed or

2         closed to the public generally.

3                   MR. RORK:  Judge, number one, when we

4         left last night, you'd indicated that we'd get

5         the testimony today and then we'd get the

6         written time after today and get the written

7         motion.  So, based upon that assertion, I did

8         that.  With respect to the proceedings being

9         closed, the newspaper has been full of reports

10        and evidence that Mr. Pickard had prior labs

11        and prior activities, and the Court has

12        admonished the jury.  It's not our intentions--

13        I just wish the government had had the closed

14        position January 13th when all the other

15        information has been in there.  And I haven't

16        followed all of it, but I get things sent to me

17        from people around the state about other labs,

18        and how this come in, but that's the Court's

19        right to do what you want.  Mr. Skinner is not

20        going to testify and change his trial

21        testimony.  His testimony deals with issues

22        involved with new evidence, newly discovered

23        evidence, and factors involving the affidavit

24        that he filed originally, the affidavit then

25        filed by the government, whatever, Exhibit

1     9-0-- that fat thing filed last night by Hough,

2     9-0 something.

3               MR. BENNETT:  908.

4               MR. HOUGH:  908.

5               MR. HALEY:  That's in our office.

6     That particular exhibit is in our office.  I'm

7     going to have to go get it.

8               MR. RORK:  Okay.  It's about 908, the

9     other affidavits and information relating to

10    the newly discovered evidence.  It has nothing

11    to do, Judge, with changing his trial

12    testimony.  That's not what he's going to do,

13    period.  I can tell you that.

14              MR. HOUGH:  Well, Judge, if all it is

15    going to be a rehash or some expansion upon

16    that affidavit that was filed, we would ask the

17    court to nip that in the bud.  The Court has

18    considered that, and the Court's ruling

19    relative-- or the Court has taken it under

20    advisement.  The Court has made no ruling that

21    I'm aware of, but we would submit that what

22    this has the potential to do is to be the

23    endless back and forth every time that there is

24    anything submitted contrary to whatever Mr.

25    Skinner now professes to have occurred.  We'll

1          be right back here again.

2                    MR. RORK:  I'll let Mr. Bennett speak

3          for a minute, Judge, while I go get my notes

4          and my paperwork I was trying to get.  Can I

5          just have just a minute?

6                    MR. BENNETT:  Do you want me to go

7          ahead?  He just kind of dumped it in my lap.

8          Well, Judge, from what I know of this, it would

9          not-- as Mr. Rork says, it won't be any rehash

10         of testimony previously given.  I'm looking at

11         it, and Mr. Rork and I really haven't conversed

12         about it, but I'm looking at this as being, in

13         effect, a proffer, or I would ask the Court to

14         consider it as a proffer of the information

15         that I made the request for yesterday-- I

16         believe yesterday-- and that the Court denied,

17         and what I-- all I want to do or see done or am

18         hoping to have done would be just a record made

19         of the basis for my request for those documents

20         yesterday, and that it would amount to a

21         proffer.

22                    MR. RORK:  And, Judge, if I may add,

23         it's also a proffer on-- based upon an

24         interview with Mr. Skinner with his attorney.

25         It's based upon a number of other facts and

1     factors that we will submit to the Court by way

2     of a proffer for your consideration of

3     misconduct, not only in the examination of the

4     witness concerning the affidavit that he

5     provided, but in the about 19 other instances

6     that involve his trial testimony, statements

7     made to him during his trial testimony, the

8     existence of facts, the existence of

9     circumstances that go to prejudice for you to

10    ultimately consider, and then I will file the

11    written motion subsequently, Judge, but the

12    basis goes to grounds, and it's not a rehashing

13    of events.  It's new evidence that was revealed

14    to us this week regarding circumstances with

15    respect to the walk-through, the search

16    warrant, evidence not produced and provided to

17    us, testimony influence of the witness,

18    exculpatory information involving threats to

19    withdraw immunity several times throughout the

20    course of the proceedings, and other acts that

21    serve a dual purpose, one, for whatever

22    consideration the Court may make with respect

23    to the suppression issue and, two, for whatever

24    consideration reference any misconduct that the

25    Court may believe individually or collectively

1     may merit review with respect to the motions,

2     and this is our only way to get that.  We don't

3     intend to spend all day on it.  We don't intend

4     to rehash any trial testimony.  All we intend

5     to recall is these events, the walk-through,

6     the new evidence, the testimony, the influence

7     of testimony, the threats made, the withholding

8     of information, the continued withholding of

9     information, and other facts, and that's just a

10    brief summary, Judge.  I've got a lot of notes.

11          MR. HOUGH:  Well, Judge, to the

12    extent that it's cumulative with that affidavit

13    that they sponsored by Mr. Skinner the other

14    day, we would believe it inappropriate to hear

15    that again, and again, and again, but

16    regardless, our request is that it would be

17    appropriate for the courtroom to be closed, or

18    this hearing closed to the public generally.

19    Our additional request would be for the Court

20    to remind Mr. Skinner of his agreement with the

21    government.  That immunity agreement provides

22    specifically that if he provides false

23    statement, perjury, obstruction of justice--

24    which at a later date this may very well be

25    determined to be-- that he violates his

1        agreement, he could then be prosecuted not only

2        for those false statements and obstruction of

3        justice, but also this very conspiracy.  So I

4        think it's important that, as a matter of fact,

5        he is advised of that.

6            MR. BENNETT:  Judge, with regards to

7        the advising him, so that the record is clear,

8        Ron Wurtz, his attorney, is here present, as I

9        understand it has discussed this at great

10       extent with him, and Mr. Wurtz is a very

11       capable lawyer, and I'm sure that he's done

12       that.  I don't know that-- but if, you know,

13       that's up to the Court.

14           MR. HOUGH:  I don't know that I would

15       assume that.

16           MR. RORK:  Judge, he has done that

17       and he's discussed it, that Mr. Skinner won't

18       lie, and he's gone over proposed questions

19       we've asked him, given parameters, and he has

20       one preliminary inquiry with you, Mr. Wurtz

21       does, then we're ready to go.  It won't take

22       that long.

23           THE COURT:  Let me just make some

24       comments here.  From the number of things you

25       listed there, it looks to me like we could be

1           here a week on this.
2                    MR. RORK:  I don't think so.
3                    THE COURT:  You listed about 20
4           things.  I have our order of March 27th, a 23-
5           page order, which we discussed.
6                    MR. BENNETT:  February 27th.
7                    THE COURT:  That was signed,
8           actually, in March.
9                    MR. BENNETT:  Oh, last year.  I'm
10          sorry.
11                   MR. RORK:  Yes, Judge, and this is
12          nothing old.
13                   THE COURT:  March 27th of 2002, a 23-
14          page order in which we discussed in great
15          detail a lot of the things here and
16          unfortunately, as I say, I don't have anything
17          in front of me, really, in writing as to what
18          we're doing, what we're doing here.  But first,
19          in response to closing the courtroom, I'm not
20          in favor of doing that.  I don't know what's
21          going to come out in this thing, and I think
22          anything could come out in this thing, and let
23          me just read you something.  "There was some
24          suggestion yesterday that Mr. Wurtz might seek
25          to have the courtroom closed during Mr.

1      Skinner's testimony.  I want to provide the

2      following summary to address this issue.

3      Supreme Court decision in Wallner versus

4      Georgia, 467 U.S. 39 requires that before

5      public access to a courtroom in a criminal case

6      may be restricted, the party seeking to close

7      the hearing must advance an overriding interest

8      that is likely to be prejudiced, the closure

9      must be no broader than necessary to protect

10      that interest.  The trial Court must consider

11      the reasonable alternatives to closing the

12      proceeding, and the Court must make findings

13      adequate to support the closure."  In addition

14      to that, the newspaper people came in and said

15      they wanted to oppose and wanted to be heard on

16      closing the courtroom.  "Accordingly, without

17      some showing of an interest that is likely to

18      be prejudiced," and it has to be a serious

19      interest, "I'm going to deny the request to

20      close the courtroom," so we will take care of

21      that.  Then in regard to what we're doing here,

22      "The Court is not exactly certain what

23      defendants intend to do today, but the Court

24      does want to establish the following ground

25      rules.  The Court directs counsel to

1    immediately proceed to the issues that are the

2    subject of the defense motion."  I do not want

3    to hear about painting the walls and doing

4    everything else out there at the missile base.

5    "The Court does not expect the questioning of

6    Mr. Skinner to devolve into a fishing

7    expedition, a discovery deposition, or a dress

8    rehearsal for some later testimony by him in

9    the defendants' case.  Defendants have

10   suggested that at least a portion of the

11   testimony relates to a renewed motion to

12   suppress based on newly discovered evidence.

13   As such, the Court believes that the counsel

14   should initially address the issue of

15   standing-- as standing.  As counsel are aware,

16   the Court previously ruled that neither

17   defendant had an expectation of privacy at the

18   missile site.  Apparently, there may be some

19   additional evidence offered on the issue of

20   defendant Pickard's expectation of privacy.

21   However, the Court is unaware of any evidence

22   providing an expectation of privacy for

23   defendant Apperson."  Now, maybe you can come

24   up with some.

25             MR. BENNETT:  No, sir.

1           THE COURT:  "Wherein, the Court does

2     not intend to allow counsel for defendant

3     Apperson to participate in any renewed motion

4     to suppress unless he can persuade the Court

5     that Apperson has some standing here.  In

6     addition, the Court's prior ruling on the

7     motion to suppress was based on skinner's

8     consent to the tour and searches of the missile

9     base and his authority to provide that consent

10     as a result of his control of the property.

11     All the evidence in the case has demonstrated

12     that he had access and control over the

13     property.  If there is any effort to challenge

14     the Court's prior ruling, the defendant Pickard

15     needs to directly address the issue of Mr.

16     Skinner's consent and his authority to consent.

17     The Court also wants to address the further

18     progress of this case.  The Court expects

19     defendant Pickard to be prepared to present

20     testimony next week.  The Court does not intend

21     to allow any additional continuances.  The

22     Court believes that both defendants have had

23     substantial time to prepare in this case.  The

24     indictment was filed approximately two and a

25     half years ago.  The trial is now in the eighth

1   week.  The Court does not wish to hear any

2   further complaints about lack of preparation

3   and that my ruling on an immunity issue ruined

4   the entire case and we have to start over again

5   because of that."  So that's my feeling about

6   this case.

7              MR. BENNETT:  Judge, could I ask one

8   question in regards to that?

9              THE COURT:  Yes.

10             MR. BENNETT:  When you talk about

11  next week, are we working on just four days, or

12  are we going to work Friday, or has that

13  decision been made at this point?

14             THE COURT:  Well, I think we're

15  probably going to have to start working, either

16  that or be here forever, we're going to have to

17  start working--

18             MR. BENNETT:  I had no problem with

19  that.  I just--

20             THE COURT:  We're trying the jury

21  because they've been here so long with so much

22  wasted time, so much wasted time.  But let's go

23  out there and--

24             MR. RORK:  And, Judge, in that

25  regard, when we get done, this afternoon, could

1          Mr. Pickard and I stay in the courtroom where

2          we have more room and exhibits, and then Mr.

3          Bennett at some time wanted to participate in

4          the questioning of Mr. Pickard.

5                    THE COURT:  All right.

6                    (THEREUPON, the bench conference was

7          concluded.)

8                    THE COURT:  All right, I might just

9          say to the people that were not up here at the

10         bench that I laid down certain rules about this

11         matter as to how we're going to proceed.  This

12         is not to be a fishing expedition.  If there

13         was any request to close the courtroom, I have

14         denied that, and we're going to proceed along

15         with this as quickly as we can, and I do not

16         want any more wasted time in this case talking

17         about painting walls and what people did and so

18         forth.  I have handed down on March 27th, 2002,

19         a 23-page matter which addresses many of the

20         issues that are here, a 27th day of March,

21         2002, 23-page memorandum and order that had to

22         do with motions to suppress at an earlier date.

23         I expect all people to be advised of what I

24         said in that motion.  Now, with that, Mr. Rork,

25         are you going to handle this matter?

1              MR. RORK:  Your Honor, I'm going to

2     start with the issue that the Court directed

3     and then go into the other issues, yes.  I

4     would call Mr. Gordon Todd Skinner.

5              MR. WURTZ:  Your Honor, may I address

6     the Court?

7              THE COURT:  Yes, you may.

8              MR. WURTZ:  My name is Ron Wurtz.  I

9     have been appointed as Assistant Federal Public

10    Defender to represent Mr. Skinner.  Mr. Skinner

11    is here pursuant to subpoena.  Prior to his

12    actually walking up and taking the stand and

13    taking the oath, I wanted to confirm my reading

14    of the Court's order compelling his testimony

15    pursuant to 18 U.S.C. 6001, et seq.,

16    specifically 8000-- 6003, and it's my

17    understanding he is still under that

18    compulsion.  If that's the case, he's prepared

19    to take the stand, and I just wanted to confirm

20    that.  He's ready to take the stand with that

21    understanding.  If there's any dispute about

22    it, I obviously would like to know that before

23    he takes the stand.

24             THE COURT:  Who served the subpoena?

25             MR. WURTZ:  Well, he is here, I

1      thought, under a continuing order.  He's under

2      one subpoena by the defense, which he

3      understands that's why he's here.

4              THE COURT:  This is not a new

5      subpoena that they have offered him?

6              MR. WURTZ:  No.  He received-- I

7      haven't seen-- I saw a subpoena that came in

8      just the other day, but as I understood it, it

9      was more a notice of when to appear pursuant to

10     a previous subpoena from which he has not been

11     released.  Now, if I'm wrong, I need to know

12     that so I can properly advise him.

13             MR. RORK:  It's my understanding he

14     was served when he was in jail in Washington,

15     DC, at that time-- not in Washington, DC-- but

16     in the state of Washington with the subpoena

17     from the defense, yes, and then he was on a

18     continuing order not to be released and to

19     notify Mr. Hough when he was to be present.

20             MR. HOUGH:  Judge, that subpoena in

21     Washington state would be null and void unless

22     the Court approved it under Rule 17.

23             MR. RORK:  Judge, it was before I was

24     appointed.  It was whenever he was arrested.

25             (THEREUPON, there was a conversation

1     in low tones between the Court and the

2     Bailiff.)

3              THE COURT:  We've never issued a

4     subpoena to him.

5              MR. RORK:  No, Judge, you never have

6     but, one, before I was appointed, there was a

7     subpoena served on him when he was in jail in

8     the state of Washington and, two, when he

9     finished his testimony, he was ordered to

10    appear, not released from the subpoena, subject

11    to recall by the defense, and that's why he's

12    here to testify for these purposes.

13             THE COURT:  Who issued the original

14    subpoena to him, the defense?

15             MR. RORK:  Yes, Your Honor.

16             MR. BENNETT:  I believe it was issued

17    by Mr. Rork, Your Honor.  I have not-- I did

18    not issue a subpoena for him.

19             MR. RORK:  Can I ask Mr. Wurtz when

20    he was in jail in Washington?  Do you know what

21    time that was, like in January of 2001 or '02?

22             MR. WURTZ:  He was arrested out there

23    mid July of 2002.

24             MR. RORK:  It was in July 2002,

25    Judge.

1          THE COURT:  Well, my understanding--

2     and I can't confirm any more-- that he was

3     under subpoena by the defense attorneys, or at

4     least one of the defense attorneys, and he then

5     testified, and then, as far as the Court was

6     concerned, I don't know whether you asked me to

7     hold him.  Again, he actually testified for the

8     government originally, was my understanding.

9     Now, do you think he's under a continuing

10    subpoena?

11         MR. RORK:  Yes, Your Honor.  Also,

12    when he was here, we asked that he not be

13    released and he specifically--

14         THE COURT:  Well, that's all I can

15    tell you about that, and I cannot take away

16    anything that he had originally or add anything

17    to it.  I have no idea-- I know we have a

18    letter from the government here, at least

19    there's some sort of an agreement here from the

20    government, but what happens to that I have no

21    idea.

22         MR. WURTZ:  Well, by reading the

23    Court's order, it appears to me, because it's

24    under the caption of this case, that he remains

25    under the grant of immunity if he testifies

1          today, and it's with that understanding that he

2          is prepared to testify, and I've advised him he

3          is obligated to testify because of that grant

4          of immunity.

5                    MR. RORK:  Judge, and I would just

6          point you to--

7                    (THEREUPON, there was a conversation

8          in low tones between the Court and the

9          Bailiff.)

10                   THE COURT:  Well, we think probably

11         that's true, but that's not saying there cannot

12         be something else that I'm not-- I'm not

13         granting him a guarantee.  That came from the

14         government.  I don't think I have the authority

15         to do that.  I mean, about something else that

16         might come up.

17                   MR. WURTZ:  Well, if it is the

18         question of perjury, we know that is not

19         covered by the grant of immunity.  There is no

20         question about that.  And the fact that the

21         government has informed me that they are

22         contemplating perjury charges does not stop him

23         from testifying today.  He's prepared to do

24         that even if the government does follow through

25         with its statement to me that they are

 1          contemplating perjury charges for something

 2          that he hasn't testified to here yet.

 3                    THE COURT:  Well--

 4                    MR. WURTZ:  But he's prepared to take

 5          the stand, but it is with the understanding

 6          that the Court's order made previously in this

 7          case dated-- I don't have a document number,

 8          I'm sorry-- dated January 28th, 2003, remains

 9          in effect.  So he's prepared to take the stand,

10          understanding that the government is

11          contemplating perjury charges for other

12          matters, that he would be subject to

13          prosecution for telling a lie here under oath,

14          that what he says may not be used to prosecute

15          him pursuant to 18 U.S.C. 6003 except for

16          perjury, and without an objection from the

17          government, he's prepared to take the stand.

18                    THE COURT:  Do you agree with that,

19          Mr. Hough?

20                    MR. HOUGH:  Your Honor, we would

21          disagree with that because of the fact of the

22          affidavit that was filed on March the 3rd of

23          Mr. Skinner sponsored by Mr. Rork and Mr.

24          Bennett, in light of the four affidavits that

25          the Court received subsequent to that.  It is

 1      as a result of that, that Mr. Wurtz was

 2      informed by my supervisor consistent with his

 3      disclosure to the Court.  If in fact that is

 4      deemed to be true, that 6003 agreement would

 5      not be effective today.

 6              THE COURT:  Well, that may be

 7      accurate.  What you say may be accurate, but I

 8      can give you no further guarantees than--

 9              MR. WURTZ:  Well, then, we can't

10      testify, Your Honor.  We have to invoke our

11      Fifth Amendment right.

12              MR. RORK:  Well, Judge, I would note

13      for the record specifically page 1584 and 1583

14      of the transcript.  When Mr. Skinner was

15      released Mr. Bennett, line 12-- line 16, asked

16      that Mr. Skinner be made available throughout

17      the remainder of this proceeding.  The Court

18      stated he doesn't need to say stay here.  Mr.

19      Hough said that Mr. Bennett paid for his hotel.

20      Page 1585, Mr. Bennett says, "I want him

21      available."  Page 1585 line 4, Mr. Hough,

22      "Judge, my understanding he's under subpoena by

23      defense.  That's not a problem."  The Court,

24      "You may step aside."  And then they rested.

25      So he's still here and available.

1          MR. HOUGH:  Judge, that's not the

2     issue.  That's the subpoena issue.  Mr. Wurtz's

3     issue is the immunity agreement.

4          THE COURT:  The only thing I can say

5     is I think the agreement probably holds true

6     absent-- but there's nothing the Court can do

7     to guarantee that at all, and I'm not sure what

8     the government is going to do in this case, but

9     if he was here on an original deal-- but your

10    point is, Mr. Hough, the fact that he took new

11    action and filed an affidavit--

12         MR. HOUGH:  That's correct, Judge.

13    The plain reading of the immunity agreement

14    would indicate that perjury or false statement

15    would violate the agreement.  He could be

16    prosecuted for that and the substantive offense

17    for which we are all here and have been for

18    some weeks.  The trouble lies in that Mr. Wurtz

19    was advised by my supervisor, based upon that

20    affidavit and the ensuing affidavits,

21    consistent with what Mr. Wurtz said.  Okay?

22    That's true.  That agreement is null and void

23    as of March 3rd, so he would not be covered

24    here today.

25         MR. WURTZ:  Well, I'm confused, Your

1    Honor, because I'm not talking about any

2    agreement.  I'm talking about a court order

3    that orders him to testify in the face of his

4    invocation of his Fifth Amendment right.

5              MR. HOUGH:  I apologize.  I misspoke,

6    Judge.

7              MR. WURTZ:  And unless this Court

8    entered that order, and my understanding is

9    that unless this Court rescinds that order,

10   that he is still compelled to testify, and

11   that's what I wanted to confirm and actually

12   give the Court the opportunity to rule that

13   this order either stands or it's rescinded.  It

14   stands in effect at this point, the way I

15   interpret it, but in order to protect Mr.

16   Skinner and for me to give proper legal advice,

17   I need to know if this order is still in full

18   force and effect, and only this Court can

19   rescind it, or a higher court.

20             THE COURT:  Pat, go get that order

21   and bring it up and let me look at it.

22             MR. HOUGH:  Judge, if you will recall

23   the order, the order was merely the Court's

24   recognition of the immunity agreement that the

25   government has with Mr. Skinner.  That was

1          executed back in October of 2000.  At Mr.

2          Wurtz's request, we asked that the Court

3          enforce that and recognize that.  The Court

4          did.  That, in a nutshell, is what the order

5          is.

6                      (THEREUPON, there was a conversation

7          in low tones between the Court and the

8          Bailiff.)

9                      MR. HOUGH:  But again, Judge, that

10         order relies upon the grant of immunity issued

11         by the Department of Justice pursuant to 6001

12         and 6002.

13                      (THEREUPON, there was a conversation

14         in low tones between the Court and the

15         Bailiff.)

16                      THE COURT:  Well, it's my thought

17         that the order does stand, absent the

18         government's withdrawal of immunity, which I

19         based this on.  So unless there's a withdrawal

20         of immunity, I suppose that we'll be seeing you

21         back here many, many times before we finish

22         this case.  So perhaps now, with that statement

23         from the government, that statement from the

24         Court, you can make whatever decision you want

25         to make.  We believe the order stands, unless

1          the government withdraws the immunity.

2                    MR. WURTZ:  Very well.  Mr. Skinner

3          is relying on the Court's statement and our

4          research and belief the Supreme Court law makes

5          this stand under general rules.  He's prepared

6          to take the stand.

7                    MR. RORK:  I would call Gordon Todd

8          Skinner.

9                    GORDON TODD SKINNER,

10         called as a witness on behalf of the Plaintiff,

11         was sworn, and testified as follows:

12                    THE CLERK:  Have a seat.

13                    DIRECT-EXAMINATION

14         BY MR. RORK:

15    Q.   Would you state your name for the court record,

16         please?

17    A.   Gordon Todd Skinner.

18    Q.   Mr. Skinner, I would direct your attention to--

19         do you recall previously being present in this

20         proceeding and testifying during the course of

21         the judicial proceedings?

22    A.   Yes.

23    Q.   Subsequent to the court proceedings, did you

24         not, through your attorney, Mr. Wurtz, have a

25         discussion where certain facts were related to

1    myself and others about questions we had of

2    you?

3  A.  Ask the question again.

4  Q.  Subsequent to your trial testimony, did you

5    not, in the presence of your attorney, discuss

6    with us facts involving both your trial

7    testimony and other circumstances surrounding

8    this investigation?

9  A.  (No response.)

10  Q.  Let me rephrase the question, then.  I want to

11    direct your attention to October 27th of 2000.

12    Assume that's the date that has been testified

13    to there was a walk-through at your missile

14    base.  Do you recall that date?

15  A.  Yes.

16  Q.  Prior to that date and time, you had entered

17    into various letters and a written agreement

18    with the government concerning your immunity,

19    had you not?

20  A.  Yes.

21  Q.  When you were at the missile base on October

22    27th, 2000, you were aware that law enforcement

23    from Sacramento, California, and elsewhere were

24    to arrive at that location, were you not?

25  A.  Yes.

1    Q.  And prior to their arrival that day, had you
2        been told with respect to that location what if
3        anything should be placed out in the open?
4    A.  No.  I was-- no.
5    Q.  What were you told about anything dealing with
6        the can of ET or chemicals from Native Scents?
7    A.  In the Sacramento meeting, I said that I had a
8        can of ET that had the inscription of where it
9        possibly would show that it came from-- where
10       it came from, either in the Eastern Bloc or
11       Germany-- I seem to remember saying Germany--
12       and that they could possibly go and trace back
13       the source of the ET from that, and they said,
14       "Make sure that we can see this," because they
15       didn't believe me that there was an LSD lab
16       there.
17   Q.  And when you were told make sure they could see
18       this, were you understanding they were coming
19       out to your missile base?
20   A.  Absolutely.  Well, they had to make a decision
21       if I was even remotely telling the truth, so I
22       don't know if at that point they were coming
23       out to the missile base.  I'm sorry.  But they
24       were dubious.  The only one that really
25       believed me was Zack Zajac.  The other people

1          were, like, "Well, this sounds wild."

2   Q.    When you said they said to make sure this can

3          was out there, who was "they"?

4   A.    They-- I said--

5                    MR. HOUGH:  Judge, that misstates the

6          witness's statement.  The witness said, "Make

7          sure we see this."  The witness did not say

8          that he was told to make sure that can was out

9          in the open.

10                   THE COURT:  All right, I'll sustain

11         your objection.  Try to clear it up.

12  Q.    (By Mr. Rork)  What was the statement you made

13         previously about they wanted to make sure they

14         saw?

15  A.    They wanted me to be able to prove that I was

16         remotely even telling the truth.

17  Q.    And in order for them to prove you were

18         remotely telling the truth, what did they say

19         to you?

20  A.    They wanted to be able to see this can of ET.

21  Q.    And who was "they"?

22  A.    It would have been maybe present Zajac, Bob

23         Dey, D-E-Y, Nan Carter, Carl Nichols, or it may

24         have been Arthur Hubbard and Carl Nichols.  I

25         can't remember which meeting.

1    Q.   And as a result of that meeting, were you told

2         in Sacramento specifically when anybody arrived

3         at your missile base to--

4              MR. HOUGH:  Judge, based upon the

5         Court's prior order indicating that unless

6         there is some evidence that Mr. Skinner did not

7         have the control of the base at the time of all

8         of this, that the Court was not interested in

9         hearing this evidence.  We would object.

10             MR. RORK:  Judge, and that's what I'm

11        getting to, the preliminary questions for why

12        he's getting the paperwork in that regard.

13             MR. HOUGH:  Judge, he's jumped way

14        ahead to this deal with the ET can.  There's

15        been no evidence whatsoever that Mr. Skinner

16        now claims that he was not in control of the

17        missile base.

18             THE COURT:  Well, I ruled on that

19        once, you know.

20             MR. RORK:  I know you did, Judge.

21             THE COURT:  Well, I'll overrule it.

22        Go ahead.

23   Q.   (By Mr. Rork)  For background information, were

24        you not in Sacramento, California, as has been

25        testified, October 17th and 18th for two days

1        of various debriefings?

2    A.  Yes.

3    Q.  And it's during those two days of various

4        debriefings that the conversation came up with,

5        one, whether or not you owned this or

6        controlled this missile base.  Is that correct?

7    A.  I don't know if that came up in that

8        discussion.  I mean, it's very possible it did.

9        That wasn't the primary focus.  They were

10       trying to just find out if I was in the real

11       world or not.  Okay?

12   Q.  And in trying to find out if you were in the

13       real world or not, you related to these agents

14       various facts and circumstances regarding how

15       you were in possession of what you believed was

16       an LSD lab and various chemicals used in the

17       production of same.  Did you not?

18   A.  That's correct.

19   Q.  And in your discussion with the various

20       individuals on October 17th and October 18th,

21       did you not describe that at a missile base in

22       Wamego, Kansas, you had stored in a number of

23       large green military boxes all of these items

24       of laboratory equipment?

25   A.  Yes.

1    Q.   And was it not during this meeting on October

2         17th and October 18th that you also described

3         what has been referred to as a Pringles type

4         can with powder in it you believed was ET?

5              MR. HOUGH:  Well, Judge, again, we'll

6         object.  If, in fact, the witness has now

7         confirmed that he was in control of the base,

8         based upon the Court's prior ruling, this is

9         irrelevant.

10             MR. RORK:  Judge, I never said he

11        controlled the base.  I'm establishing a

12        foundation of where he said the items were, and

13        then I'm going to who owned it and what and

14        where the documents were, and what I know of

15        the government's position.

16             MR. HOUGH:  Judge, the point is the

17        whole deal of the can is irrelevant and matters

18        not as long as Mr. Skinner owned, operated,

19        controlled, had that interest in the missile

20        base, as the Court has previously ruled.  We're

21        wasting time here.  This is irrelevant.

22             THE COURT:  Well, overruled.  Go

23        ahead.  The court will eventually have another

24        look at this, and we'll see.

25             THE WITNESS:  Could you please ask

```
 1        the question again?
 2   Q.   (By Mr. Rork)  Was it not during the course of
 3        this two days of debriefing, besides indicating
 4        all the equipment with respect to the
 5        laboratory you were attempting to indicate to
 6        them was used for the manufacture of ET, that
 7        you had discussions about a Pringles type can
 8        that had a white powder in it you believed was
 9        ET?
10   A.   It's possible it was at that meeting or the
11        meeting with Carl Nichols and Arthur Hubbard in
12        Oakland or San Francisco.  I can't recall.  If
13        I had the reports before me, I could tell you.
14        It was in California in these early meetings.
15   Q.   It was in California in the early meetings of
16        October prior to your returning to the base--
17   A.   Correct.
18   Q.   -- whenever you returned?
19   A.   Correct.
20   Q.   And during the course of any or all of those
21        meetings in California where you had worked
22        out-- first, you had worked out with your
23        attorney various proffer letters and then a
24        written agreement, had you not?
25   A.   My attorney handled that stuff.  I-- with John
```

1      Roth.  I wasn't involved much with that.

2  Q.  And your discussions were relative, while in

3      California before you returned to the missile

4      base, that there was a can that has been

5      described as a Pringles type can that had a

6      substance you believed was ET in it, did you

7      not?

8  A.  Yes.

9  Q.  And in relation to--

10  A.  Now, I say I had the can.  I didn't know what--

11      how much was in there, but that it had the

12      insignia.  My whole statement was what was

13      printed on the bottom of that can, the metal

14      embossing.  That's what I'm talking about.

15  Q.  And when you described the metal embossing and

16      the discussions about this can, you referred to

17      an insignia on the bottom where you believed

18      they, law enforcement, could determine where in

19      the Eastern Bloc or Germany it had come from?

20  A.  Yes.

21  Q.  And in relation to this can that you referred

22      to and that description, what were you

23      specifically told about that can when they

24      arrived at the base, what they needed to see?

25  A.  They were just wanting me to prove that I had

```
 1            an LSD lab out that.  That was it.  I mean, I
 2            was under so much pressure--
 3       Q.   That's fine.  And did you specifically indicate
 4            to these individuals somewhere in California
 5            prior-- early October, prior to them arriving
 6            at the base, that all of the lab equipment and
 7            other chemicals were in green military boxes?
 8       A.   I mean, not-- I mean, most of it was in green
 9            military boxes.  I mean, I don't have the
10            benefit of reading these reports.  I mean, yes,
11            most of the stuff was in green military boxes.
12       Q.   Were you specifically told at that meeting, or
13            any meeting in California, before you returned
14            to the missile base, that-- were you
15            specifically instructed not to touch, move,
16            open, or bring anything out of the military
17            boxes or otherwise having to do with this lab?
18       A.   I do not recall specific instructions.
19       Q.   Do you recall a day when the individuals of law
20            enforcement arrived at the missile base
21            pursuant to previous discussions in California?
22       A.   Yes.
23       Q.   And when they arrived, who was that?
24       A.   There was a whole bunch of people I don't know.
25            The people I do know is Arthur Hubbard arrived.
```

```
 1            I believe very generally Carl Nichols, Zack
 2            Zajac.  I was introduced to other people at
 3            that time.
 4       Q.   And when those individuals arrived, before
 5            they-- you met them at the gate.  Is that
 6            correct?
 7       A.   I don't know where I met them.
 8       Q.   Do you remember any discussions or anything
 9            being said at that point in time when they
10            arrived about shutting things down?
11       A.   What do you mean by shutting things down?
12       Q.   That the DEA agents had received a call from
13            Barbara Salana or somebody.
14       A.   No, that was done later.
15       Q.   What happened when they first arrived then?
16            Would you describe that briefly?
17       A.   They started walking through the base.
18       Q.   And when you say, "walking through the base,"
19            what parts of the base was that?
20       A.   The missile bay, everywhere.  I wasn't with
21            them all.  There were a lot of DEA agents
22            showed up, a lot of agents, a lot of people I
23            didn't know showed up.
24       Q.   As they were going around the base, were they
25            also entering into what's known as the Lester
```

```
 1              building and the Quonset hut?
 2      A.   I did not see anyone enter the Lester building
 3           or the Quonset hut, because I was dealing with
 4           a fiasco underground.
 5      Q.   Let's go to that.  While you were underground,
 6           were people from the DEA or law enforcement
 7           underground in the missile base?
 8      A.   Yes.
 9      Q.   And what were they doing?
10      A.   They were looking around.
11      Q.   And while they were looking around, had they
12           been there for a period of time when something
13           that you referred to-- everything was shut
14           down?
15      A.   Yes.
16      Q.   Do you know about how long a period of time
17           that was?
18      A.   I can't recall.
19      Q.   What do you recall about being shut down?
20      A.   Call came in, and they said, "You immediately
21           must not open any evidence.  You cannot have
22           him show you anything that has to do with this
23           LSD lab.  We have a problem."  I was told it
24           came from Barb Salana.  Zack Zajac said,
25           "Everybody shut down immediately.  We have some
```

1        sort of procedural problem occurring.  Mr.

2        Skinner, do not open up anything."

3                MR. HOUGH:  Judge, we'll object as

4        hearsay.  This vicarious hearsay being thrown

5        out by some third party in California is

6        irrelevant.

7                THE COURT:  Sustained.

8    Q.  (By Mr. Rork)  What did Agent Nichols or others

9        present there represent to you had been told?

10   A.  That--

11               MR. HOUGH:  Judge, that's hearsay.

12               MR. RORK:  Well, Judge, I'm asking

13       what Agent Nichols, who is present here in the

14       courtroom, or others he's identified told him

15       to do at that point in time.

16               THE COURT:  I'll sustain that.  All

17       this is hearsay.

18   Q.  (By Mr. Rork)  Was there a question in there--

19       or you were told by Agent Nichols or others in

20       his presence, there was a question concerning

21       whether or not they had authority to be on the

22       missile base at that point in time?

23               MR. HOUGH:  Judge, it's still hearsay

24       whether counsel asks it or the witness gives

25       it.

1               MR. RORK:  Judge, it's--

2               MR. HOUGH:  It's hearsay.

3               MR. RORK:  Whether it's offered for

4       the truth of the matter asserted, it's offered

5       for a foundation to show to you why he goes to

6       get paperwork showing who had control of the

7       base, including Mr. Pickard.  It goes to show

8       issues of why the agents then discontinued

9       activities that they had been doing and what

10      actions he took in response to that.  And the

11      basis for asking him is that throughout this

12      trial he has testified concerning instructions

13      given to him by Carl Nichols, Ralph Sorrell, or

14      Roger Hanzlik that were based on others.  These

15      are the foundation questions that you wanted me

16      to get into with the issues and parameters you

17      gave me on the search issue.

18              MR. HOUGH:  Judge, for purposes of

19      this hearing, it's still hearsay.  All he has

20      to do is ask him:  Did you control the base on

21      October the 27th?  Period.  If he answers yes

22      to that, this inquiry should cease based upon

23      the Court's prior order.

24              MR. RORK:  But, Judge, asking him if

25      he controlled the base, I need to get into the

1      foundation for what questions were told him why

2      he needed to be shown that he controlled the

3      base and why he took those actions.

4              MR. HOUGH:  Why is irrelevant, Judge.

5              THE COURT:  Yeah, bringing in

6      hearsay, right now, I'll sustain the objection.

7              MR. RORK:  Were you represented-- the

8      question I would then ask, Judge:

9   Q.  (By Mr. Rork)  Were you represented to by the

10     agents in your presence that they needed to see

11     if you had consent or who had consent to allow

12     them on the property?

13  A.  Yes.

14  Q.  And with respect to the issue of who had

15     consent and whether they could be on the

16     property, what did you then do?

17  A.  I started producing trust documents, and we

18     started opening up safes, and--

19  Q.  And who is "we"?

20  A.  Myself, and mainly Zack Zajac, because he was

21     an expert at opening safes up.  And I don't

22     know which of the DEA agents were present.  I

23     believe Ralph Sorrell was present at opening

24     some of these safes up.  One of the statements

25     was made to me was, "Under no circumstances--"

| | |
|---|---|
| 1 | | "Make sure there's nothing involving this LSD |
| 2 | | lab in these safes," and they said, "If you lie |
| 3 | | to us and trick us, you're going to be charged |
| 4 | | with this conspiracy." |
| 5 | Q. | And-- |
| 6 | A. | And nothing was-- I didn't trick them or |
| 7 | | anything.  There was nothing found. |
| 8 | Q. | And the safes were being opened up, and there |
| 9 | | was a question over whether you had consent. |
| 10 | | Did you produce documents that dealt with the |
| 11 | | trust involved in this missile base? |
| 12 | A. | Yes, tremendous amount of documents. |
| 13 | Q. | And did you present those documents to Ralph |
| 14 | | Sorrell to look at? |
| 15 | A. | I don't know which agent got them from me.  I |
| 16 | | mean, they were laid up on a giant granite |
| 17 | | table. |
| 18 | Q. | And when the agent looked at those documents, |
| 19 | | were you told anything about those documents |
| 20 | | and what they represented? |
| 21 | | MR. HOUGH:  Objection to what he was |
| 22 | | told, Judge.  That too is hearsay.  Again, the |
| 23 | | only issue is:  Did the man control the base on |
| 24 | | the date in question?  It's as simple as that |
| 25 | | question. |

1           THE COURT:  Well, go ahead.

2    A.    Ralph Sorrell at some point got very verbally

3          abusive and said, "This is a fictitious trust

4          you're trying to sell us.  Just come clean.

5          Tell us the truth."  I told him, "No, it's a

6          real trust."  The argument escalated until

7          finally Zack Zajac said to Arthur Hubbard, "Get

8          whoever this man is, that's bothering Mr.

9          Skinner under control immediately, because--"

10          MR. HOUGH:  Judge, again, we'll

11          object to this hearsay.  It's irrelevant, it's

12          immaterial, it's hearsay.

13          THE COURT:  Sustained.

14   Q.    (By Mr. Rork)  With respect to the comments

15          that were made to you, were you advised that--

16          did you advise anybody there at that location

17          that within those documents there existed

18          paperwork showing William Pickard had a

19          beneficiary interest in the trust?

20   A.    They wouldn't even-- they just said the whole

21          thing was fiction, so they didn't care.

22   Q.    When they said that, within those documents,

23          were there not records that showed William

24          Leonard Pickard had a beneficiary interest?

25   A.    I don't know what records they looked at, and I

1       don't know what, because they just ignored the

2       whole thing.  I don't know.

3   Q.  And what I want you to indicate is,

4       specifically, in getting the papers that you

5       were to show them in relation to who had the

6       beneficiary interest, specifically Mr. Pickard,

7       how thick and what number of papers did you

8       give them that related to the actual trust?

9   A.  It was fragmented, but if you stacked it, it

10      would have been five inches or something like

11      this.  It was in green folders.  It was

12      fragmented around.  I was trying to come up

13      with title insurance for them.  I was trying to

14      generate anything to prove, because they just

15      kept calling me a liar about this trust.  They

16      were all over me and abusive.

17  Q.  And did you not also understand that people

18      went down to the Register of Deeds to determine

19      if there was any trust paperwork there that

20      might correspond to the trust paperwork you

21      had?

22  A.  They said that there was nothing there, and

23      then I told them to call Todd Shepherd,

24      Charlson & Wilson Abstract Bonding Company,

25      because he couldn't have issued insurance on

1          the base, title insurance through the Chicago

2          Title Insurance Company, without the

3          registration being done in Pottawatomie.  The

4          registration in Pottawatomie and Westmoreland

5          had disappeared.  He said he had facts.  He

6          couldn't have done it.  He had to call in

7          there.  This was from years earlier, and he

8          said this indeed was a good trust.  He couldn't

9          have generated the paperwork without it.  He

10         said he would have lost his job.  He said--

11              MR. HOUGH:  Judge, we'll object to

12         what some third party said.  This is not Mr.

13         Skinner's forum to tell us what third parties

14         said.  It's hearsay.

15              MR. RORK:  Judge, it's his

16         understanding what they're saying in his

17         presence about the paperwork he's trying to

18         give to them.

19              MR. HOUGH:  Hearsay.

20              THE COURT:  Overruled.  Go ahead and

21         tell us about the paperwork.  We've looked at

22         this once, I think, but go ahead.

23    Q.   (By Mr. Rork)  You may continue.

24    A.   The question again?

25    Q.   You indicated they were saying they wouldn't

1            have issued the title insurance because of

2            what?

3       A.   They couldn't have issued the title insurance

4            without it being registered in Westmoreland.

5            There was even a tax paid in Westmoreland for

6            the mortgage.  So in order for the whole thing,

7            the transaction had to be, and the DEA said

8            they went up there, but they said they could

9            not find it.  They said they could not find

10           these registered papers.  I eventually found

11           copies of where the registration was done.

12      Q.   But when you were told by the DEA present at

13           the base concerning who had control, did you

14           put these documents in any type of container

15           for them to take to have them reviewed?

16      A.   I kept telling them to take a whole stack of

17           stuff, which was three brief cases, and laid it

18           in front of a huge missile bay door, and no one

19           would take it.  I kept saying, "Take these

20           documents."  In the whole 60 days, they didn't

21           take the documents.

22      Q.   In those documents, are you not aware that

23           there did, in fact, exist evidence that Mr.

24           Pickard had a beneficiary interest in the

25           missile base?

A. I am not a lawyer. This is so complicated that-- and it's a Fourth Amendment thing that probably no one's ever ruled on. I need to confer with my lawyer to answer this question.

Q. Well, I'll let you answer that question in just a second. Let me get to the foundation. So when you were trying to show-- and questions came up about whether or not Pickard had control of the base and you gave these piles of documents to the agents to look at, was there any effort made to take them from you, Mr. Skinner?

A. Some point, they took some fraction of them, and I don't know where they took them to, and I don't know what they did with them, and they came back and just tossed them on this granite table.

Q. So at that point in time, the documents that you had presented to them with respect to who had control and ownership in the trust and who were the beneficiaries of the trust were given back to you and not taken. Is that correct?

A. They were either given back, taken and whatever done with them, thrown back, not taken. I don't know what happened to them. I mean, I

1    had other problems.  I was trying to show them

2    this whole place.  I was being argued with.

3    Everyone was very stressed.

4  Q.  (Pause.)  Let me hand you what's been marked

5    for identification purposes as P-801, which

6    consists of three pieces of paper purporting to

7    be what law enforcement provided to us

8    regarding the documents in respect to the trust

9    that you had given to them concerning who had

10   ownership in the property.  Can you-- have you

11   ever seen those before?

12 A.  Oh, yeah.  This was what was filed with

13   Pottawatomie.  This is the standard thing

14   that's used to file when you go to a bank.

15   This is a-- this is a very fractional part of

16   this trust.  I mean, this is the most minimal

17   amount.

18 Q.  And, in fact, aren't you aware that those items

19   there in no way reflect who actually has

20   control of the trust and who are the

21   beneficiaries of the trust, do they?

22 A.  No.

23        MR. HOUGH:  Objection.  It calls for

24   a legal conclusion, Judge.  The document speaks

25   for itself.

```
 1                    THE COURT:  Sustained
 2      Q.   (By Mr. Rork)  As a part of the trust paperwork
 3           that you gave to the agents that's three pieces
 4           of paper, is it not?
 5      A.   I gave the agents everything, I mean-- you mean
 6           these three pieces?  Please.
 7      Q.   What you have in front of you, that's three
 8           pieces of paper.
 9      A.   Okay, yes.
10      Q.   And in relation to the number of pieces of
11           paper that you had in your possession that day,
12           when the question came up about whether or not
13           Pickard had control of the base, does that
14           accurately reflect the number of pages in the
15           documents you gave to any of the law
16           enforcement agents there to review that issue?
17      A.   Not even close.  I've said there was a huge
18           amount of documents I gave them.
19      Q.   How many other pages would you, in your best
20           estimate, indicate existed?
21      A.   Again, we're talking five inches of paperwork.
22           I don't know.
23      Q.   Do you recall in the discussions with the
24           agents that day during the issue of ownership
25           your indication to them that Mr. Pickard had
```

```
 1            the right to exclude others from the base?
 2    A.   What's your question?
 3    Q.   Do you recall in the discussions over who had
 4            right of access and control to the base, and
 5            after you were advised that these papers were
 6            fictitious, or the trust was, do you recall
 7            advising the law enforcement officers in any
 8            manner in response to their question about Mr.
 9            Pickard that, under the trust documents, they
10            would find he had the right to exclude others,
11            including them, from the base?
12    A.   No.  I'm sorry.  I didn't advise them of that.
13    Q.   All right.  Were you asked about that
14            particular question with respect to the trust?
15    A.   No, I wasn't asked that question.
16    Q.   In--
17    A.   You're referring to these trust documents,
18            correct?
19    Q.   The trust documents or the title insurance
20            paperwork.
21    A.   Well, they got pretty upset when they read that
22            unlimited power of attorney thing.
23    Q.   I'm going to get to that, yes.
24    A.   Okay.
25    Q.   So in the discussion of ownership and whether
```

```
 1          or not Mr. Pickard had any right or control to
 2          the property, did you not also give them what's
 3          referred to as a power of attorney?
 4     A.   We were going through safes, and I was kicking
 5          out any paperwork I could find, and I produced
 6          them a power of attorney letter.
 7     Q.   And what was expressed to you when that power
 8          of attorney letter was provided they became up
 9          set about?
10     A.   They said, "Why is this?  What's this about?"
11          I don't know.
12               MR. HOUGH:  Judge, again, this is
13          hearsay, and we object.
14               MR. RORK:  Well, Judge, it has to do
15          over who had control.
16               THE COURT:  Well--
17               MR. HOUGH:  Well, it's still hearsay,
18          Judge.
19               THE COURT:  Well, the Court made
20          quite a study of who had control and wrote an
21          order on it, and we seem to be rehashing old
22          ground, and he's not saying anything different
23          than the Court looked at, but if you think
24          there's something else that I'm not looking at,
25          go ahead.
```

1    Q.   (By Mr. Rork)   What did they say about-- upset
2         about?
3    A.   They said "Why do you have this?"  I said in
4         case Graham dropped dead, because Leonard and I
5         had an agreement that if either one of us went
6         to prison or died either, we would take care of
7         the other one's families.
8    Q.   And under that understanding, did you convey
9         that information to the law enforcement that
10        were present there?
11   A.   Absolutely.
12   Q.   And were some of the law enforcement present
13        there during that conversation, Carl Nichols?
14   A.   I don't know where Carl was.  It was Zack Zajac
15        and, I mean, Carl was trying to get other stuff
16        done.
17   Q.   Is that the same time you had given them the
18        conversation and information that Mr. Pickard
19        had also been-- previously been given keys and
20        the access code to enter the premises?
21   A.   Say this again now.
22   Q.   Was it during that same conversation you had
23        also advised them that Pickard had been given
24        the keys and the access code?
25   A.   He was given the access codes.  I didn't know

```
 1            who had the keys.  I didn't even have a set of
 2            keys half the time, because people took them
 3            from me.  I don't know who had what keys.
 4       Q.   After that point, do you recall how long a
 5            period of time it was that the issue
 6            surrounding whether or not you had consent or
 7            who had consent to have them on the base when
 8            this was shut down, how long that was before
 9            things began changing?
10       A.   I don't know, sir.
11       Q.   Minutes or hours or days?
12       A.   Oh, a long time.  Hours, days, I don't know.
13            Took them a long time to sort it out.
14       Q.   And that power of attorney was given to the
15            agents when you were discussing with them the
16            documents in the safe that Mr. Zajac had
17            opened, was it not?
18       A.   Now, these documents had to be gathered up from
19            numerous places, so it was early in the
20            discussions that we were talking about this
21            unlimited power of attorney.
22       Q.   During the period of time that the can of ET
23            was discovered in the presence of you, did Mr.
24            Nichols open the lid and smell the powder?
25                      MR. HOUGH:  Well, Judge, again, this
```

1        is irrelevant unless there is some evidence

2        that Mr. Skinner did not control the base on

3        the date in question, because if he did,

4        consistent with the Court's order, the agents

5        were legitimately there, and this question

6        doesn't matter.

7                MR. RORK:  Judge, I've moved from the

8        issue of the control.  I've now moved to the

9        issue that we indicated to the Court deals with

10       misconduct and other factors, and these are

11       issues where Mr. Nichols has testified in the

12       courtroom and the beginning of many bases of

13       fact that we have for the Court's

14       consideration.

15               THE COURT:  If you're going to the

16       issue of misconduct, overruled.  Go ahead.

17               THE WITNESS:  Please repeat the

18       question.

19   Q.  (By Mr. Rork)  Well, will you describe and

20       relate the circumstances involving, in your

21       presence, any discussions had or observations

22       made of Mr. Nichols picking up the can,

23       smelling the items, and asking what the lethal

24       dose, if any, was or anything of that nature?

25   A.  Please rephrase the question.

1    Q.   Will you tell me, Mr. Skinner, the

2         circumstances involved that we discussed with

3         your attorney present that you recall-- just

4         tell me in your own words, what do you recall

5         happened with respect to the can that was

6         discovered in your presence and any action of

7         Mr. Nichols?

8    A.   Mr. Nichols picked the can up, opened the top

9         up, put his finger in, and swabbed the inside

10        of it.

11   Q.   And what if any comment was made at that point

12        in time in asking you about the dosage amounts?

13   A.   Some other agent walked up to him and said, "Is

14        that safe?"  I don't know what it was, and

15        there was a conversation of, "Todd, what's the

16        danger level on this?"  And I said it would be

17        above 100 milligrams.

18   Q.   Do you recall if there were any other

19        statements then made in your presence that

20        now-- that him picking up the can had

21        compromised the finger prints?

22   A.   What now?

23   Q.   Do you recall any conversation being made in

24        your presence that-- in addition to what you

25        have indicated, that his picking up of the can

```
 1            had then compromised any fingerprints?
 2     A.    I don't know.  Maybe I-- I have no clue about
 3            that question.  I don't know.  I'm sorry.  I
 4            don't remember what was said about the
 5            fingerprints on that can.
 6     Q.    (Pause.)  Let me direct your attention to when
 7            you were testifying on the witness stand.  Do
 8            you recall that there were several questions I
 9            had asked of you dealing with whether or not
10            certain chemicals or items of glassware--
11            excuse me.  I'll rephrase the question.  Do you
12            recall my discussion with you of questions
13            involved with a number of items of glassware
14            and various equipment, flasks, and evaporators,
15            concerning being shipped from Native Scents to
16            you?  Do you recall that?
17     A.    Yeah.  I said no, Native Scents did not ship
18            anything to me.
19     Q.    When there was a break in the proceedings, do
20            you recall bringing up with the agents and/or
21            in the presence of Mr. Hough questions
22            regarding why I was asking the wrong set of
23            circumstances involving, then, shipment from
24            Native Scents to you when it should have been
25            shipments from you to Native Scents?
```

```
 1    A.  Yes, I said why--

 2              MR. HOUGH:  Judge, we'll object.

 3        That's irrelevant, and even assuming the truth

 4        of this spurious allegation, it would not be

 5        misconduct.

 6              MR. RORK:  Judge, the nature of the

 7        question I'm asking, I think, will be self-

 8        evident to the Court whether it's relevant or

 9        not.

10              THE COURT:  Well, I'm going to allow

11        you to go a ahead.

12    Q.  (By Mr. Rork)  What conversation did you have,

13        and what were you told?

14    A.  I said, "Why are these questions being asked

15        this way, because this isn't what happened?"

16        And they explained to me that Alfred Savinelli

17        had lied and said he shipped glassware to me.

18        I didn't know that.  And it's-- it's me that

19        shipped vacuum pumps and glassware to him.

20    Q.  And when you related-- who was "they" that was

21        telling you this?

22    A.  Hough, Carl, and I don't remember if Roger or

23        Ralph were sitting there.  It was right there

24        that we had the conversation.  I was very

25        confused by what was going on.
```

| | | |
|---|---|---|
| 1 | Q. | And when you related to them that it was you |
| 2 | | that had shipped pumps and glassware to Alfred |
| 3 | | Savinelli from the period of 1994 to 2000, did |
| 4 | | they advise you that that was all right, |
| 5 | | counsel had been given reports to that effect, |
| 6 | | and we were just stupid and weren't asking the |
| 7 | | right questions, or something to that effect? |
| 8 | A. | I don't know who counsel is. |
| 9 | Q. | What did they say to you then? |
| 10 | A. | Carl said, "It's in the reports.  It's no |
| 11 | | problem.  You're covered.  You told us about |
| 12 | | it.  It's in our data base.  We know about |
| 13 | | this." |
| 14 | Q. | And do you recall specifically telling these |
| 15 | | agents during the course of your assistance |
| 16 | | with them that you had shipped what would be |
| 17 | | the equivalent of a truck load of flasks, |
| 18 | | evaporators, and other such items from Tulsa, |
| 19 | | Oklahoma, at your direction to Albert Savinelli |
| 20 | | for the time period 1994 to 2000? |
| 21 | A. | Yeah, I mean, we'd have to go over a list, but |
| 22 | | in general, lab-type ware, glassware, pressure |
| 23 | | cookers maybe, maybe some autostirrers, I don't |
| 24 | | know, a vacuum pump, you know. |
| 25 | Q. | And then you were told in response to your |

1          questions of why we're asking them wrong that

2          reports had been prepared and provided, and we

3          weren't asking the right questions?

4     A.   Yeah.  I don't know what was said.  I just

5          didn't understand why there was confusion,

6          because I said it once.  They kept-- I didn't

7          know Alfred had made this lie up.  Okay?  I was

8          baffled why you guys were asking me the wrong

9          shipment way, and they-- and I don't know, they

10         said something about, "These guys haven't done

11         their preparation.  They don't know what's

12         going on."  I don't know.

13    Q.   But you're clear, there's no question in your

14         mind you were told before and you were told in

15         the courtroom they recalled you had explained

16         the shipment of lab equipment and glassware

17         from you to Alfred Savinelli?

18    A.   Absolutely.  They said it was in their data

19         bases.  That's without a doubt.

20    Q.   Do you recall during your testimony initially,

21         when I was questioning you involved with your

22         ability and capacity to synthesize various

23         items such as DMT and LSD?

24    A.   No.  I'm sorry.  You're going to have to

25         rephrase that.

1    Q.  Do you recall early in your testimony when I

2        was questioning you about your capabilities,

3        and you would describe in great detail what

4        processes and abilities you had in scientific

5        equipment?

6    A.  Please rephrase the question again.

7    Q.  Cross-examination of you began, and there was a

8        list that's been marked as, I believe, P-22,

9        the list of 163 drugs.  Do you recall making

10       that list?

11   A.  That's correct.

12   Q.  Was that the only list that you made with

13       respect to your drug usage, or was there

14       another list?

15   A.  There was another amended list.

16   Q.  And how many items were contained on the

17       amended list?

18   A.  I don't know.  Twenty items.  I don't know.

19   Q.  Was that amended list given to us?

20   A.  I have no idea what the hell has been given to

21       anyone at this point.

22   Q.  Let me direct your attention--

23   A.  Sorry for cursing.  I've just had it.

24   Q.  When you were asked questions by me regarding

25       your experience in any of those items on the

```
 1            list and how they could be manufactured or
 2            synthesized, any of them, do you recall a
 3            period of time when there was a break in the
 4            questioning, and you were admonished at the
 5            break about your testimony?
 6     A.     The word admonished, can you-- I'm not being
 7            difficult.  Please phrase what admonish means.
 8     Q.     Was a discussion made with you about shutting
 9            down your testimony?
10     A.     I was told to quit pontificating and that at
11            this point I look like the chemist.  I was told
12            to shut that down and quit pontificating about
13            what was going on.
14     Q.     And the pontificating had to do with?
15     A.     That was from Greg Hough's mouth, the word
16            pontificating.  He said, "Right now the jury
17            thinks you're the chemist."
18     Q.     And were you told to shut down and to quit
19            giving testimony regarding your capabilities in
20            synthesizing or manufacturing those items you
21            were testifying about?
22     A.     Some sort of statement was made about it.
23     Q.     And then after that was told you, did you do
24            that?
25     A.     I tried to cut back.
```

```
 1    Q.   And would that explain circumstances where then
 2         you were asked questions about how to do
 3         something, and you would just refer to ordinary
 4         kitchen equipment versus the other details?
 5    A.   I guess.  I don't know.  Yes, I guess.  I don't
 6         know.
 7    Q.   Do you recall also with respect to questions I
 8         had asked of you about the lumi-LSD and the
 9         iso-LSD similarly being told to shut down your
10         knowledge in regard to those questions?
11    A.   Some statement was being said, "Don't get into
12         that kind of talk.  It's too technical.  You
13         look like a chemist.  Stay away from
14         pontificating on that."
15    Q.   And as a result, did you do that?
16    A.   I tried.
17    Q.   Do you know an individual by the name of Dennis
18         Zigrang, Z-I-G-R-E-N-G?
19    A.   Yes.
20              MR. HOUGH:   What's the spelling
21         again?
22              MR. RORK:   Z-I-G-R-E-N-G.
23    Q.   (By Mr. Rork)  Is he not a molecular--
24    A.   Wait a minute.  Z-I-G-R-A-N-G, Dr. Dennis
25         Zigrang.
```

1    Q.   Is he not a molecular engineer and received the

2         equivalent of the Nobel Peace Prize?

3    A.   No, he is a chemical engineer.  He is a

4         structural engineer.  He is a double E.  In

5         1959 he received one of the highest awards in

6         the world in chemistry.  He is the one that

7         developed Stealth-- the Stealth, B-1 Stealth

8         bombers' radar.  He was involved with that.  He

9         designed the space shuttle doors.

10        Unfortunately, he had something to do with the

11        original panels of the space shuttle for

12        reentry.  He also was involved with nuclear rod

13        designs, and he worked under Werner von Braun

14        for rocket engineering, and he's considered one

15        of the world's leading minds, and--

16   Q.   Do you recall an occasion where Mr. Zigrang--

17   A.   Zigrang, Dr. Dennis Zigrang.

18   Q.   Dr. Zigrang discovered the byproducts of your

19        synthesis of some complicated controlled

20        substance?

21   A.   Yes.

22   Q.   And in regard to that discovery, are you aware

23        Carl Nichols called Dr. Zigrang, the doctor, to

24        inquire about your capacity to synthesize the

25        item in question?

```
 1    A.   Yes.
 2    Q.   What did Agent Nichols advise you in that
 3         regard?
 4    A.   He said he spoke to Dr. Zigrang.
 5    Q.   And did he confirm that Dr. Zigrang would
 6         testify that you were capable of synthesizing
 7         LSD and other type items?
 8    A.   No, he--
 9    Q.   What did he say?
10    A.   He said I'd like-- Dr. Zigrang's elderly now,
11         and he thought I was in trouble, and he said,
12         "I would make a great witness for the defense,"
13         and he never understood that it wasn't me, that
14         I wasn't the defense, and he was wanting to
15         take the stand to defend me.
16    Q.   And "wanting to take the stand to defend me,"
17         were you told that the defense was disclosed
18         all about this?
19                   MR. HOUGH:  Judge, we'll object.
20         This is irrelevant.  Agent Nichols testified
21         all about Dr. Zigrang and that Dr. Zigrang--
22         what that conversation was at trial.
23                   MR. RORK:  Judge, in respect to a
24         question, we didn't know who Dr. Zigrang was
25         until Agent Nichols in cross-examination was
```

```
 1            asked about Mr. Skinner's capacity to
 2            synthesize some item, and the question that Mr.
 3            Skinner deals with, it's my understanding of
 4            the conversation, that Dr. Zigrang has been
 5            disclosed to the defense, that he would make a
 6            --he would be able to testify that Mr. Skinner
 7            was capable of manufacturing the items in
 8            question, and had been originally subpoenaed by
 9            the government, would not be called as a
10            witness, and the information of his knowledge
11            of Mr. Skinner's chemistry experience had been
12            disclosed to us, and that was the nature of my
13            question.
14                      THE COURT:  I'm going to sustain the
15            objection.
16       Q.   (By Mr. Rork)  But there's no doubt in your
17            mind that Mr. Nichols indicated to you he had
18            talked with this doctor about your experience
19            in the events?
20                      MR. HOUGH:  (Standing.)
21                      THE COURT:  I'll sustain the
22            objection again.
23                      MR. RORK:  (Pause.)  Your Honor, may
24            I take a short break at this time to finish the
25            other notes?
```

```
 1                    THE COURT:  Mr. Bailiff, let's recess
 2          for 15 minutes.
 3                    THE BAILIFF:  All rise.  Court will
 4          stand in recess for 15 minutes.
 5                    (THEREUPON, a recess was had.)
 6     Q.   (By Mr. Rork)  Mr. Skinner, from the time when
 7          Officer Zajac and other people arrived
 8          initially and until you had then left the 1st
 9          of November, do you recall whether or not there
10          was any video tape made in your presence?
11     A.   Give me the dates again.
12     Q.   From the time law enforcement arrived in late
13          October of 2002 (sic) when you described about
14          when they first arrived at the base until at
15          some point in time before Mr. Pickard and
16          Apperson were arrested, do you recall if there
17          was any video taping done in your presence?
18     A.   Yes.
19     Q.   And do you know how much, or how long, or what
20          was video taped?
21     A.   Let's see.  I don't know what was video taped
22          by whoever else.  The only thing that I
23          directly witnessed was Zack Zajac asked
24          permission if he could video tape for his
25          personal collection the base and if I would
```

```
 1          help him do it.  He had a problem with the
 2          video tape machine, the video camera.  His
 3          children has messed it up.  I fixed it for him,
 4          and I helped him carry the cord around, and we
 5          video taped extensively the entire facility.
 6      Q.  And would that have been inside and all around
 7          the base?
 8      A.  Yeah, inside of the base.  I remember he went
 9          outside a little bit.  I don't remember much
10          about it.  But inside we did a lot of-- we
11          spent a lot of time having fun with it.
12      Q.  At the time in the sequence of events when
13          there's evidence that you gave to Mr. Pickard
14          some pills to take and asked him to titrate
15          those, do you recall that?
16      A.  Yes.
17      Q.  And do you recall what if anything unusual
18          there was about those pills that you gave to
19          him?
20      A.  Not unusual.  They were just 10 milligram
21          Valiums.  They were strong Valiums, strongest
22          prescription Valium, I think, you can get.
23      Q.  And you've heard the behavior of Mr. Pickard
24          the next day after he had taken those Valiums.
25          Is that correct?
```

1    A.  Yes.

2    Q.  And was that unusual behavior of him, or did

3        you relate that to anything?

4    A.  It was very unusual behavior for him.

5    Q.  And did you relate it to the Valium that you

6        had given him?

7    A.  Yeah, and the stress of the situation.  I'd

8        never seen him behave that way in my life.

9    Q.  With respect to-- let me hand you what's been

10       marked as Government's Exhibit No. 908, and--

11            MR. HOUGH:  What exhibit number was

12       that again?

13            MR. RORK:  908 and then 903.

14            THE WITNESS:  Let me get my stuff put

15       away.  Okay now.

16   Q.  (By Mr. Rork)  904, 905 and 906.  Do you recall

17       earlier this week you filed an affidavit?

18   A.  Do you have my affidavit?

19   Q.  815.

20   A.  Yes.  I don't know if it was earlier this week.

21       It was a few days ago.  The date was March 3rd.

22            MR. HOUGH:  Judge, we'll object to

23       any further testimony confirming the claims in

24       his affidavit.  That's already all before the

25       Court.  This would be cumulative.

```
 1                    MR. RORK:  Judge, all I want to show
 2          him was the 908 that was represented as to
 3          being what was being shown and ask if that was
 4          what was shown to him with respect to his
 5          affidavit.
 6                    THE COURT:  All right, you may go
 7          ahead.
 8      Q.  (By Mr. Rork)  So you reviewed your affidavit,
 9          correct?
10      A.  Correct, yes.
11      Q.  And I'd have you review this, if you would
12          quickly, 903, 904, 905, and 906?
13                    MR. HOUGH:  Judge, 903 through 906
14          are the affidavits of the government.  There's
15          no reason--
16                    MR. RORK:  I'm asking--
17                    MR. HOUGH:  -- for the witness to
18          review those.  If the question before the
19          witness is whether or not he was ever shown
20          908, so we would object to that.  A rehash of
21          his affidavit is irrelevant and cumulative.
22                    MR. RORK:  Judge I'm not asking him
23          to rehash it.  I'm asking him to read those
24          before he then looks at 908, and then I'll ask
25          him a question about 908.
```

1              THE COURT:  If you're asking him a

2        question about 908, ask him about it.

3              THE WITNESS:  Okay.

4    Q.  (By Mr. Rork)  We'll just leave those here in

5        case you have other questions.  908, will you

6        review that?  908, will you look at that?  Have

7        you ever seen that?

8    A.  Yes.  It's got my handwriting on it.

9    Q.  With respect to information involved with being

10       asked questions and shown exhibits with respect

11       to testimony provided in this case, does 908

12       appear to be the Excel document that you refer

13       to in your affidavit that was shown to you?

14   A.  You're going to have to let me read through

15       this.  This is a huge document.

16             MR. HOUGH:  Judge, it is a huge

17       document.  It's about 119 pages.  So we will

18       object to the next 45 minutes being taken by

19       the witness to review that 117 or 119 pages.

20   Q.  (By Mr. Rork)  I'm not asking you to review the

21       contents of it.  I'm asking you to review the

22       form to see if it appears to be in the form of

23       the Excel document you refer to in your

24       affidavit.

25   A.  (Pause.)  Are you saying that this exhibit 908

```
 1              is the same as what I'm referring to in this
 2              exhibit A-15?
 3       Q.    Yes, I'm asking you that.
 4       A.    No.
 5       Q.    What kind of document were you shown, and for
 6              what purpose?
 7                        MR. HOUGH:  Judge, again, we would
 8              object.  It's cumulative to the affidavit that
 9              was submitted March 3rd.  What he was shown and
10              why, the full explanation is in that affidavit.
11                        MR. RORK:  Well, Judge, if it's not
12              the one he was shown, that's why I'm trying to
13              find out what was shown.
14                        (THEREUPON, there was a conversation
15              in low tones between the Court and the
16              Bailiff.)
17                        THE COURT:  Well, go ahead.  I'll
18              overrule it.
19       Q.    (By Mr. Rork)  What were you shown, for what
20              purpose?
21       A.    I was shown some sort of a document that was
22              laid out in a grid form that had different
23              color marks on it, and it was evidence that
24              was-- exhibits that were being pulled, and they
25              would be-- they were looking through-- they
```

1          being Hough and the DEA agents around him,

2          Carl, or at least Roger and Ralph, and the

3          statement that was made to me was, "We're

4          trying to figure out where they're going on

5          their defense and what kind of questions are

6          going to be asked."

7     Q.   And were you then shown those documents and

8          asked questions in response to those exhibits

9          with respect to your testimony?

10    A.   Say your question again.

11    Q.   Were you then shown those documents with

12         respect to questions that were going to be

13         asked of you possibly by the defense?

14    A.   I may not have been shown the documents, I may

15         have been shown the documents, but at least

16         there was discussion about it based upon these

17         items being known.

18    Q.   And after you left these proceedings, were you

19         called by Ralph Sorrell and told anything about

20         testimony in this case, or did you call Ralph

21         Sorrell, or did you discuss testimony of other

22         witnesses in this case?

23    A.   When I went back down to Tulsa, he and I were

24         talking about what was going on in the case.

25    Q.   What were you told?

1   A.   Just told me how things were going.

2   Q.   Did he tell you how he knew that?

3   A.   Something about being in the Federal Marshal's

4       office and watching the video monitors or

5       something like that.  I don't know.

6           MR. RORK:  Thank you.  I have no

7       further questions at this time.  Mr. Bennett

8       may or Mr. Hough may.  I would just ask to

9       leave my 801 up there for a while until the

10      Court is done.

11          MR. BENNETT:  Judge, I just have a

12      couple of questions, and I'm aware of the

13      Court's rulings, and they won't relate to the

14      search warrant issue, but I do have just a

15      couple of questions.

16               CROSS-EXAMINATION

17      BY MR. BENNETT:

18   Q.   Mr. Skinner, you, in response to one of Mr.

19      Rork's questions, talked about a video that was

20      taken that you-- I think you said you were

21      carrying the cord or something to that effect.

22      Was that-- and I just want to pin down the time

23      when that was.  Was that between-- was that

24      following the meeting that you had in

25      Sacramento on October 17th and 18th that that

| | | |
|---|---|---|
| 1 | | occurred? |
| 2 | A. | Yes. |
| 3 | Q. | Okay. |
| 4 | A. | You mean-- I mean, we were in Sacramento and, |
| 5 | | obviously, we couldn't be videoing. |
| 6 | Q. | No, no. And my question is: Did that video |
| 7 | | occurring-- video taping occur after the |
| 8 | | October 17-18 meeting in Sacramento? |
| 9 | A. | Yes, yes, yes. I understand now. Yes. |
| 10 | Q. | And it's my understanding that a walk-through |
| 11 | | occurred on October 27th, based on testimony in |
| 12 | | this trial, and that a search warrant was |
| 13 | | served on October 31st. Did this video taping |
| 14 | | that occurred occur sometime between the period |
| 15 | | of October 27th at the walk-through and October |
| 16 | | 31st when the search warrant occurred? |
| 17 | A. | I don't know. All I know is it occurred before |
| 18 | | Zack Zajac left the base, and he had to leave |
| 19 | | earlier than-- I don't know. I don't know. |
| 20 | Q. | All right. Do you remember, do you know what |
| 21 | | time he arrived at the base? |
| 22 | A. | I think he arrived there very early, like when |
| 23 | | Carl and Arthur-- but I can't remember exactly. |
| 24 | | Maybe one of them arrived an hour or two-- I |
| 25 | | don't remember how they arrived. |

1    Q.  All right.

2    A.  But he left substantially before they left.  He

3        had something to do in Washington, DC, or to go

4        somewhere else in the United States.

5    Q.  When you say he left substantially before they

6        left, they didn't believe until after the

7        search warrant was served.  Is that right?

8    A.  They also didn't leave until after the bust

9        occurred, and he was not present for the bust--

10       or I'm sorry-- for the arrest.

11   Q.  Do you recall if the search warrant-- or if the

12       video taping occurred during the-- in the same

13       time period as the walk-through and the search

14       warrant?

15   A.  I don't know.

16   Q.  Okay.

17   A.  I mean--

18   Q.  Did any--

19   A.  If we could get airline tickets of Zack Zajac,

20       I could tell you what happened.  I mean--

21   Q.  Who else that you know of the names of were on

22       the base proper during the time that this video

23       taping was occurred?

24   A.  I mean, they would come and go.  People were

25       coming and going continually so, obviously, if

1      they came and left--

2   Q.   I just want-- yeah, at any time during that

3      time.

4   A.   Carl Nichols, Arthur Hubbard, Ralph Sorrell,

5      Roger, a guy named Rocky, I believe.

6   Q.   Roger being Roger Hanzlik?

7   A.   Yeah, Roger Hanzlik.

8   Q.   Okay.

9   A.   Rocky, I think.  I don't remember seeing L. D.

10      come out there, but he may have.

11   Q.   Okay.

12   A.   Then there were a whole bunch of people that I

13      have no clue-- I think that Andy and Larry

14      Watson--

15   Q.   I understand that.

16   A.   -- a lot of people.  I don't know who.

17   Q.   I understand that, and you have named the

18      individuals that you have named, and that's

19      sufficient.  Did anyone ever suggest to you or

20      indicate that you should not make known the

21      fact of that video taping?

22   A.   Let me think about that.  This Exhibit 908,

23      seems to me there was something about this

24      coming up somewhere in here.  Can I have a

25      second to answer this?

1    Q.   Sure.

2    A.   I'm not trying to be difficult.  I'm trying to

3         be accurate.

4                   MR. RORK:  If it would assist you,

5         it's page 92 on the-- page 92.

6                   THE WITNESS:  I don't have page 92.

7         Is it item 92 or page 92?

8                   MR. RORK:  I'm sorry.  It's

9         different.

10   Q.   (By Mr. Bennett)  Just go ahead, Mr. Skinner,

11        and look.

12   A.   No, I'm missing some pages.  I can't find it.

13        It's not a matter-- I need another copy.

14                  MR. RORK:  The original is out of

15        order.  I found that out.

16                  MR. BENNETT:  Let me give you one

17        that's in order.

18                  THE WITNESS:  Sorry.

19                  MR. HOUGH:  Well, Judge, it was not

20        out of order when we submitted it to the Court

21        the other day, and whoever got it out of order

22        we would respectfully request would put it back

23        in correct order before resubmitting it to the

24        Court.

25                  MR. RORK:  Judge, the reason I say

1      that is last night when I was looking at my

2      copy, the pages were out of order.  I assumed

3      my copy was made and the machine got it out of

4      order.

5   Q.  (By Mr. Bennett)  Go ahead.  Did you find it?

6   A.  Yeah, I found it.  I'm on page 92-- it's 93.

7      It says, "audio and video made," and I've got

8      question mark, question mark, question mark.

9      When it was handed to me there was questions

10     being asked of me, and they said, "What are

11     going to be your responses to this?"  And I

12     said-- I remember-- I said I don't know

13     anything about audio and video stuff that was

14     installed in the base, because I don't know.

15     They didn't tell me anything about that, but I

16     said I remember Zack asking permission to make

17     the video.  I said was I allowed to mention

18     that.  I asked Carl, and Carl said that he was

19     getting in touch-- they were making

20     arrangements to get the video down here

21     immediately from Washington, DC, or from Zack,

22     or something like that, but he said "Good

23     memory on that.  Thank you.  I appreciate your

24     timeliness."  There was some comment made like

25     that.

1    Q.   Have you seen that video since?

2    A.   No.  I would love to see it.  I'd love to have

3         a copy of something.  I don't have a video or

4         anything of that base.  Everyone else does but

5         me.

6              MR. BENNETT:  Judge, that's all the

7         questions I have, and I would ask, again, that

8         we be provided with a copy of that video tape.

9         It hasn't been provided to us.  It obviously

10        had to do with the period of time that is

11        involved-- or part of the period of time that's

12        involved in this trial, and early on in the

13        discovery, I asked for video tapes, audio

14        tapes, any that were made, and we've never

15        gotten it.

16             THE COURT:  Well, is this owned by a

17        casual bystander or a government official who

18        was taking it in an official capacity?

19             MR. BENNETT:  Well, it was taken by

20        Mr.-- as I understand it, Your Honor-- was

21        taken by Mr. Zajac or Agent Zajac during this

22        investigation and with his own personal camera,

23        but it's-- I would respectfully submit to the

24        Court that it's certainly relevant evidence.  I

25        think the government has it, and I would

1          request that we be given an opportunity to look

2          at it.

3                    MR. HOUGH:  Your Honor, our position

4          would be that the Court's original ruling was

5          right, it's irrelevant.  However, being tired

6          of listening to counsel pontificate, and in the

7          hope that he will pontificate no more on this

8          issue, we have a copy of Zajac's video that we

9          would offer as Government's Exhibit 909, or

10         whatever the next in the sequence is.

11                   THE COURT:  All right, that will be

12         admitted.

13                   MR. HOUGH:  Are you through?

14                   MR. BENNETT:  Go ahead.

15                        CROSS-EXAMINATION

16         BY MR. HOUGH:

17    Q.   Mr. Skinner, I have one question for you, sir.

18    A.   Yes.

19    Q.   I want you to tell me with specificity exactly

20         where in your trial testimony you lied, and do

21         not pontificate.

22    A.   What do you mean by that?

23                   MR. RORK:  Excuse me, Your Honor.

24                   THE WITNESS:  I don't understand your

25         question.

1          MR. RORK:  Well, excuse me, Judge.  I
2     would object to the form of the question.  The
3     questions here have dealt with issues involved
4     with circumstances specifically asked, and to
5     ask a broad question like that, we would be
6     here for a long time.  I think it's irrelevant
7     to the issues involved here.
8          MR. HOUGH:  Judge, the only relevant
9     question here is if this man committed perjury
10    in his trial testimony, and I would like to
11    hear exactly where, without pontification, he--
12         MR. RORK:  May I ask a preliminary
13    question of the witness, preliminary voir dire
14    question?
15         MR. HOUGH:  Judge, this is not a
16    question that requires voir dire.  If that man
17    claims to have committed perjury in the prior
18    trial testimony, that's the only relevant
19    issue.  We need to know it now.
20         MR. RORK:  Judge, he hasn't made any
21    claim he's committed perjury.  We haven't made
22    any claim he's committed perjury.  That's why I
23    object to the relevancy.
24         THE COURT:  Well, I don't believe the
25    question is necessary.  I'm going to overrule--

1           I'm going to deny your right to answer that--

2           to ask that.  It's too broad.  It's difficult.

3           I don't know how he could answer it.

4     Q.    (By Mr. Hough)  Okay, did you lie when you

5           testified about the ownership of the base?

6                 MR. RORK:  Judge-- well, and again,

7           Judge, I'd object to the form of the question

8           that it's not relevant to the proceedings that

9           we're here on.

10                THE COURT:  Well, this is a question

11          that can be answered, and we've taken up a lot

12          of things about the ownership of the base,

13          which we have written, as I've said, a 26-page

14          order on, but go ahead.  If you can answer the

15          question, go ahead.

16    A.    No.

17    Q.    (By Mr. Hough)  Did I?

18    A.    No-- I mean, I don't know if you lied.  Not in

19          front of me.

20    Q.    Has anyone at this table told you to lie in

21          your trial testimony?

22    A.    No.

23                MR. HOUGH:  Nothing further.

24                MR. RORK:  I have nothing further,

25          Your Honor.

```
 1                  THE COURT:  All right, you may step
 2       down and be excused.
 3                  THE WITNESS:  There are exhibits up
 4       here.
 5                  MR. RORK:  Your Honor, I have nothing
 6       more at this time.  If Mr. Wurtz could remain
 7       for a second, I have nothing more at this time.
 8       I would just ask for time to submit in writing
 9       anything we need to follow up with, Judge.
10                  THE COURT:  All right, both sides can
11       give me what you want in writing.
12                  MR. HOUGH:  Judge, we would like to
13       call Agent Nichols.
14                  THE COURT:  Yes.  I'm sorry.
15                            CARL NICHOLS,
16       called as a witness on behalf of the Plaintiff,
17       was sworn, and testified as follows:
18                  MR. HOUGH:  Sir, I would ask the
19       Court to take judicial notice of his prior
20       testimony and qualifications in this matter,
21       please.
22                  THE COURT:  Yes.
23                        DIRECT-EXAMINATION
24       BY MR. HOUGH:
25    Q.  Agent Nichols, you were here, and you heard Mr.
```

```
 1          Skinner's testimony.  Is that correct?
 2     A.   Yes.
 3     Q.   And you interviewed Mr. Dawson relative to the
 4          ownership of the base, correct?
 5     A.   I did not specifically interview him, but
 6          agents who were directed either by me or were
 7          part of this investigation did.
 8     Q.   And he said who owned the base?
 9               MR. BENNETT:  Judge--
10               MR. RORK:  Your Honor, I'd have to
11          object as to hearsay.  Those are questions I
12          attempted to ask Mr. Skinner and was denied,
13          and ask for the same ruling on behalf of Mr.
14          Hough.
15               MR. BENNETT:  Join in that objection,
16          Your Honor.
17               MR. HOUGH:  Judge, the case agent's
18          collective knowledge of the interviews of
19          agents is a separate matter.
20               THE COURT:  Where are you claiming he
21          got the information for-- for the-- from
22          Charlson & Wilson, the abstractors, or if he'll
23          tell you in five minutes who owned this.
24               MR. HOUGH:  An agent that he directed
25          or supervised interviewed Mr. Kendall-- or
```

1          excuse me-- Mr. Dawson.  Mr. Dawson indicated

2          Mr. Skinner was the owner of the base.

3                    MR. BENNETT:  Judge, that's hearsay

4          on top of hearsay on top of hearsay.

5                    MR. HOUGH:  Judge, if you will

6          recall, it was Mr. Bennett and Mr. Rork that

7          asked this witness and Mr. Sorrell about ten

8          hours of questions on collective knowledge in

9          their case agent capacity.

10                    THE COURT:  Well, I assume--

11          actually, the way you're doing it now, I assume

12          it can be claimed to be hearsay, and I don't

13          think the Court needs any more information on

14          who owns the-- if that's what you're trying to

15          do.

16                    MR. HOUGH:  Thank you, Judge.  I'll

17          withdraw the question.

18     Q.   (By Mr. Hough)  You heard Mr. Skinner testify

19          about you picking up the can of ET, putting

20          your finger in it, and swabbing the inside, and

21          asking about the danger level, or another agent

22          asking about the danger level.  Do you recall

23          that testimony?

24     A.   I do.

25     Q.   Did that happen?

1    A.   No.

2    Q.   Tell us why.

3    A.   Well, first of all, ergotamine tartrate is a

4         convulsant, in other words, substantial

5         substances-- a substantial amount of that would

6         cause somebody to go into convulsions.  It is

7         widely known of the problems with ergot

8         poisoning causing-- in the medieval times,

9         causing St. Anthony's fire, substantial

10        problems with individuals who ate contaminated

11        rye, which is something that ergot or the ergot

12        alkaloids are derived from or obtained from.

13   Q.   Do you recall Mr. Skinner's testimony about the

14        glassware issue and Mr. Savinelli, correct?

15   A.   Yes, I do.

16   Q.   And you interviewed Mr. Skinner on that during

17        the period of time that pretrial and, in fact,

18        during the course of this trial.  Is that

19        correct?

20   A.   Yes, that is correct.

21   Q.   And what did Mr. Skinner tell you at that time

22        about the glassware deal with Mr. Savinelli?

23   A.   Well, what I recall is Mr. Skinner said that he

24        had obtained glassware and equipment from a

25        university in Tulsa, and that the glassware or

1        equipment had some type of marking on it from

2        that university, and that that glassware and/or

3        equipment was shipped to Mr. Savinelli sometime

4        around 1994, that none of that glassware or

5        equipment was in the laboratory, the laboratory

6        that we seized.

7   Q.   Did you ask Mr. Savinelli about the same issue?

8   A.   Yes.

9   Q.   And did Mr. Savinelli give you any reason to

10       believe that any of that wound up in this lab

11       October the 31st?

12  A.   No.  He said, in fact, he made sand of the

13       glassware.

14  Q.   And you heard Mr. Skinner deny relative to

15       Exhibit 908 that he was shown.  Do you recall

16       that?

17  A.   Yes.

18            MR. RORK:  Well, excuse me, Your

19       Honor.  That misstates the evidence.  He was

20       asked if Exhibit 908 accurately reflected the

21       document Mr. Skinner referred to in his

22       affidavit of whatever that number is.  That's

23       what he was asked, not if he was shown that

24       one.  He was asked if that document represented

25       the one.

1              THE COURT:  Overruled, go ahead.

2    Q.  (By Mr. Hough)  Do you recall his testimony?

3    A.  Yes, I do.

4    Q.  And is it your testimony that that is the trial

5        type document that he was shown?

6    A.  Absolutely, and it is his handwriting on that

7        document that was submitted to the Court.

8    Q.  On the original, of course, the ink is not

9        black Xerox, there's colored ink on there.  Is

10       that right?

11   A.  That's correct.  I believe there's blue.  There

12       may be some other color ink on there as well.

13              MR. HOUGH:  That's all I have.  Thank

14       you.

15                   CROSS-EXAMINATION

16   BY MR. RORK:

17   Q.  Mr. Nichols, who all would have been present at

18       the time that Mr. Skinner described that you

19       picked up the can?  He's indicated that he

20       believes Officer Hubbard and Zajac were

21       present.  Do you recall who was present?

22              MR. HOUGH:  Judge, we'll object.  It

23       assumes facts not in evidence.  The witness has

24       denied that it happened.  How can he ask him

25       who was there when it didn't happen?

1          MR. RORK:  I said Mr. Skinner has

2     indicated at the time he picked up the can.

3     I'm asking this witness who was there when he

4     was at the can.

5          MR. HOUGH:  Basis of knowledge,

6     Judge.  It was Mr. Skinner's claim, not this

7     witness.  This witness denied it occurred.

8          MR. RORK:  I'll rephrase the question

9     maybe so Mr. Hough won't have any problem.

10  Q.  (By Mr. Rork)  When you were at the can, and

11     concerning this one in question, who was

12     present in your presence or any time you were

13     around that can?

14  A.  During the walk-through, which is the first

15     time I saw the can, I testified before that I

16     was present, Arthur Hubbard was present, John

17     Zack Zajac was present, and I believe Tim

18     McKibben, forensic chemist, was also present.

19     I'm not sure about Mr. McKibben, but I believe

20     he was.

21  Q.  And any time during your work as a forensic

22     chemist or as an agent, have you ever gone to

23     unknown substances and smelled them?

24  A.  You know, on occasion, yes, I have.  Did I do

25     it with this substance?  Absolutely not.

1  Q.  Do you recall any conversation directed toward

2      Mr. Skinner as to what level of ET would be a

3      dose that would be of any consequence?

4  A.  I don't recall talking to him about it.  I knew

5      what ET was.  I knew what the general dosage

6      was for causing some type of effect.  Somebody

7      else may have asked that.  I don't recall that.

8              MR. RORK:  Thank you.  Mr. Bennett

9      may have some questions.

10             MR. BENNETT:  I have no questions.

11             THE COURT:  All right, you may step

12     down and be excused-- or you have a question?

13             MR. HOUGH:  Of this witness, new

14     witness.

15             THE COURT:  Oh, I'm sorry.

16                  RALPH SORRELL

17     called as a witness on behalf of the Plaintiff,

18     was sworn, and testified as follows:

19             MR. HOUGH:  Judge, we'd ask the Court

20     to take judicial notice of Agent Sorrell's

21     identity and credentials from his prior trial

22     testimony, please.

23             THE COURT:  I'll do that.

24                  DIRECT-EXAMINATION

25     BY MR. HOUGH:

```
 1     Q.   Agent Sorrell, you were present in the
 2          courtroom and heard the testimony of Mr.
 3          Skinner, were you not?
 4     A.   I did.
 5     Q.   Do you recall him indicating that he had a
 6          telephone conversation with you about the
 7          United States Marshal's Service and back there
 8          watching the video tape?  Do you recall that?
 9     A.   Yes, I do.
10     Q.   Without pontificating, sir, can you please tell
11          us about that?
12     A.   I would like to see anybody in the U. S.
13          Marshal Service office that said I set foot in
14          that office at any time in my life.  I've never
15          been back there.
16     Q.   You didn't watch the video back there?
17     A.   I have not.
18     Q.   You didn't tell Skinner you did?
19     A.   No.
20               MR. HOUGH:  Nothing further.
21                    CROSS-EXAMINATION
22          BY MR. RORK:
23     Q.   I believe Mr. Skinner's testimony was twofold.
24          He indicated, one, that in telephone
25          conversations with you while he was in Tulsa,
```

```
 1            you had discussed with him testimony of other
 2            witnesses.  Do you recall that?
 3     A.     I talked to him about the testimony of Ms.
 4            Krystal Cole.
 5     Q.     And that was the only one you talked to him
 6            about then?
 7     A.     He was asking continued questions about the
 8            stupid questions that you and Mr. Bennett was
 9            asking, and I said, "From what I understand,
10            they're still asking them."
11     Q.     And do you recall telling Mr. Skinner responses
12            of any other witnesses in these proceedings or
13            questions that they had made while testifying?
14     A.     I haven't been in the courtroom.  I know of no
15            responses that these witnesses made without me
16            being present.
17     Q.     So the question was:  Do you recall telling Mr.
18            Skinner any responses of the witnesses?
19     A.     I can't tell Mr. Skinner anything about any
20            responses to any witness that I would not have
21            seen while they're in the courtroom.  That
22            would have been impossible.
23     Q.     The answer would be--
24                   MR. HOUGH:  Objection.  Asked and
25            answered.
```

```
 1              THE COURT:  Well, sustained.
 2     Q.   (By Mr. Rork)  You don't recall any
 3          conversation with Mr. Skinner advising him
 4          anything about a TV in the Marshal's office
 5          being capable of videoing or watching
 6          testimony, anything of that nature?
 7     A.   I would only have to assume that there's a
 8          monitor in their office, but I don't know that.
 9          I've never been in their office, and I would
10          want you to find me a U. S. Marshal or any
11          employee in that office that said I have been
12          in there.
13     Q.   The question that was asked of you:  Do you
14          recall having any conversations with Mr.
15          Skinner about there being a monitor in the
16          Marshal's--
17     A.   I don't know if there is a monitor in their
18          office.  It would be totally a guess on myself.
19     Q.   So then you're indicating you don't have any
20          reason to believe you would have talked to Mr.
21          Skinner about a monitor being in the Marshal's
22          office?
23     A.   Again, I don't know if there's a monitor in
24          there, and I couldn't have a discussion with
25          anybody about a monitor in a place I have never
```

been.

MR. RORK:  I have no further
questions at this time.

MR. BENNETT:  I don't have any
questions, Your Honor.

THE COURT:  All right, you may step
down.

MR. HOUGH:  Judge, as an additional
matter, for purposes of the record, Agent
Nichols's affidavit refers to three voice mails
left by Mr. Skinner.  We would ask that that be
marked, and we would offer that as the next
exhibit in the ongoing line here.

THE CLERK:  It would be 910.

MR. HOUGH:  Thank you, ma'am.  Also,
as it relates to anything that would bear on
impeachment matters, previously, the Court
ruled allowing counsel to make inquiry
regarding the Washington State matter, and I
have what I would like marked as the next in
the line of exhibits, the video tape of that
fine affair and the letter accompanying it,
copies of which were provided to defense
counsel, and the Court, in fact, allowed
inquiry regarding that, but not playing the

1        video tape, but because the Court is being

2        asked to make rulings relative to, at least

3        some degree, impeachment matters, we would ask

4        that this be a nonjury exhibit for purposes of

5        the record so that a subsequent court could see

6        just exactly the circumstance relative to those

7        issues.  So we would offer those two exhibits.

8                MR. BENNETT:  Well, Judge, with

9        regards to the video tape, at least on behalf

10       of Mr. Apperson, if-- I don't have any

11       objection to it being introduced, but I would

12       submit that it's relevant to the issues before

13       this jury, and if it's going to be an exhibit,

14       that it ought to be an exhibit that the jury

15       has access to.

16               MR. HOUGH:  Well, Judge, our position

17       is the Court's original ruling on that is

18       absolutely correct, and we are in no way

19       challenging that.  We just want there to be a

20       record, because one of the issues that, as it

21       relates to impeachment matters, as a matter of

22       law, the 10th Circuit has recognized that

23       relevant to issues of disclosure of impeachment

24       matters, "generally requires when the testimony

25       of the witness," in this case Mr. Skinner, "is

1    corroborated by other testimony," in this case

2    approximately 820 trial exhibits, "or when the

3    impeachment evidence merely furnishes an

4    additional basis on which to impeach the

5    witness whose credibility has already been

6    shown to be questionable."  It's our position

7    that based upon that-- that's the Payne case,

8    P-A-Y-N-E, 63 F.3d at 1210, citations omitted,

9    that at a subsequent date the Circuit Court, in

10   light of Payne, would want to know the issue

11   and the matters relative to the inquiry, the

12   Court did in fact allow on the cross-

13   examination of Mr. Skinner, and it's certainly

14   relevant as to the Court's consideration of

15   what is now alleged as additional impeachment

16   information as directly contemplated by the

17   Court in Payne.

18            MR. RORK:  Judge, I would defer to

19   your discretion and join in Mr. Bennett's

20   request.  If it's going to be admitted, let the

21   jury see it too.

22            THE COURT:  I'll simply make it a

23   part of the record and not make it a jury

24   exhibit.

25            MR. BENNETT:  Judge, just as a point

1       of clarification on the other video that Mr.

2       Hough offered, I don't remember the exhibit

3       number, but it was the video, I believe, taken

4       by Mr. Zajac.  Is that a nonjury exhibit or a

5       jury exhibit?

6               THE COURT:  I don't believe we ever

7       decided.  Did we?  I can't remember we

8       specifically--

9               MR. HOUGH:  I'm sorry.  I missed it.

10              MR. BENNETT:  The Zajac video, was

11      that offered as a jury exhibit or a nonjury?

12              MR. HOUGH:  We offered that as a

13      nonjury exhibit, Judge.

14              MR. RORK:  Do you have a copy of that

15      for us?

16              MR. HOUGH:  I don't, but it's right

17      there.

18              MR. RORK:  How long is it?

19              MR. HOUGH:  It is 31 minutes.

20              MR. BENNETT:  We can play it right

21      here?

22              MR. HOUGH:  Yeah, you can play it

23      right here.  As a final exhibit for purposes of

24      the record in this hearing, we would offer

25      copies of all the reports of interviews of Mr.

1          Skinner from start to finish, the majority of

2          which bear his signature and initials, all of

3          which were disclosed during discovery.  We

4          would offer this as a nonjury exhibit for

5          purposes of the record and of determination as

6          to this matter and any subsequent types of

7          silliness that may raise its ugly head.  We

8          would also ask the Court to take judicial

9          notice of the confidential informant file of

10         Mr. Skinner that the Court previously reviewed

11         in camera.  We have it over here.  It's been

12         brought back, and we would ask that that be

13         considered by the Court in its ruling here as

14         well.  And that is all that I have, Judge.

15              MR. RORK:  Judge, other than the

16         comment of, quote, silliness, we have no

17         objection to what I think now would be 911.

18              THE CLERK:  No, 912.

19              MR. RORK:  912.

20              MR. BENNETT:  With regards to the

21         last file that he made reference to, Judge, we

22         don't have any objection to that, but-- to the

23         Court taking judicial notice of it, but we

24         would like it included in the nonjury items as

25         well so that it be available on the appeal, if

1      there is one.

2                MR. HOUGH:  Judge, the problem is

3      that the DEA regs would not allow that.  What

4      is allowed as a matter of the DEA regs is the

5      Court to look at it and require disclosure of

6      certain specific pieces of that, as has

7      occurred here.

8                MR. BENNETT:  Well, Judge, I don't

9      think--

10               MR. HOUGH:  The Court has the

11     notations of all the matters relative to the

12     issues at hand from its prior ruling, having

13     previously seen this.

14               MR. BENNETT:  Judge, I don't think

15     the Court's bound by the DEA regulations.

16     Those are the DEA regulations but, certainly, I

17     would submit that the Court has authority to

18     override, if you will, if that's necessary, the

19     DEA regs, and this is one of the things that's

20     in issue in this case, and it may be something

21     that the appellate court would need to see.  I

22     don't know at this point?  I don't even know if

23     there will be an appellate court looking at

24     this but, certainly, all I'm asking is that the

25     Court make it a nonjury exhibit, and it be--

```
 1                    MR. WURTZ:  Your Honor, Your Honor.
 2                    THE COURT:  I'm going to call on you
 3          here when we finally--
 4                    MR. WURTZ:  Can we approach the bench
 5          on this?  We're talking about some things here
 6          that has no business in open court.
 7                    THE COURT:  Yes, you can.
 8                    MR. WURTZ:  May I approach also, Your
 9          Honor?
10                    MR. RORK:  Yeah, he said that was
11          fine.
12                    (THEREUPON, the following proceedings
13          were held at the bench.)
14                    THE COURT:  Yes.
15                    MR. WURTZ:  Your Honor, I've
16          certainly become a little panicked here.  If
17          we're putting in a public record history of
18          informant activity, which I understand is
19          extensive, he has, I would say, at least a
20          contractual right not to have this spread over
21          the record.  I don't want him getting shot for
22          some information he gave ten years ago.  I see
23          no purpose here, and for my client's safety
24          alone, I would object to this being placed
25          anywhere in any public record.
```

```
 1              THE COURT:  This is his confidential
 2      file you're talking about?
 3              MR. WURTZ:  Yes, yes, yes.
 4              MR. HOUGH:  That's our position as
 5      well, Judge.  The Court has seen it, the Court
 6      has the record of it, and the Court can take
 7      judicial notice of it.
 8              THE COURT:  Well, I'm going to accede
 9      to that request, and I'll not put it in any
10      record, and--
11              MR. RORK:  Can the Court just make
12      note that it can be made available on demand in
13      the event the appellate court would want it,
14      the government keep it in that condition,
15      something like that?
16              MR. HOUGH:  The DEA maintains it, but
17      as long as the Court--
18              MR. WURTZ:  I would have no problem
19      with the ordering everybody-- which I think is
20      the rule anyway, that it be preserved and be
21      produced upon a valid order of the Court.  I
22      don't have any problem with that.
23              MR. HOUGH:  DEA maintains them.
24      That's not an issue.
25              MR. HALEY:  What if we just order it
```

1        sealed?

2                MR. WURTZ:  And I would like it be

3        maintained by the DEA or a government agency

4        rather than in a court file too.

5                MR. HOUGH:  As to destruction, every

6        so often your clerk goes through the

7        destruction of sealed documents, and we get

8        notices of, "Hey, get this out of here.  We're

9        destroying stuff."

10               MR. HALEY:  Who sees it then?

11               MR. HOUGH:  Well, there's no telling.

12               MR. HALEY:  We shred it, so no one is

13       going to have access to it.  Is that a problem?

14               MR. HOUGH:  We would agree the better

15       practice would be, because it's the DEA file,

16       that it remain in DEA possession subject to an

17       order of the Court to produce for purposes of

18       an appeal.

19               MR. HALEY:  Just makes it difficult

20       for the appellate court to get a hold of it in

21       that fashion.  That's the problem.  They don't

22       go through that.  That's not a procedure they

23       follow, so they want it to come from the

24       district court level, so I think it would be

25       easier if we just sealed it.

```
 1                    THE COURT:  Why don't we just file it
 2        and just file it sealed.
 3                    MR. WURTZ:  Oh, yes, sir, and
 4        especially if I could receive notice if it is
 5        forwarded so that we would just know that it's
 6        happening.
 7                    MR. HOUGH:  Judge, what I would
 8        appreciate from you is you to order me to give
 9        up that file to the Court so that it can be
10        sealed, so that I can call the Chief Counsel in
11        Washington of DEA and tell him just that.
12                    MR. RORK:  You just did that, Judge
13                    MR. HOUGH:  So is that--
14                    THE COURT:  That's all right with me.
15        We can do that.
16                    MR. HOUGH:  Thank you.
17                    THE COURT:  We'll order you to do it
18        forthwith.
19                    MR. RORK:  While we're up here,
20        Judge, can I talk to you before you leave?  I'd
21        like to keep Pickard in here.
22                    MR. HALEY:  Are we through?  Let's
23        see if we're through.
24                    (THEREUPON, the bench conference was
25        concluded.)
```

1           THE COURT:  Does that take care of

2     everything that anyone had?

3           MR. RORK:  Yes, Your Honor.  We will

4     submit anything further the Court may need in

5     writing.

6           THE COURT:  All right, Mr. Bailiff,

7     let's recess the Court.

8           THE BAILIFF:  All rise.  Court will

9     stand in recess subject to call.

10           (THEREUPON, a recess was had.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1           UNITED STATES OF AMERICA  )
                                       )      ss:
 2           DISTRICT OF KANSAS        )

 3                      C E R T I F I C A T E

 4                I, Roxana S. Montgomery, Certified

 5           Shorthand Reporter in and for the State of

 6           Kansas, do hereby certify that I was present at

 7           and reported in machine shorthand the

 8           proceedings had the 6th day of March, 2003, in

 9           the above-mentioned court; that the foregoing

10           transcript is a true, correct, and complete

11           transcript of the requested proceedings.

12                I further certify that I am not attorney

13           for, nor employed by, nor related to any of the

14           parties or attorneys in this action, nor

15           financially interested in the action.

16                IN WITNESS WHEREOF, I have hereunto set

17           my hand and official seal at Topeka, Kansas,

18           this ___13__ day of ___March___, 2003.

19

20                           _____

21                           Roxana S. Montgomery

22                           Certified Shorthand Reporter

23

24

25
```

NORA LYON & ASSOCIATES, INC.
1515 S.W. Topeka Blvd., Topeka, KS  66612
Phone:  (785) 232-2545      FAX:  (785) 232-2720