## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) Case No:  00-CR-40104-01-RDR |
| | ) |
| WILLIAM LEONARD PICKARD, | ) |
| Defendant, | ) |

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE (DOC. 855) TO MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)

**COMES NOW**, Defendant, William Leonard Pickard, by and through his counsel - Wendie C. Miller, and in support of **"DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE (Doc. 855)...,"** informs the court as follows:

### Extraordinary and Compelling: Defendant's Prediction of the Fentanyl Epidemic and His Policy Recommendations for Prevention

### "Compassionate Release Matters" (fn [1])

At the outset of this reply, it may be noted that Defendant has advised counsel that he is very appreciative of the United States description of his pre and post conviction research efforts as "praiseworthy."

---

[1]      Judge Breyer, one of the two active members of the Sentencing Commission, in *United States v. Osorto*, 3:19-CR-00381-CRB (N.D. Cal. May 11, 2020) (Order, Doc. 210).

1

That said, the Government response overall is more notable for what it does not contest than what it does.  For example, it does not dispute any and all of Defendant's facts and exhibits regarding his prediction and recommendations for prevention of the fentanyl epidemic. (*Defendant's Motion*, Doc. 849, p. 5-20, pgr. 1-37).  Specifically, the Government does not dispute the following:

1. His detailed warnings in the 2003 trial (p. 7-9, pgr. 2-7) ("We have a serious problem.");

2. The many trial exhibits of overheads (p. 7-9, pgr. 3-6);

3. The 110-page Fentanyl Proposal briefing book (*Motion*, *Id.*, Ex. 2 containing trial testimony);

4. The sequence of events nationally prior to and after trial regrading the fentanyl epidemic and the extent of fentanyl-related deaths (p. 9-13, pgr. 8-18; p. 19, pgr. 31-33);

5. RAND corroboration of his 1996 and 2003 proposals for early detection and prevention, and precursor control of "NPP and 4-ANPP", later independently included in "federal law 21 C.F.R. Part 1310 (2007), 21 C.F.R. Part 1310 (2008)" and only in 2017 "subject to U.N. drug conventions" (p. 16-17, pgr. 24.a-I);

6. His 1996-2003 proposal to establish the Fentanyl Signature Profiling

Program (FSPP) (p. 17-18, pgr. 25-28);

7.      The application of his recommendations to New Psychoactive
        Substances (NPS) (p. 18-19, pgr. 29-30);

8.      The RAND 2019 book "the Future of Fentanyl and Other Synthetic
        Opioids" and citing Defendant's recommendations eleven (11)
        instances (*Motion*, Ex. 4);

9.      The proliferation of the epidemic in 2020 (p. 19, pgr. 31-33);

10.     Defendant's continuing assistance to RAND analysis, law faculty,
        drug policy researchers and others with equity in the opioid crisis (p.
        20, pgr. 34-35).

Most importantly, the Government does not dispute the Summation: "Had
Mr. Pickard's 1996-2003 control policies been established, precursor stockpiling
by illicit labs likely would have been severely curtailed, reducing the death rate
significantly and potentially saving thousands of lives." (p. 20, pgr. 36).  Nor does
it dispute that "Mr. Pickard has made a significant contribution to society." (P. 20,
pgr. 37).

**The Court Has Authority to Determine What Constitutes Extraordinary and
Compelling Reasons.**

Rather, even in light of all the foregoing, the Government suggests yet again

that this Court does not have authority to "find, independent of any motion, determination or recommendation by the BOP Director that extraordinary and compelling reasons exist based on circumstances other than those set forth in U.S.S.G. 1B1.13, Cmt. N.1 (A)-(C)" and "the FSA does not extend as far as these courts have found." (Citing *United States v. Redd*, No. 1:97-CR-00006-AJT (E.D. Va., March 16, 2020) (collecting cases). (*Response*, at 14).

However, the Court long has ruled that courts do have authority. As the Government admits (*Response*, fn. 11) "To be sure, in the case of *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475 (D. Kan. February 21, 2020), this Court found consistent with other courts the authority to reduce a sentence for compelling reasons under the FSA." (and see *United States v. Perez*, 2020 WL 1180719 (No. 88-10094-1-JTM) (D. Kan. March 11, 2020) ("As a majority of courts have concluded, this court concludes it has the authority to exercise the same discretion as the BOP does when weighing a request for compassionate release.") The Court also exercised its authority in *United States v. Davis*, 2020 U.S. Dist. LEXIS 98893 (No. 03-10157-1-JTM) (D. Kan. June 5, 2020); *United States v. Rodarmel*, 15-CR-10105-JTM (June 1, 2020); *United States v. McGill*, 16-CR-10082-JTM (D. Kan. June 11, 2020); *United States v. Machuca-Quintara*, 6:12-CR-10085-JTM (D. Kan. June 8, 2020) and in other cases.

In sum, the Government's boilerplate assertion is unavailing.

## The Government Has Not Defined Any Non-Medical Reasons for Sentence Reduction.

While noting twice that Mr. Pickard's pre and post-conviction efforts on the fentanyl epidemic are "praiseworthy" (*Response*, 17-18), the Government asserts they do not "establish a non-medical reason for early release from a life sentence." (Id.).  Yet, the Government fails to explain what - in its view - may constitute an adequate non-medical reason, nor does it provide any examples. Indeed, the Government cannot propose any such non-medical reasons, given its insistence that courts lack the authority, and in any event that courts must be limited to the facts and circumstances "set forth in U.S.S.G. 1B1.13 Cmt. N.1 (A) - (C)." (*Id.*)

In contrast, this Court previously has held that the "catchall" provision in Application N.1(d) can apply.  See *O'Bryan, Id.* (Regarding sentencing disparity, in combination with other circumstances such as rehabilitative progress and good behavior).  Here, Defendant initially proposes that his recognized efforts to anticipate and prevent the fentanyl epidemic, standing alone, constitute an extraordinary and compelling non-medical reason under N.1(d).

## Courts Have Concluded N.1(D) Has Broad Application.

The *Redd* Court observed that the U.S.S.G. "Pronouncements do not define

the universe of considerations" (*Id*.).  Congress and the Sentencing Commission

set no limitation on what may be considered extraordinary (while noting

rehabilitation alone is insufficient).

Courts have concluded that there are no restrictions on what circumstances

may qualify. "The statute itself does not place any restrictions on what

extraordinary and compelling reasons 'might warrant sentence reduction.'"

(*United States v. Conrado Cantu*, 423 F. Supp. 3d 345, 2019 WL 2498923 (S.D.

Texas, June 17, 2019) (citing *Crowe v. United States*, 430 F. App'x. 484, 485 (6th

Cir. 2011) , and *Deluca v. Lariva*, 586 F. App'x. 239, 241 (7th Cir. 2014) (noting

the "list is non-exhaustive").  The majority of district courts have now determined

that "a vast variety of circumstances" may be considered extraordinary and

compelling. (See *United States v. Maumau*, No. 2:08-CR-758-TC-11, 2020 WL

806121 (D. Utah, Feb. 18, 2020) (collecting cases).

Examples of non-medical reasons currently are rare, however.  "Meaningful

use of time" involving personal achievement was a basis (together with other

reasons) cited in *United States v. Walker*, 1:11-CR-00270, 2019 WL 5268752

(N.D. Ohio, Oct. 17, 2019), wherein the Defendant published a well-received book

(*Id*. *Order*, Doc. 75 at 4-5).  Mr. Pickard reasonably meets the "meaningful use of

time" standard in *Walker*.

The Court may also consider Mr. Pickard's efforts as an "exceptional degree" of rehabilitation. (*United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272 (S.D. Texas, June 24, 2019) (see also *United States v. Millan*, 91-CR-00685(LAP), 2020 U.S. Dist. LEXIS 59955 (S.D.N.Y. April 6, 2020) (*Id*., Order, Doc. 1080, noting exceptional rehabilitation in combination with letters of support). However, Defendant suggests that this proceeding provides an opportunity to advance the *Walker* standard, and public policy, by concluding that the opioid efforts, standing alone, are extraordinary and compelling under N.1 (D).

## Defendant Presents An Individualized, Extraordinary And Compelling Reason for Relief Under N.1(D).

Here, as a matter of first-impression, the Court may establish that a substantive, recognized contribution to society can be extraordinary and compelling, in that accomplishments by inmates outside the BOP programs are not often seen.  Mr. Pickard proposed that societal contributions could be a factor in prison and sentencing reform in a September 27, 2012 monograph for a Yale Law Journal prison writing project titled "Schelling's Rule: How to Have Safer Prisons and Less Recidivism." (Ex. 1).  Well in advance of the FSA, "Schelling's Rule" (provided to the Warden and SIA of U.S. P. Tucson, Yale, and published online) contained numerous proposals including "Sentence Reductions for Ideas

Benefitting Government and Society" and explaining:

> "Incentives can be provided in the form of sentence reductions for
> developing new approaches to prison, gangs or community problems...the
> BOP Director has personal authority to reduce sentences on various
> grounds. This authority is underused but can be employed to encourage
> inmates to contribute actionable ideas and programs benefitting society. The
> BOP's authority could grant reductions for exceptional rehabilitation or
> educational accomplishments. Many prisoners now mired in hopeless
> pursuits would become actively engaged and goal-directed toward positive
> outcomes."

The Court's inclusion of significant contributions to society would be in

agreement with the 2018 enactment of the FSA, which now provides incentives of

"Time Credits" for unspecified "productive activities."  Establishing a high

standard for exceptional achievement under N.1(D) hardly would result in

wholesale prisoner releases (one of the concerns with the COVID-19 pandemic,

See *Davis*, *Id.*, et. seq.) But it would stimulate greater effort by many inmates to

use their time wisely and to engage with and contribute to society-at-large.  A non-

medical reason of accomplishment would encourage meaningful pursuits for

prisoners, and would be notably in accord with the decisions in *Walker*, *Cantu-

Rivera*, and *Millan*, but most importantly reflect Congressional intent in the FSA.

In a Topeka courtroom in 2003, Mr. Pickard testified for two days on his

warnings and recommendations on a then-arcane drug, entering documents into

the public record over Government objections, and arguably at considerable costs

to his credibility and defense. The Court and jury could not have anticipated that his testimony accurately foretold an event that more than a decade later would be described by the Attorney General as "the deadliest drug crisis in American history" and resulting in more deaths than "World War One and Two combined." (*Motion*, p. 12, pgr. 15-16).

Sixteen years after trial, the RAND book - containing discussions of Mr. Pickard's recommendations - is widely disseminated and read by regulators, officials and decision-makers ranging from Congress to the National Institutes of Health, National Institute on Drug Abuse, Office of National Drug Control Policy and the Centers for Disease Control and Prevention, in addition to many foreign governments, the World Health Organization, the United Nations Office of Drugs and Crime, and the European Monitoring Center for Drugs and Drug Addiction (Ex. 4, RAND, at v-vi, xxxi-xxxii).

All related Court records and exhibits - and RAND documents, correspondence and emails - are considered of "historical significance" to scholars concerned with the opioid crisis (Ex. 2).  Purdue University is housing these records in perpetuity in its Special Collections at the Gordon Archive for Psychoactive Substances Research, where they will be indexed online and the originals made available at Purdue to the research community. (*Id*.).

The Court is respectfully requested to consider these inmate activities as extraordinary and compelling under Application N.1(D).

**<u>Extraordinary and Compelling: Age.</u>**

The Age of Defendant: Note discussion in Defendant's Motion is Included Here as if fully restated (*Motion*, Doc. 849, p. 20-24).

**<u>The Government Applied An Incorrect Standard</u>**.

Remarkably, the Government, in its *Response*, while expanding in detail on the Medical Condition Note U.S.S.G. 1B1.13, Cmt. N.1(A), fails to address the Age of Defendant Note U.S.S.G. 1B1.13 Cmt. N.1(B) (hereafter "N.1(B)") as applied to Mr. Pickard (*Response*, Doc. 853, p. 9-10).  The Government's sole mention of N.1(B) is a generalized passing reference: "defendant's age and family circumstances U.S.S.G. 1B1.13, Cmt. N.1(B)-(C)" (*Id*. at 9).  All of the Government's arguments and cases cited involve only No.1(A), the Medical Condition Note.  Defendant's Motion, after reviewing the text of both Notes, clearly defines the two:

> "However, Mr. Pickard asserts only subdivision (B) Age of the Defendant. Indeed, at the age of 74 and with almost 20 years of incarceration he is considerably beyond the requirements of (B)(I) "65 years of age" and (B) (iii) "ten years" (of imprisonment).  Thus, subsection (b)(ii) is the remaining factor ("experiencing a serious deterioration of physical or mental health because of the aging process").  (*Motion*, at 22)."

The Government did not address any of the three criteria of the Age of

Defendant Note N.1(B)(i)-(iii).  Rather, it applied only an incorrect standard, in

this instance the Medical Condition Note N.1 (A).  In applying the wrong

standard, an failing to consider the declarations of Dr. Baston and Dr. McNalley

(*Motion*, Ex. 5-6), the Government has effectively conceded the issue.

The decision in *United States v. Ebbers*, (S4) 02-CR-1144-3(VEC), 432 F.

Supp. 3d 421, 2020 U.S. Dist. LEXIS 3746 (S.D.N.Y. January 8, 2020)

distinguishes between the two Notes.  For clarity in the ensuing discussion, it is

restated here:

> "Whether a defendant is experiencing 'a serious deterioration of physical or
> mental health because of the aging process,' a criterion that is part of the
> Age of Defendant Note, is a fact-intensive analysis.  But comparing the two
> notes reveals that a defendant need not have lost all ability to self-care or be
> suffering from a terminal illness to qualify for relief under the Age of
> Defendant Note.
>
> The medical condition phrase in the Age of Defendant Note is almost
> identical to a similar phrase in the Medical Condition Note, except that the
> Medical Condition Note indicates the additional requirement that the
> defendant's deteriorating health must 'substantially diminish the ability of
> the defendant to provide self-care.' Because the Age of Defendant Note
> does not mention self-care, a substantially diminished ability of the
> defendant to provide self-care is impliedly not required when the defendant
> is relying upon his age as the basis for requested relief.
>
> The Medical Condition Note, which controls health-based compassionate
> release requests for younger defendants, highlights 'terminal illness' and
> 'serious (conditions...impairments)' including diseases with 'an end of life

trajectory.' The Age of Defendant Note does not require a health condition to reach these extremes for qualifying an older defendant for a sentence reduction, but it does, at least, require the age related deterioration to be 'serious.'

From these differences, two standards become apparent.  The Medical Condition Note applies to a defendant younger than 65 who has a specific life-ending or debilitating illness with a predictable, dire, short-term prognosis.  The Age of Defendant Note applies senior-citizen defendants who have already spent over ten years in prison and whose physical and cognitive deterioration has impaired basic human function without regard to whether these conditions, other than aging, are terminal."

Because Mr. Pickard is 74 years of age and has served 20 years, he need not "reach these extremes" and show an inability to self-care (*Ebbers*, *Id.*). Nevertheless, the Government persists in its *Response* in applying the wrong standard, requiring a "serious medical or physical condition...that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover. U.S.S.G. 1B1.13, Cmt. N.1(A)." (*Response*, at 10).  In the recent matter of *United States v. Lynn*, 89-0072-WS, 2020 U.S. Dist. LEXIS 103670 (S.D. Ala. June 15, 2020), the Government used the same phrase in also failing to address N.1(B) and similarly confusing the notes. As in *Ebbers*, the *Lynn* court distinguished between the two Notes; first observing that "for an inmate of any age" N.1(A) requires deterioration "because of the aging process that substantially diminishes the ability of the

defendant to self-care," then stating:

> "This shows at least two things. First, the Sentencing Commission knew how to express a diminished-ability-to-function requirement, so that the absence of corresponding language from Application Note (B) must be viewed as purposeful rejection of any such requirement.
>
> Second, were the government view accepted, it would be more difficult for an elderly inmate to be released due to the aging process than for a young inmate. This is because, while both would have to show deteriorating health due to the aging process that substantially diminishes ability to function in a prison environment, only the elderly inmate would also have to show (1) that the deterioration was serious, and (2) that he had served 10 years or 75% of his sentence.  It cannot be easily imagined that the Sentencing Commission intended it to be easier for the young to obtain compassionate release due to aging than the old." (*Lynn*, *Id*.).

## The Government Attempts to Add Criteria to the U.S.S.G.

As in *Ebbers*, and *Lynn*, the Government again attempts to add a criterion of inability to self-care to a defendant's assertion of the Age of Defendant N.1(B) (*Response*, at 10), even though prior courts have rejected the effort. The Government here, while agreeing that Mr. Pickard "appears to suffer from hypertension and chronic kidney disease" (*Id*, at 19), now also tries to impose the additional criteria of "pulmonary hypertension" and "dialysis" (*Id*. at 19). Yet, the Age of Defendant N.1(B) contains no such requirement or language. (See *United States v. DeBartolo*, 14-016-WES, 2020 U.S. Dist. LEXIS 102335 (D. R.I. June 10, 2020) where the Court disagreed with the same Government assertion.

In its *Response*, (*Id*. at 19), it also proposes that a defendant's condition must be of "substantial severity and irremediable," another requirement that does not appear in No.1(B).  Of the cases the Government cites containing this phrase, all involved - due to lesser age or time served - only the Medical Condition Note No.1(A).  For example, in *United States v. Lisi*, 15-CR-00457, 2020 U.S. Dist. LEXIS 31127 (S.D.N.Y., Feb. 24, 2020), "completely disabled" was a referenced condition (Id. at 9).  The Court in *Ebbers* explained that physical conditions under No.1(B) "need not reach these extremes."

**Defendants Comorbidities and Mortality.**

The *Ebbers* Court observed that a defendant's condition "does, at least, have to be 'serious.'" (*Ebbers*, *Id.*, and See No.1(B)(ii).  "Serious" is defined as "having important or possibly dangerous consequences." (Merriam-Webster's Collegiate Dictionary, 10th Ed.). Mr. Pickard's irreversible kidney disease has the important or possibly dangerous consequences of stroke, heart attach, end-stage renal disease, and death.

In *Lynn*, where the Defendant was 65 years of age, the Court stated "the expert also notes that the defendant's chronic kidney disease is more severe than is typical of septuagenarians and that it has the risk of cardiovascular events such as heart attacks. The government does not challenge this evidence." Mr. Pickard's

14

chronic kidney disease is more advanced (Stage 3.b) than the defendant in *Lynn* (*Lynn*, citing "Stage 3" - Moderate and "up from Stage 2"), and he is a septuagenarian - thus reasonably at greater risk. The National Institute of Diabetes and Digestive and Kidney Diseases also confirms that "kidney disease increases the risk of heart attack or stroke...each year kidney disease kills more people than breast or prostate cancer." (fn [2]).

The mortality rates are striking. Mortality for patients with chronic kidney disease (in 2009) were 56% greater than those without chronic kidney disease...hospitalization rates among chronic kidney disease patients are 3-5 times higher." (fn [3]).   The World Journal of Nephrology states "progression to end-stage renal disease is inevitable" and "the hazard ratio for death" in chronic kidney disease stage 3B indicates the "serious" impact of "chronic kidney disease cardiovascular events" (fn [4]).   "Stage 3A and 3B marks the full-blown kidney disease." (fn [5]).

---

[2]     https://www.niddk.nih.gov/healthinformation/health-statistics/kidney disease

[3]     "Chronic Kidney Disease" P. Agora M.D., V. Batuman M.D., https://emedicine.medscape.com/Article 1 238798-overview #A6

[4]     World J. Nephrol, 2016 May 6, 5 (3), 258-273, doi: 10.5527/WJN.V5.1.13.258

[5]     "End-Stage Renal Disease Life Expectancy" https:/nephcure.org/2019/end-stage-renal-disease-life-expectancy (Sep. 2, 2019). B. Landry

## Failure to Address the Expert Declarations

Importantly, the Government failed to refute, refer to, or even mention the expert declarations of Dr. Cameron Baston, M.D., Assistant Professor of Medicine at the University of Pennsylvania School of Medicine and Director of Clinical Care Education for the Hospital of the University of Pennsylvania (*Motion*, Ex. 5). Further, the Government did not contest the declaration of Dr. Thomas McNalley, M.D., Clinical Fellow and Associate Professor at the University of California, San Francisco and the University of Washington. (*Motion*, Ex. 6).

Dr. Baston stated, "The patient has stage 3 kidney disease, iron deficiency anemia, and pre-diabetes," and noting "hypertension." (Doc. 849-5, p. 3, pgr. 15). "Chronic kidney disease is a marker of cumulative damage to Mr. Pickard's kidneys, and is staged from 1-5.  He is currently at Stage 3B, putting him at highly increased risk for acute kidney injury with life-threatening consequences were his kidneys to be exposed to another incident, such as severe infection." (*Id*., p. 3, pgr 17).

Dr. Baston states of Defendant's immuno suppression "chronic kidney disease results in suppression of the immune system through multiple pathways, and has been associated with an increased risk of developing pneumonia from all causes (Chou, et al., Medicine 2014) and a 14-16 fold increased risk in mortality

16

(Sarnak Chest 2001) (*Id.* P. 3, pgr. 17).

Dr. Baston also observes "detention facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis." (*Id.*, p. 2, pgr. 12).

Most importantly, the Government does not dispute Dr. Baston's assessment: "Independently of contracting COVID-19 Mr. Pickard is experiencing a serious deterioration in physical health because of the aging process." (*Id.*, p. 3, pgr. 24).

In a detailed discussion, Dr. McNalley concurs with Dr. Baston ("I agree with Dr. Baston's assessments and recommendations. I have also confirmed these diagnoses through review of his medical records.") (*Id.*).

In accord with the diagnoses of Dr. Baston and Dr. McNalley, Defendant's conditions meets the three criteria of the Age of Defendant - Note N.1(B).

**Under the U.S.S.G. Less of a Showing is Required With Advancing Age and Time-Served.**

Although Mr. Pickard meets all three criteria of the Age of Defendant -Note N.1 (B)(i)-(iii), it is observed that less of a showing of health issues is

17

required by the Sentencing Commission with advancing age and time served. For example:

(1)     The Medical Condition Note N.1(A), for younger defendants with less time served, requires conditions of far greater severity than the Age of Defendant Note N.1(B).  Were the requirements of equal severity, the Age of Defendant Note would be superfluous.

(2)     At the age of 65, with 10 years served, the standard lessens significantly, requiring an undefined condition related to the aging process that "does at least, have to be 'serious.'" (*Ebbers*, *Id*.)

(3)     This lessening of health conditions continues through age 70 and 30 years served, whereupon a defendant need not show any medical condition whatsoever. (See 18 U.S.C. §3582(c)(1)(A)(ii), and see *United States v. Perez*, No. 88-10094 (D. Kansas, March 10, 2020) where a medical condition was neither asserted nor required.

(4)     In light of the Sentencing Commission's progressive inclusion of the factors of age and time served, and its lessening of a showing of health issues until none is required, Defendant suggests that with increasing age past 65, and increasing time-served past 10 years (the minimums in N.1(B)), an even lesser showing is necessary than that

for a 65-year-old defendant who has served 10 years. The factors of
age and time-served then become of increasing relevance until a
showing of health issues is no longer relevant.

While Mr. Pickard, at age 74 with 20 years served and medical issues of
consequence, meets all of the criteria of the Age of Defendant Note N.1(B).
However, the observation above (pgr. 4, *supra*), may be considered pertinent in
this and other proceedings.

**The Age of Defendant Note Applies to Few Incarcerated Individuals.**

Compassionate release petitions asserting the Age of Defendant Note
N.1(B) are uncommon relative to N.1(A), so that a ruling favorable to Defendant
on this ground will affect few inmates.  According to BOP, the median age of
prisoners is 36, which is 38 years younger than Mr. Pickard. (fn [6]).  Those over the
age of 65 comprise only 2.8% of inmates (*Id*.).  Of these, the number with Stage
3B chronic kidney disease, immuno suppression and hypertension, and who have
served 20 years, is even smaller.  The BOP website does not publish statistics for
inmates, like Mr. Pickard, who are 74 or older.

In sum, the Court is requested to determine that Defendant meets all three
criteria of the Age of Defendant Note N.1(B).

---

[6]        https://www.bop.gov/about/statistics/statistics_inmate_age.JSP (April 11, 2020).

19

## Extraordinary and Compelling: COVID-19.

## Background

In its *Response*, the Government expands in detail on the effectiveness of BOP's Action Plan, making essentially the same assertions it did on March 20, 2020 in a letter to the Court in *United States v Millan*, 91-CR-00685 (LAP) 2020 U.S. Dist. LEXIS 59955  (S.D.N.Y., April 6, 2020) (See *Millan*, *Id., Government Response*, Doc. 1058).  The Government's assurances to the court in *Millan* are instructive:

(1)   "[T]here are currently no reported cases of COVID-19 affecting any inmate in a facility operated by BOP."

(2)   "BOP is well-prepared to handle the risks posed by the coronavirus/ COVID-19, as well as other infectious diseases, and other medica problems of inmates."

(3)   "Given that there are no reported cases of COVID-19 infection in an inmate housed in any BOP facility, and no persons (inmates, staff, attorneys) will be admitted to these facilities without being screened for symptoms and risk of infections, the risk that Defendant himself, or another housed at Defendant's institution will be infected simply as a result of ongoing detention is minimal and entirely manageable,

and the Court should not countenance Defendant's claims to the contrary." (*Id*.)

Eleven (11) days later, the Court in *United States v. Rodriguez*, No. 03-271, 2020 U.S. Dist. LEXIS 1627331 (E.D. Pa., April 1, 2020) stated, "BOP's containment measures have already proven insufficient [The BOP reported cases are growing rapidly and almost certainly underestimate the true numbers of infections]. The questions of whether the Government can protect inmates from COVID-19 is being answered everyday, as outbreaks appear in new facilities." (*Id*.).

## COVID-19 In the BOP

On April 3, 2020, less than two weeks after the Government's pronouncements in *Millan*, Attorney General Barr declared emergency conditions in federal prisons, urging BOP to move vulnerable inmates out of affected institutions. Even with a BOP-wide lockdown since April 1, 2020, the pandemic has spread to more than 70 facilities.  The Government, in its *Response* admitted that on June 22, 2020: "there are 1,338 federal inmates and 169 BOP staff who have confirmed positive test results for COVID-19 nationwide.  Currently, 4,953 inmates and 516 staff have recovered.  There have been 86 inmate deaths and 1 Bop staff member death attributed to COVID-19 disease." (*Id.*).

The figures, in which most inmates appear to "recover" - excluding those who died - are misleading. (fn [7]).  The true medical outcomes are not binary, i.e., either "recovered" or dead.  As the CDC states, nearly 20% of all infections are "severe," or "critical (respiratory failure, shock, or multi organ system dysfunction)." (fn [8]).  The BOP includes as "recovered" those who have not died, those who survived severe illness, hospitalization, intubation and ventilation for weeks, and those who have permanent organ damage (lung, heart, kidney).   These 20%, according to the BOP website and the Government's *Response*, are "recovered."

The more accurate and revealing estimate is derived from the total of known infections, both current and "recovered;" then application of the CDC percentage for "severe," or "critical."  Over 7,000 individuals across more than 70 BOP facilities have been or are infectious, with unreported rates of disability.  By June 26, 2020 - 4 days after the Government's *Response* - inmate deaths increased to

---

[7]     See Judge Breyer's *Order* in *United States v. Trent*, 3:16-CR-00178-CRB (N.D. Cal. April 8, 2020) ("The true number of infected individuals in the federal prison system is vastly greater than the number reported by BOP.") (*Id*., Doc. 105).

[8]     CDC "Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)" (See "Illness Severity") https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

89. (fn [9]).

## Defendant's Facility Has COVID-19 Infections.

During the nationwide BOP lockdown, the Warden of United States Prison Tucson confirmed on June 29, 2020 that "several" Federal Correctional Center staff members have been diagnosed with COVID-19. (fn [10]). (Ex. 14).

Counsel is advised by Defendant that since the nation-wide lockdown, BOP has never tested him for COVID-19, nor taken his temperature, nor screened or interviewed him for COVID-19. Inmates are still transferred between units, against CDC guidelines, and inmate orderlies continue to prepare institutional food, mingling with staff.

The prolonged and indefinite lockdown itself is debilitating, with "lack of sunlight, activity, and only re-circulated air to breathe," posing additional concerns to the elderly and those with medical conditions. In the absence of any effective vaccine, COVID-19 likely will become epidemic in prisons, with lethal outcomes to those of advanced age.

United States Prison staff continue to freely circulate in the Arizona community, now considered as a region of greatest concern for COVID-19

---

[9]   https://www.bop.gov/coronavirus (scroll down to the COVID-19 Cases Section, then click on "Full Breakdown and Additional Details").

[10]   Memorandum of June 29, 2020 to Inmate Population.

infections (fn [11]) with one of the largest "second wave" outbreaks, 90% of ICU

beds are filled and 25% of those tested are positive (fn [12]) (see *DeBartolo* (*Id.*),

where a factor was "the rate of infection [within the greater community].")

## Distinguishing Defendants During Outbreaks.

In this instance where COVID-19 has entered the facility, guidance is

provided by the Court's recent decisions in *Rodarmel* (*Id.*), *Davis* (*Id.*), *Machuca-

Quintana* (*Id.*) And *McGill* (*Id.*) (noting, generally, *United States v. Seymon*, 11-

CR-10040, 2020 WL 2468762 at *4 (C.D. Ill. May 13, 2020), ("The Court does

not seek to minimize the risks that COVID-19 poses to inmates in the BOP...but

the mere presence of COVID-19 in a particular prison cannot justify

compassionate release, if it could, every inmate in that prison could obtain

release.").

Age has been a primary factor considered by the Court. Rodarmel was "not

of advanced age" (43), Davis was "relatively young" (49), Machuca-Quintana was

52, McGill was 38 (fn [13]).  Thus, all defendants were considered under the Medical

---

[11]   https://en.wikipedia.org/wiki/cov-19_pandeic_in_Arizona

[12]   ABC News, July 3, 2020, and see as early as June 16, 2020 the Arizona "second
        wave" at http://www.kuld.com/2020/06/16/southern-arizona-hospitals-
        approaching-icu-bed-capacity-covid ("ICUs are full").  See also June 23, 2003
        article on Arizona State Prisons "Arizona Reports More than 1,100 Coronavirus
        Cases Behind Bars" https://www.latimes.com/world-nation/story/2020-06-
        23/hundreds-coronavirus-cases-arizona-jails-prisons

[13]   See https://bop.gov Inmate Locator, giving age.

Condition Note N.1(A), not the Age of Defendant Note N.1(B) (discussed, *supra*), and were required to show an inability to "self-care" in a correctional setting.

Davis and McGill failed to show a "specific danger" in their institutions, e.g. active infections. Even so, the presence of infections, without more, was deemed insufficient in *Machuca-Quintana*.

Additional factors weighed by the Court, other than the presence (or not) of COVID-19, included time served. Machuca-Quintana had been "in custody less than a year," Rodarmel, "not yet three years." Rehabilitation was also considered. Rodarmel had "not demonstrated substantial rehabilitative efforts" while Davis also "did not cite any extraordinary rehabilitative efforts."

Mr. Pickard is easily distinguished from these cases. At 74, he is of "advanced age" and he has served 20 years, thus exceeding the age and time-served requirements of the Age of Defendant Note N.1(B). "Independently of contracting COVID-19, Mr. Pickard is experiencing a serious deterioration in physical health because of the aging process." (Dr. Baston, *Defendant's Motion*, Ex. 5, p. 3, pgr. 24) (see also Dr. McNalley, *Id.*, Ex. 6, p. 1-3, concurring).

Defendant therefore relies on the declarations of Drs. Baston and McNalley concerning the exceptionally heightened risk of Mr. Pickard contracting COVID-19 in a prison environment, and the greatly increased risk of death or disability

due to his multiple comorbidities. (fn [14]).  He is able to seek more responsive and

aggressive treatment, including renal specialists, MRI, ultrasound, and diet at St.

Vincent's Hospital (see family letter, *Defendant's Motion*, 849-14).

**A Current Review of Applicable Factors from 18 U.S.C. §3553(a) Supports A
Sentence Reduction**.

**Sentence Disparity and the FSA.**

In its *Response*, the Government did not address Defendant's contention

that the FSA may be considered in this instance:

> "Congress's dramatic reduction of penalties under the FSA is applicable
> here.  Life sentences were eliminated in FSA Sec. 401 "Reduce and Restrict
> Enhanced Sentencing for Prior Drug Felonies" and mandatory minimums
> were changed under 21 U.S.C. §841(b)(1)(A)(viii), FSA, Pub. L. No. 115-
> 391, Sec. 401 (a)(2)(A)(ii).  A sentencing disparity may exist therefrom,
> with similar rationale as the §924(C) matter in *United States v. Redd*, 2020
> WL 1248493 (E.D. Va. March 16, 2020) (noting the sentence was "much
> longer than what Congress now deemed an adequate punishment"
> (*Defendant's Motion*, Doc. 849, at p. 31-32).

Defendant was sentenced under the mandatory minimum, not the then-

mandatory Guidelines or the §3553(a) factors. (*Id*. at p. 31).  However,

Defendant's first prior, a lesser state charge, was almost half-a-century ago - 42

---

[14]     In *Davis* and *McGill*, defendants lesser medical issues were considered "well-
controlled."   Mr. Pickard's Stage 3B renal disease is progressive, not
controllable.  His hypertension is not yet managed to the level advised in Stage 3B
Chronic Kidney Disease (i.e., less than 130/90 b.p.).  BOP has taken his blood
pressure only once.  Further, CDC does not suggest that any medications lower
the risk of COVID.

years in the past (fn [15]).  Were Defendant sentenced today, the 1978 matter would

not apply, so that his mandatory minimum would be 15 years.  Defendant has

already served 20 years.  In *United States v. O'Bryan*, No. 96-10076-03-JTM,

2020 WL 869475 (D. Kan. Feb. 21, 2020), this Court observed with regard to the

non-retroactivity of the FSA, "it does not mean that the Court may not or should

not consider the effect of a radically changed sentence for purposes of applying

§3582(c)(1)(A)."

As in *O'Bryan* (*Id.*), the Government here "offers no rejoinder to the prison

record evidence submitted by Defendant indicating rehabilitative progress and

favorable behavior.  The Government has not shown that additional imprisonment

will serve the interests of deterrence, or is necessary to protect the public."

Similarly, as in *United States v. Perez*, 88-10094-1 (D. Kan., March 10,

2020), "the United States does not contest Defendant's statements concerning his

efforts at rehabilitation in prison, nor does it argue he would pose a risk to public

safety if he was immediately released." (*Id.*).

As it did in *O'Bryan* and *Perez*, the Government does not suggest

Defendant poses any risk to society, nor does it indicate a longer sentence would

---

[15]     See County of San Mateo, California, March 21, 1978, Court No. C-7810, with a
sentence of 12 months in jail, 6 months suspended, paroled after several months.

act as a deterrence. The Government does not refute Mr. Pickard's exemplary prison record, his non-violence, his many rehabilitative actions, or his close community and family ties. (*Defendant's Motion*, p. 32-40).

Rather, the Government argues only of "the need for a sentence to provide just punishment, promote respect for the law, and reflect the seriousness of the offense." (*Response*, p. 21). (fn [16]).  With regard to respect for the law, Congress has responded to public and legislative concerns over harsh and lengthy sentences for non-violent drug offenses, by amending Guidelines (fn [17]) and enacting the FSA and CARES Act to lessen severe sentences.  It has eliminated life sentences, resulting in many instances in a "radically changed sentence" (*O'Bryan*, *Id.*), and drastically reduced mandatory minimums for prior offenses.  Thus, Congress itself determined that just punishment did not include the severity of pre-FSA law, and concluded that respect for the law would be enhanced - not reduced - by reducing sentences.

## Sentencing Disparity with Defendants in Prior Cases

---

[16]   The cases upon which the Government relies (*Response*, 21-23) involve heinous financial frauds, arson with 4 deaths, and murder, and are not applicable here. Defendant is non-violent, with no fines or restitution. The cases cited appear not to have Mr. Pickard's strong letters of support - exceptional rehabilitation, and declarations by physicians.

[17]   See, e.g., Amendment 782, revising Drug Quantity Tables, U.S.S.G. §2D.11, reducing base offense level for all drugs even before the FSA.

As it has in many similar prior cases, the Government in its *Response* overestimates the quantities alleged. (*Response*, p. 21, and fn 13 therein) (see also fn [18] and fn [19] *infra*).

Mr. Pickard has served a far longer sentence than defendants in similar prior cases of much larger scale. (fn [20]).  Although the Government made the same claims in those earlier cases, defendants served an average of two to five years (*Id.*).

Mr. Pickard's decades-old non-violent offense does not compare to several

---

[18]   While the Government points to a DEA website (*Response*, fn. 13), stating "41.3 kilograms" was seized, these figures included the weight of inert liquids, described by DEA technician T. McKibben at trial on February 25, 2005 *Transcript*, p. 289-291.  The actual amount was only 300 grams, less than 1% of the quantity alleged. (See Sentencing Hearing, Nov. 24, 2003).

[19]   Drug policy analyst Peter Reuter has described the routine inflation of quantities in his most often cited paper "The (Continuing) Vitality of Mythical Numbers" Public Interest 75:135-139 (1989). Dr. Reuter, one of the six co-authors of the 2019 RAND report (*Defendant's Motion*, Ex. 4), was for this and other rigorous observations awarded the 2019 Stockholm Prize in Criminology (*Id.*).

[20]   See obituary of Augustus Owsley Stanley, "Heads Bowed in Grateful Memory" New York Times March 11, 2011; see also wikipedia.org for Owsley Stanley, noting 2 years served for 500 grams (reported in LA Times - Capital Times, April 11, 1973 as "much of LSD in world," and Oakland Tribune, Dec. 22, 1967 "biggest LSD arrest in history," and see *United States v. Owsley Stanley*, Court No. 42328 (N.D. Cal. Nov. 7, 1973)(sentenced to 3 years); same *United States v. Nicholas Sand and Timothy Scully*, No. CR-73-1306-SC (N.D. Cal. 1974), with Sand serving 6 years and Scully 2 years; see also Santa Rosa, California Press Democrat (Dec. 3, 1977) regarding William Weeks "billions of doses" (five years served); see also *United States v. Denis Lee Kelly*, CR-77-61-1 (D. Oregon, September 16, 1981), reducing a sentence of two years imposed on Denis Kelly on January 5, 1981 (the clearlight organization).

defendants recently granted compassionate release. In *United States v. DuBoc*, 98-

CR-00046-RH (N.D. Florida), regarding a "massive international organization that

distributed hashish and marijuana," the defendant was subject to a "$5,000,000

fine" and a "$100,000,000 forfeiture judgment." (*Id.*, *Government's Response*,

Doc. 468, p. 3).  Though able to self-care, the Defendant in *DuBoc* was granted

release by Judge Hinkle (noting the defendant "committed serious offenses, but he

did so long ago [he is not a danger to the community]").  (*Id.*, Order).  Notable, the

Government in *DuBoc* made the same arguments as here, and cited the same cases

(*DuBoc, Id., Government Response*, Doc. 468, p. 21).  The Court disagreed.  In

contrast, Mr. Pickard had no fine or forfeiture judgment; the Court declared him

indigent.

In *Millan* (*Id.*), the Defendant was 57-years-of-age, had not medical

conditions, and was described by the Court as head of the "Bluethunder" heroin

trafficking organization, a Continuing Criminal Enterprise, with "26

codefendants" including the "Acting Boss of the Bonano Crime Family." Millan

was granted a sentence reduction to time served for "exceptional rehabilitative

achievements" and "extraordinary and compelling letters of support." (*Id.*).

By contrast, Mr. Pickard was not a Career Offender or involved in a CCE,

and his rehabilitative achievements are no less than exceptional.  His letters of

support describing the RAND efforts and personal efforts, are compelling.  His

only codefendant, Clyde Apperson, was recently released. (See Doc. 851).

### "The Most Up-To-Date Picture" - History and Characteristics of the Defendant Now.

As in *United States v. Walker*, 1:11-CR-00270, 2019 WL 5268752 (N.D.

Ohio, Oct. 17, 2019) (citing defendant's "meaningful use of time"), "The Court

should consider post offense developments under §3553(a) in order to take into

account the (1) most up to date picture of Defendant's history and characteristics.

See U.S.S.G. §1B1.13, Application Note 3."  The Government here focuses on

events 20 years ago, and "fails to consider that the present plea for compassionate

release is based on conditions that have changed completely" in the 20 years since

the offense (*United States v. Andre Williams*, 3:04-CR-00095-MCR, 2020 U.S.

Dist. LEXIS 63824 (N.D. Florida, April 1, 2020).

The Government does not dispute any of the §3553(a) factors and

rehabilitative efforts in Defendant's Motion (*Motion*, p. 31-40), further

characterizing Defendant's fentanyl and RAND work as "praiseworthy."  It does

not dispute his "extensive education efforts" at the BOP level, his exemplary

conduct while in prison, his work as a law librarian, his public interviews by

groups of students, his tutoring GED and literacy, his public speaking, and his

years of work with Richard Shelron, Regents Professor Emeritus of English and Creative Writing at the University of Arizona.

The Government does not contest his thousands of hours of copy editing and proofreading of full-length academic manuscripts, or his acknowledgments for contributions not only in the RAND book, but in other prominent publications including Mark Kleiman's "When Brute Force Fails - How to Have Less Crime and Less Punishment" (Princeton University Press, 2009); Jonathan Caulkins's "Drugs and Drug Policy - What Everyone Should Know" (Oxford University Press, 2011); Bev Westhoff's "Fentanyl Incorporated" (Grove Atlantic, 2019); and his editing in Dennis McDougal's history of the musician/poet Bob Dylan ("Dylan - the Biography" Turner, New York, 2015). (*Defendant's Motion*, p. 33-34).

In this *Reply*, it may be noted that Mr. Pickard also has been acknowledged for contributions to other Oxford publications, the first and second editions of the lending work on States' Regulatory Health and Enforcement issues with cannibis (B. Kilmer et al. "Marijuana Legalization - What Everyone Should Know" Oxford University Press, 2015 and 2018 editions (Ex. 3, Ex. 4) (fn [21]).  Further, he has been acknowledged for editing in several non-academic works, including the

---

[21]     "We received many useful comments on this volume and other assistance from friends and colleagues, including...a federal prisoner who prefers not to be named."

Vietnam fiction of Dennis McDougal ("The Candlestick Maker" Rosebud Press, 2011); and Donna Frees's "American Psychic - A Spiritual Journal from the Heartland" (Post Hill Press, 2018).  As a courtesy to a dying friend, Mr. Pickard edited the personal Vietnam memoir of Agent Orange victim and Bronze Star winner Mike Shimek ("Conscious from a Canopy" Amazon, 2013).

Mr. Pickard's rehabilitative efforts are creative and mixed. The Warden of CCA Leavenworth stated:

> "Mr. Pickard has displayed what seems to be a sincere desire to spend his time in custody productively.  He has worked as a Law Librarian for three years and has served on Inmate Panels when high school and college groups tour the facility.  Mr. Pickard maintains a positive, respectful and helpful attitude when dealing with staff personnel as well as other inmates.  He has a clear disciplinary record and is not considered a management problem at our facility." (Ex. 5).

His other activities are diverse, e.g.:

(1)   While a Law Librarian, Mr. Pickard applied to and was accepted to the LLB program at the University of London (Ex. 6) (fn [22]);

(2)   He proposed establishing in federal prisons inmate readers to support "Recordings for the Blind and Dyslexic" (RFB) in Princeton, N.J. (See Letter to BOP Director, Ex. 7);

---

[22]   The External Programme at the University of London was established in 1858. The LLB is the American JD.  Mr. Pickard could not afford tuition, being indigent.

(3)     At USP Victorville, he gathered twenty-five inmate volunteers, and

was Inmate Coordinator in establishing a nascent recordings for the

blind program (see flyers and letters, Ex. 8);

(4)     He was Inmate Coordinator for Toastmasters (Ex. 9);

(5)     He assisted Electronic Frontier Foundation (EFF.org) in analyzing

large data sets of FOIA records (see Ex. 10, letter of David Sobel,

Lead Attorney of EFF in Washington, D.C.);

(6)     Other than fentanyl, he suggested to DEA that the novel drug "PT-

141" be temporarily scheduled in Schedule I of the Controlled

Substances Act (see letter from Michele Leonhardt, Deputy

Administrator, noting as yet "no indication of abuse in humans" (Ex.

11) (PT-141 was withdrawn from Phase 2 FDA trials months later);

(7)     Through interaction with DOJ Office of Information and Privacy, he

demonstrated that NADDIS Records were included under the

Freedom of Information and Privacy Act, and prepared a monograph

on NADDIS for courts, researchers and attorneys (Ex. 12);

(8)     As noted, he applied the work of RAND game theorist Thomas

Schelling to prisons, in an effort to reduce alcohol and gang-mediated

violence, for the Yale Law Journal prison writing project (Ex. 1).  Its

34

application at United States Prison Tucson reduced alcoholism and
violence to a "low equilibrium" (*Id.*).

The Government does not dispute "other" efforts cited in Defendant's
Petition (*Defendant's Motion*, Ex. 1, p. 6-7, pgrs. 38-42) including "Since 2015 [at
the outset of the fentanyl epidemic] Mr. Pickard has been the only federal inmate
registered as a volunteer on the Peer Review Board of the Department of Justice,
Bureau of Justice Assistance, Office of Justice Programs (DOJ, BJA/OJP)." (*Id.* at
pgr. 39).

The Government further does not contest the letters from Ben Sessa, M.D.,
Julie Holland, M.D., and Carlo Rovelli, Ph.D.

Mr. Pickard has a loving family waiting for him. (*Defendant's Motion*, Doc.
849, Ex. 14).  He poses no risk of recidivism (Ex. 13).  The Government does not
consider him any threat to the community.  Thus, "in combination with" Mr.
Pickard's advanced age and his 20 years of incarceration, other considerations
include his significant and continuing contributions to criminal justice and drug
policy, his societal contributions, his acknowledgments in many publications, his
exemplary behavior while imprisoned, his age-related and progressive medical
conditions, and his strong community ties and letters of support.  Hence, this
request for compassionate release is respectfully submitted.

**WHEREFORE**, the Defendant respectfully requests this Court reduce his sentence to time served and modify the terms of supervised release as this Court deems appropriate.

Respectfully submitted,


s/Wendie C. Miller
Wendie C. Miller, #21781
1540 N. Broadway St. Suite 201
Wichita KS 67214
316.500.6767
Wendie.miller1974@yahoo.com
Attorney for Pickard

## CERTIFICATE OF SERVICE

I, hereby certify that on the 20th day of July, 2020, I electronically filed the foregoing objection with the Clerk of the United States District Court by using the CM/ECF system which will send a notice of electronic filing to interested parties of record.

s/Wendie C. Miller
Wendie C. Miller, #21781

## EXHIBIT LIST

Exhibit 1: Schelling's Rule

Exhibit 2: Purdue Letter

Exhibit 3: Oxford book, 1st edition, acknowledgments

Exhibit 4: Oxford book, 2nd edition, acknowledgments

Exhibit 5: Warden letter, CCA Leavenworth

Exhibit 6: University London Acceptance

Exhibit 7: Letter to BOP Director regarding Recording for Blind

Exhibit 8: Flyer and letters on Recording for Blind

Exhibit 9: Toastmasters Letter

Exhibit 10: Electronic Frontier Foundation Letter

Exhibit 11: Letter from Deputy Administrator, DEA

Exhibit 12: NADDIS monograph

Exhibit 13: BOP Recidivism Risk Low

Exhibit 14: Memorandum from Warden